IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| EUGENE KLINE, et al., ) | CASE NO. 3:08cv408 |
| ) | |
| Plaintiffs, ) | JUDGE WALTER HERBERT RICE |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| MORTGAGE ELECTRONIC SECURITY ) | |
| SYSTEMS, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO AMICUS BRIEF OF WELLS FARGO, BARCLAYS CAPITAL AND MERS "CORRECTING MISREPRESENTATIONS"**

Plaintiff Eugene Kline, on behalf of a putative class and by his counsel Paul Grobman, submits this Memorandum in response to the Amicus Brief filed by defendants Wells Fargo Bank, N.A. ("Wells Fargo"), Barclays Capital Real Estate ("Barclays/HomEq") and Mortgage Electronic Registration Systems, Inc. ("MERS") (hereinafter "Amicus Br.") which purportedly "correct[s] Plaintiff's misrepresentations with respect to discovery contained in his Memo in Opposition to Defendants' Reimer, Lorber and Lerner Sampson's Request for Summary Judgment." (Amicus Br., p. 1)

In the Amicus Brief, Wells Fargo, Barclays/HomEq and MERS repeatedly accuse plaintiff and his counsel no less than nine different times of attempting "to mislead the court" about the status of discovery in this case. (See Amicus Br., pp. 1, 4, 5, 6, 8, 10, 12)  However, defendant's willingness to make these serious accusations does not

constitute evidence, which is in conspicuously short supply in the Amicus Brief. As shown below, even a cursory review of the record evidence demonstrates that it is the defendants who – having repeatedly failed to produce timely discovery in this action – now make reckless and completely false accusations regarding what has transpired in this case.[1]

> 1. **Defendants' False Accusation That The New Documents Produced After the Rule 30(b)(6) Depositions Were Not Requested By Mr. Kline During Discovery**

As plaintiff related to the Court in its extension requests dated April 9, 2015 and May 7, 2015, each of the corporate defendants produced numerous additional documents which were subject to plaintiff's discovery requests after defendants' Rule 30(b)(6) depositions in February 2015 were concluded, and after the March 1, 2015 deadline for discovery in the Scheduling Order had passed.

Among the new documents produced were:

- **March 17, 2015**: Wells Fargo produces 61 pages of additional documents relating to Mr. Kline's loans and certain policies and procedures relating to Wells Fargo's role as trustee and custodian of those loans; (See letter dated April 10, 2015 annexed to the Declaration of Paul Grobman dated July 23, 2015 ("Grob. Decl.") as Exhibit A)

- **March 26, 2015**: Barclays produces 18 pages of additional documents relating to Mr. Kline's loans, including Transaction and Escrow Activity histories showing each transaction in Mr. Kline's loan account, including the posting of legal fees and expenses therein; Id.

---

[1] As the Court is aware, Wells Fargo, MERS and Barclays/HomEq's obfuscatory conduct during discovery in this litigation resulted in the Court granting motions to compel against each of these defendants in October 2014, as well as the award of attorney's fees to plaintiff. (See Oct. 1, 2014 Order)

- **March 26, 2015**: MERS produces 1,326 pages of additional documents relating to its policies and procedures for loans on the MERS System, including policies relating to foreclosure. In addition, in a four-page cover letter, MERS indicated that it was withholding documents on the basis of the attorney-client privilege, the bank examination privilege, though it refuses to provide a Privilege Log. (Id.)

- **June 19, 2015**: Wells Fargo produces documents relating to Wells Fargo's inspection of Mr. Kline's loan documents. (See June 19, 2015 email annexed to Grob. Decl. as Exh. B)

- **June 23, 2015**: Wells Fargo produces Custodial Agreements which set forth Wells Fargo's obligations with respect to holding and transferring the loan documents for the Trust which bought Mr. Kline's loans from Merrill Lynch. (See Transmittal Email annexed to Grob. Decl. as Exh. C hereto).

- **June 25, 2015**: Wells Fargo produces documents relating to requests to release Mr. Kline's original mortgage documents in connection with the foreclosures on plaintiff's property in 2005 and 2007. (See Transmittal Email annexed to Grob. Decl. as Exh. D)

With regard to each of these belated document productions, the Amicus Brief repeatedly asserts that the documents produced were never sought by Mr. Kline in his written discovery demands, but rather were "requested for the first time" during the February and June 2015 depositions. (Amicus Br., p. 6, 8, 11, 12)  This is patently false.

Thus, according to Wells Fargo, "plaintiff expressly sued Wells Fargo in its capacity as Trustee", not the custodian, of Mr. Kline's, and thus plaintiff's document requests did not require Wells Fargo to produce Custodial Agreements or the so-called "Warehousing Agreement" between Wells Fargo and Merrill Lynch relating to Wells

3

Fargo's inspection, possession and transfer of Mr. Kline's loans. (Amicus Br. pp. 6-7). However, in Plaintiff's First Request for the Production of Documents served on Wells Fargo in 2013, plaintiff specifically asked for the following documents which clearly encompass the agreements between Wells Fargo and Merrill Lynch relating to Wells Fargo's responsibilities with regard to loans such as Mr. Kline's:

1. *Any and all* documents in any loan file within Wells Fargo's possession, custody or control *relating to Kline's loans*, including all documents relating to the transfer or assignment of Klines' loans to different owners, holders or servicers.

4. *Any and all contractual agreements between Wells Fargo, on the one hand, and Merrill Lynch Investors Trust Mortgage* Asset-Backed Certificates, Series 2004-WMC5, on the other, relating to (i) the type of services performed by Wells Fargo for any of the plaintiffs' mortgage loans; and/or (ii) the compensation Wells Fargo was entitled to receive for such services.

6. To the extent not covered by any previous requests*, any and all other contractual agreements in Wells Fargo's possession*, custody or control relating to (i) *services performed by any third party* in connection with the foreclosure action against Kline; or (ii) the compensation those third-parties were entitled to receive for such services…

(See Exhibit 4 to Amicus Brief, pp. 5-6 (emphasis added))

Similarly, the Amicus Brief asserts that plaintiff never requested documents relating to "requests to release of plaintiff's original mortgage documents" received by Wells Fargo "in connection with the foreclosures" on his property in written discovery, but claims "that the *first time* these documents were ever sought was at the deposition of Wells Fargo's designee, Patrick Gorrien, on June 11, 2015." (Amicus Br., p. 8 (emphasis in original)) Wells Fargo does not even attempt to explain how the claim that plaintiff never sought documents relating to Wells Fargo's transfer of Kline's original mortgage

4

documents during foreclosure was not encompassed within document Requests # 1 and #2 served on Wells Fargo —demanding all documents in Wells Fargo's possession "relating to Kline's loans" – or Request #16, demanding "all written communications relating to any of the plaintiffs' loans." (Exh. 4 to Amicus Br., pp. 5-7)

Thus, it is simply false to contend that plaintiff never sought "any information or documentation about Wells Fargo's custodial responsibilities" relating to Mr. Kline's loan before the deposition of Wells Fargo's corporate designee on February 26, 2015, as Wells Fargo claims. (Amicus Br., p. 12) Plaintiff demanded that Wells Fargo produce "any and all documents" in its possession "relating to Kline's loans", which clearly encompasses how Wells Fargo handled Kline's loan documents in its role as custodian.[2]

2. **Defendants' Claim That The New Documents Produced By Barclays After The Discovery Deadline Are Irrelevant**

The Amicus Brief also asserts that Mr. Kline is attempting to mislead the Court that the documents produced by Barclays/HomEq on March 26, 2015 indicate that defendants (a) concealed the fact that Mr. Kline had an Escrow Balance in his account after fully paying off his loans, and (b) secretly deducted legal fees and/or expenses from

---

[2] The Amicus Brief also asserts that "the custodial role of Wells Fargo in storing mortgage instruments in a secure place is entirely irrelevant to these proceedings." (Amicus Br., p. 8) However, in the 2005 foreclosure against Mr. Kline, MERS was the plaintiff and identified itself as the owner and holder of Mr. Kline's first mortgage. At the June 11, 2015 deposition, Wells Fargo's Rule 30(b)(6) witness admitted that MERS was not in possession of the note in 2005, when it claimed to be the holder and owner:

> Q Was -- was MERS in possession of the note in 2005?
> A Not that I'm aware of.
> Q Was MERS in possession of the mortgage in 2005?
> A Not that I'm aware of.

(Dep. of Patrick Gorrien, Grob. Decl. Exh. E, p. 91; see also pp. 92-94 (admitting that Wells Fargo – not MERS -- held loan documents for Trust after 2004)

5

that Escrow Balance to reduce it to zero. According to the Amicus Brief, while Barclays'/HomEq's treatment of Mr. Kline's escrow Account was "highly unusual" and indeed "inexplicable", "all amounts collected from Plaintiff . . . were fully authorized by the loan documents and applicable law." (Amicus Br., p. 9)

Again, defendants unsupported representations in this regard are directly contrary to the June 10, 2015 testimony of Jacklin Cartmill, who was produced by Barclays/HomEq as its Rule 30(b)(6) representative. In fact, Barclays' witness admitted that she had no idea whether charging Mr. Kline for these legal fees and/or expenses through "fee adjustments" to his Escrow Balance after payoff were legal:

> Q And I'm asking you, you don't know whether
>  this was consistent with HomEq practice?
> A I do not know.
> Q You don't know whether it was consistent with the loan
> documents?
> MR. POPE: Objection. Go ahead.
> A. I do not know.
> Q And you don't know whether it was consistent with the
> law?
> MR. POPE: Objection. Go ahead.
>  A I don't know.

(Cartmill Dep. excerpts annexed to Grob. Decl. as Exh. F, pp. 82-83)

The Amicus Brief also repeatedly asserts that the belated production was also irrelevant to plaintiff's claims, because "the bottom line is that Plaintiff was never charged [for] Reimer, Lorber's attorney's fees." (Amicus Br., p. 10; See also p. 11 ("as Plaintiff knows, no Reimer, Lorber attorney's fees were ever charged to, or collected from, Plaintiff") The Amicus Brief charges that "Mr. Grobman fully understands this, but overtly tries to mislead the Court into believing" otherwise. (Amicus Br., p. 10)

Incredibly, defendants make this reckless accusation despite the fact that Barclays

6

own witness testified on June 10, 2015 that she did not know whether Mr. Kline was charged for the Reimer firm's attorney's fees. Thus, referring to the assertion in Dennis Reimer's affidavit submitted in support of Reimer Lorber's motion for summary judgment that none of Reimer Lorber's fees were passed on to Mr. Kline, Ms. Cartmill said the following:

> Q Now, in his affidavit here, Mr. Reimer says -- if you turn to Paragraph 3. "The only monies the Reimer firm received in connection with the 2007 foreclosure case for fees were paid to it by HomeEq for legal fees earned. The Reimer firm did not seek to collect, nor did it collect attorney's fees from plaintiff Kline with respect to the payoff of the first mortgage on his property. Nor were any of the Reimer firm's attorney's fees passed on to Mr. Kline with respect to the payoff of the first mortgage on his property." Now, in particular, nor were any of the Reimer firm's attorney's fees passed on to the -- Mr. Kline. Do you know whether that's an accurate statement?
> A. I do not.
>
>     \*        \*        \*        \*
>
> Q The Reimer firm's -- we saw that the Reimer firm's attorney's fees were added to corporate advance, weren't they?
> A Yes. . . .
> Q And when they are added to corporate advance, that means they are recoverable from the borrowers; isn't that correct?
> MR. POPE: Objection. Go ahead.
> MS. PETERS: Objection.
> A. Yes. However, if it's determined that they are not recoverable, then they can later be reclassified or moved to nonrecoverable.

(Grob. Decl. Exh. F, pp. 91-93)

The Amicus Brief also asserts that plaintiff falsely suggests that the defendants concealed their deduction of legal fees and/or expenses from Mr. Kline's Escrow Balance until the new Escrow Account history was produced on March 26, 2015, one month after

7

the completion of discovery. (Amicus Br., p. 11) According to the Amicus Brief, "none of the documents requested since the close of discovery, and produced as a matter of professional courtesy by Defendants, reveals an effort to conceal facts not previously known to Plaintiff ." (Id. at 13)

Again, however, this assertion is directly at odds with the testimony of Barclays witness, who admitted that the previous Escrow Activity history provided by Barclays concealed the Escrow Balance in Mr. Kline's account after payoff, as well as the deduction of attorney's fees and/or expenses which reduced that Escrow Balance to zero:

> Q. If the borrower is looking at [the prior Escrow Activity history provided to Mr. Kline], would the borrower have any way of knowing that there was an escrow balance remaining . . . after payoff?
> A. No.
> Q. And would the borrower know that there were two transactions in escrow which took that balance and turned it into zero?
> A They would not.
> Q Do you know whether the borrower was apprised, at any point before [the new Escrow Activity history] was produced on March 26th of 2015, that these transactions that we are talking about, which don't exist on [the prior Escrow Activity history], had been disclosed? . ..
> A. I -- I don't know how the borrower would know.

(Cartmill Dep., Grob. Decl. Exh. F, pp. 74-75)

### 3. Documents Which MERS Continues To Refuse To Identify Or Disclose

As previously stated, on March 26, 2015, MERS produced 1,326 pages of additional documents relating to its policies and procedures for loans on the MERS System, including policies relating to foreclosure. In addition, in a four-page cover letter, MERS indicated that it was withholding documents on the basis of the attorney-client privilege, the bank examination privilege, and privileges which purported exist under

8

various sections of the Code of Federal Regulations. Despite repeated requests, MERS has yet to identify these documents, much less provide a Privilege Log as required by the Federal Rules. (See letter from MERS' attorney dated June 2, 2015 annexed to Grob. Decl. as Exh. G)

As we have repeatedly advised, MERS is not a bank, and thus the bank examination privilege would not appear to apply. Moreover, while MERS has argued that plaintiff must first seek the withheld documents from federal agencies before demanding them from MERS, this argument was squarely rejected by the Sixth Circuit in In re Bankers Trust, 61 F.3d 465 (6th Cir. 1995) The Sixth Circuit also held that – even if it applies -- purely factual material is not covered by the privilege.

In any event, it is impossible to determine whether the privileges asserted by MERS are valid without a privilege log. Rule 26 of the Federal Rules of Civil Procedure demonstrates that a party cannot assert that documents are privileged without producing a privilege log:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
>
> (i) expressly make the claim; and
>
> (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

The requirements imposed by Rule 26(b)(5) exist irrespective of the type of privilege asserted, and have been regularly invoked in cases in which documents are purportedly protected by the bank examination privilege. See Marketing Investors Corp. v. New Millennium Bank, 2012 U.S. Dist. Lexis 52998, *23( N.D. Tex. 2012) (requiring

defendant to identify all documents in its possession "that it contends may be subject to the FDIC's bank examination privilege", and to "compile a privilege log in conformity with Rule 26(b)(5) that identifies those specific documents")  Parties who fail to provide a privilege log are routinely held to have waived the privilege, and required to produce the allegedly-privileged documents.  <u>Brown v. Tellermate Holdings Ltd.,</u> 2013 U.S. Dist. Lexis 48278, *6 (S.D. Ohio 2013) ("the failure to provide the [privilege] log in a timely manner waives the privilege.")  <u>Itskin v. Gibson</u>, 10cv00689 (S.D. Ohio Nov. 7, 2011) ("as Plaintiff has failed to provide a privilege log or present specific privilege contentions relating to any particular documents, the Court finds Plaintiff has failed to carry his burden of establishing privilege as to any specific item or document.").

CONCLUSION

The record demonstrates that --  having engaged in a pattern of producing untimely discovery in this case – the defendants now attempt to distract attention from those failures by recklessly accusing plaintiff of attempting to mislead the Court.   These accusations are completely without any basis, and demonstrate defendants' fear of having the issues herein determined on the merits.

/s/ Paul Grobman
Paul Grobman (Pro Hac Vice)
555 Fifth Avenue, 17th floor
New York, New York 10017
T. 212-983-5880
F. 212-682-7060
*Counsel for Plaintiff*