**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| EUGENE KLINE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 3:08cv408 |
| | ) | |
| vs. | ) | JUDGE WALTER HERBERT RICE |
| | ) | |
| | ) | |
| MORTGAGE ELECTRONIC SECURITY | ) | |
| SYSTEMS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO WELLS FARGO'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Eugene Kline submits this Memorandum in opposition to the motion for

summary judgment filed by defendant Wells Fargo Bank, N.A. ("Wells Fargo").   As

shown below, there is ample evidence that Wells Fargo has charged plaintiff for improper

fees and expenses, and thus the motions must be denied.

**STATEMENT OF FACTS**

In 2004, Mr. Kline entered into two loan transactions with WMC Mortgage

Corporation involving a First Mortgage for $160,000, and a Second Mortgage for

$30,000.00.   MERS was the nominee on the loan documents for both of the loans.  (See

loan documents for First Mortgage annexed to Declaration of Paul Grobman ("Grob.

Decl.") as Exh. A; Loan documents for Second Mortgage annexed to Grob. Decl. as Exh.

B)   HomEq was the servicer on both of Mr. Kline's loans.

Unbeknownst to plaintiff, in 2004, both loans were transferred by WMC to a Merrill Lynch entity, which then transferred them to a securitized Trust titled "Merrill Lynch Mortgage Investors, Inc. Mortgage Loan Asset Backed Security Series 2004-WM5" ("the 2004 Trust"). (Deposition of Barclays Rule 30(b)(6) witness Matthew Perry dated Feb. 25, 2015 (hereinafter "Barclays Dep.") annexed to Grob. Decl. as Exh. C, pp. 183-86, 192; Pooling & Servicing Agreement annexed to Grob. Decl. as Exh. D)  Wells Fargo was the Trustee which held both of Mr. Kline's loans.  (Grob. Decl. Exh. D; Barclays Dep. Grob. Decl. Exh. C, p. 186)

### A.  The First Foreclosure Action Against Plaintiff

In early 2005, Mr. Kline fell behind on his payments, and his loan was put in default.   In August 2005, Reimer commenced foreclosure proceedings against the plaintiffs and others in state court in Montgomery County, Ohio on behalf of an entity identified as "Mortgage Electronic Registration Systems, Inc. c/o HomEq Servicing Corp", which claimed in the Complaint that it owned and held the loan ("the 2005 Foreclosure Action").  Among the defendants in the 2005 Foreclosure Action was an entity which was also identified as "Mortgage Electronic Registration Systems" with an address in Ocala, Florida.  (See 2005 Complaint, Grob. Decl. Exh. E)

On November 18, 2005, judgment for the MERS plaintiff against Kline and the MERS defendant, among others, was entered in the 2005 Foreclosure Action.  Thereafter, Kline contacted MERS, Reimer and Barclays about attempting to remove the First and Second Mortgages from foreclosure.

 By letter dated December 5, 2005, Reimer, on behalf of MERS, wrote to Kline, advising him of the amount necessary to reinstate the First and Second Mortgages. (Dec.

2

5, 2005 letter annexed to Grob. Decl. as Exh. F)   In December 2005, Kline paid the amounts demanded in the December 5, 2005 letter, and the 2005 Foreclosure Action was dismissed

### B. **The Second Foreclosure Action Against Kline**

In late-2006, back problems caused Mr. Kline to miss work, and he again fell behind on his mortgage payments.. On March 16, 2007, a party named "Wells Fargo Bank, N.A., as Trustee" commenced a foreclosure action against Eugene Klein in the Court of Common Pleas for Montgomery County, Ohio (hereinafter "the 2007 Foreclosure Action").  (See 2007 Foreclosure Complaint annexed to Grob. Decl. as Exh. G.)  Wells Fargo was represented in the action by the Reimer firm.  (Id.)

In its Complaint for foreclosure, Wells Fargo represented to the Court that it "is the owner and holder" of the promissory note on the Klein's mortgage, and that it "is the owner and holder of the [] mortgage deed."  (Grob. Exh. G)   However, a document entitled "Assignment of Mortgage" which purportedly assigned the note and mortgage from defendant Mortgage Electronic Registration Systems (hereinafter "MERs") to Wells Fargo was not executed until March 26, 2007, after the action commenced.  (See Assignment, Grob. Decl. Exh. H;  Grob. Decl. Exh. C (Barclays witness says he does not know why an assignment of mortgage was executed to Wells Fargo if the note and mortgage had already been assigned)

In the Complaint, Wells Fargo also sued "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" as the purported holder of the Second Mortgage on Kline's property (Grob. Decl. Exh. G).   However, the Second Mortgage was not owned by "Mortgage Electronic Registration Systems, Inc. as nominee

for WMC Mortgage Corporation", but rather by the 2004 Trust, the same entity which owned the owned the First Mortgage.

On or about May 17, 2007, "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" filed an Answer in the 2007 Foreclosure Action in which it represented that "it has an interest in the property which is subject of the Complaint", that "there is due from the defendant" Kline $28,858.40 plus interest, court costs and advances, "that it holds a valid mortgage lien upon the real estate described in the plaintiff's Complaint", and requesting "that its interest be protected" and that its lien be paid from the proceeds of the sale." The Answer was signed by Lerner Sampson on behalf of MERS. (See Answer annexed to Grob. Decl. as Exh. I)

By Order dated October 23, 2007, the court granted Wells Fargo's motion for summary judgment against Kline and ordered Kline's home sold. The Court also noted that "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" claimed an interest in the premises arising from the Second Mortgage, and that MERS would have the right to seek to apply that interest to the proceeds of the sale of Kline's property.

In November 2007, Kline's attorney requested figures from the defendants for the amounts necessary to payoff both the First and Second Mortgages. By letter dated November 15, 2007, Reimer advised Kline's attorney of the amount necessary to pay off the First Mortgage on behalf of Wells Fargo. Among other things, the letter demanded $178.00 in late fees and $2,410.00 in "court costs" associated with the 2007 Foreclosure Action, including costs associated with serving process on the second mortgage holder. (11/15/2007 letter annexed to Grob. Decl. as Exh. J)

4

By letter dated November 14, 2007, Lerner Sampson provided a payoff quote to Kline's attorney in the 2007 Foreclosure Action on behalf of the Second Mortgage purportedly owned by MERS.  Among other things, the Payoff Quote demanded $225 in "Previous Service Costs" and $350 in "Attorney Costs."  (11/14/2007 letter annexed to Grob. Decl. as Exh. K)

On or about November 20, 2007, Kline was forced to sell his house to pay off the amounts which were demanded by and allegedly owed to Wells Fargo and MERS on the First and Second mortgages.   Of the $251,750.00 contract price paid for the home, Wells Fargo and HomEq represented that $176,332.28 was owed to them on the first mortgage, and MERS and HomEq represented that $32,946.43 was owed on the second mortgage. The amounts included (i) legal expenses purportedly incurred by the holder of the First Mortgage in suing the holder of the Second Mortgage in the 2007 Foreclosure Action, including amounts associated with service of process; and (ii) legal fees and expenses purportedly incurred by the holder of the Second Mortgage in defending against the suit brought by the First Mortgage holder.

By letter dated December 19, 2007, Kline requested that the defendants provide an itemization of the attorney's fees and expenses collected from Kline relating to the 2007 Foreclosure involving the First and Second Mortgages.  (Grob. Decl. Exh. L)

By letter dated February 7, 2008, Reimer responded to Kline's request for an itemization of the amounts collected from Kline by Wells Fargo.  (Grob. Decl Exh. M) The letter represented that $803.00 of the amount collected by Wells Fargo was for a "Preliminary Judicial Report", $507.00 was for the Complaint, $450.00 was for "Process Service", $150.00 was for a "Final Judicial Report" and $500.00 was for "Deposit for

Order of Sale." An attachment to the letter also indicated that Kline was charged for at least one late fee after his loan was accelerated. The Reimer letter also attached an Escrow Account history which showed that Mr. Kline had an Escrow Balance of zero after Payoff. (Grob. Decl. Exh. O)

By letter dated February 19, 2008, Lerner responded to Kline's request for an itemization of the amounts collected from Kline by MERS which were listed in the November 14, 2007 payoff. (Grob. Decl. Exh. N) In the February 19, 2008 letter, defendant Lerner Sampson said the following with regard to the defendants' right to recover the "attorney costs" of $350.00 from plaintiff Kline:

> With respect to your inquiry on the attorney costs . . . please be advised that these costs were incurred by my client in the protection of its security/mortgage as provided in paragraph 7 of the mortgage. . . . The attorney fees in the amount of $350.00 were incurred by my Client to protect its interest when named as a defendant in the Lawsuit initiated by Wells Fargo Bank, N.A. My office reviewed all pleadings and correspondence (including the complaint, answers, motion for summary judgment and opposition), prepared and filed the answer, and attended the telephone pretrial.

As for the "Previous Service Costs" of $225.00, the Lerner Sampson letter explained them as follows:

> [T]he sum of $225.00 was paid to 3 Arch Trustee Services, Inc. for the servicing of this loan and monitoring of the lawsuit with services that included obtaining local counsel, production of necessary documents and loan information, and billing of invoices. (Grob. Decl. Exh. N)

### C. **The Instant Lawsuit**

In November 2008, plaintiff brought this putative class action against the defendants on behalf of himself and all other similarly situated individuals, alleging claims under the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et. seq. ("the

FDCPA"), the Truth In Lending Act, 15 U.S.C. §1602 et seq. ("TILA"), breach of contract, unjust enrichment and violation of the Ohio Consumer Sales Practices Act ("the OCSPA"). Despite over a dozen motions seeking dismissal of these claims filed by defendants between 2008 and 2014, each of these causes of actions remain pending against some or all of the defendants.

In 2012, this Court allowed discovery to go forward on both the class and individual claims. Thereafter, plaintiff served document and interrogatory requests on Barclays in June 2012, on MERS in August 2012, and on Wells Fargo on November 4, 2013. MERS served its written responses to plaintiff's discovery requests in March 2014, Barclays in June 2014, and Wells Fargo served its discovery responses in June 2014.

On October 1, 2014, this Court granted plaintiff's Motions to Compel, ordering MERS, Wells Fargo and Barclays to provide plaintiff with additional discovery. (Order, Dock. #377) MERS provided additional discovery ordered by the court on October 22, 2014, Wells Fargo on October 22 and November 10, 2014, and Barclays on January 6, 2015.

In February 2015, depositions of each of the parties were taken. During those depositions, there was extensive testimony from the defendants about charges which plaintiff claims are illegal: the post-acceleration late fees and attorneys fees collected from Mr. Kline in the 2005 Foreclosure Action; the service of process fees charged to Mr. Kline relating to the First Mortgage holder serving process on the Second Mortgage holder in the 2007 Foreclosure Action; the attorneys fees charged in representing the holder of the Second Mortgage in the 2007 Foreclosure Action; and the amounts

collected from Mr. Kline relating to the outsourcing services provided by 3-Arch Trustee Services on the Second Mortgage in the 2007 Foreclosure Action.

In addition, Barclays' initial Rule 30(b)(6) witness Matthew Perry acknowledged in his February 2015 deposition that Mr. Kline had been charged at least four late fees after acceleration in the 2005 Foreclosure Action, (Barclays Dep., Grob. Exh. C, pp. 279-280) and one late fee for $69.12 after his loan was accelerated in 2007. (Exh. C, pp. 264-71), (Perry Dep., Grob. Decl. Exh. C, pp. 264-71) While Barclays witness stated that the assessment of the 2007 post-acceleration late fee was an error, and should have been returned to Mr. Kline by check, (Grob. Exh. C, pp. 268-69), defendants never returned that erroneous late fee charge to him after payoff.

After the February 2015 depositions and the March 1, 2015 discovery deadline had passed, each of the corporate defendants produced additional documents. Among the documents belatedly produced were a new Escrow Activity History which disclosed transactions which had been omitted and misrepresented in the prior Escrow History produced by the defendants in this litigation. (Grob. Decl. Exh. O). While the prior Escrow History produced by defendants indicated that Mr. Kline had an Escrow Balance of zero after Payoff, the new history showed that there was in fact a $412.96 Escrow Balance owed by Wells Fargo to Mr. Kline. (BC18800, at line 12/3/2007) Moreover, the new Escrow History also showed two new post-payoff transactions which had been previously concealed by Wells Fargo and the other defendants, in which they made two so-called "Fee Adjustments" (one for $158.00 and one for $324.08) to the Escrow Balance to bring that amount from $412.96 down to zero. (Id. at line 12/11/2007, 12/24/2007) The documents also showed that Wells Fargo had added legal fees paid to

the Reimer firm to Mr. Kline's account balance after he paid off his loan, which then appeared to have been taken out of the Escrow Balance.

On June 10-12, 2015, plaintiff's counsel travelled to Baltimore to take additional depositions of Barclays, MERS and Wells Fargo relating to the newly-produced documents. At the further deposition of Barclays' Rule 30(b)(6) witness on June 10, 2015, Barclays' deponent Jacklyn Cartmill admitted that the previous Escrow Activity history provided by Barclays and Wells Fargo omitted the transactions showing that there was an Escrow Balance in Mr. Kline's account after payoff, and that that balance had been reduced by deducting attorneys fees and/or expenses which previously had not been disclosed:

> Q. If the borrower is looking at [the prior Escrow Activity history provided to Mr. Kline], would the borrower have any way of knowing that there was an escrow balance remaining . . . after payoff?
> A. No.
> Q. And would the borrower know that there were two transactions in escrow which took that balance and turned it into zero?
> A They would not.
> Q Do you know whether the borrower was apprised, at any point before [the new Escrow Activity history] was produced on March 26th of 2015, that these transactions that we are talking about, which don't exist on [the prior Escrow Activity history], had been disclosed? . ..
> A. I -- I don't know how the borrower would know.

(See excerpts from the June 10, 2015 Deposition of Jacklin Cartmill annexed to Grob. Decl. as Exh. P, pp. 74-75)

Ms. Cartmill admitted that she had no idea whether charging Mr. Kline for these Corporate Advances through "fee adjustments" to his Escrow Balance after payoff were legal:

> Q And I'm asking you, you don't know whether
> this was consistent with home HomeEq practice?
> A I do not know.
> Q You don't know whether it was consistent with the loan
> documents?
> MR. POPE: Objection. Go ahead.
> A.  I do not know.
> Q And you don't know whether it was consistent with the
> law?
> MR. POPE: Objection. Go ahead.
> A I don't know.

(Grob. Decl. Exh. P, pp. 82-83)   She also testified that she had never seen corporate

advances reduced from an Escrow Balance after payoff, and did not know whether this

action was consistent with HomEq's escrow policy.  (See, e.g., Cartmill Deposition,

Grob. Decl. Exh. P, pp. 53,55, 82-83; p. 76 ("why they did that with the escrow account, I

don't know.  I can't answer that.");  p. 80-81  ("I'm not sure why this -- the escrow was

used in this manner. I can't answer that").

Moreover, at the June 11, 2015 continued deposition of Wells Fargo, the

company's Rule 30(b)(6) witness – Patrick Gorrien --  admitted that MERS was not in

possession of the note in 2005, when it claimed to be the holder and owner:

> Q Was -- was MERS in possession of the note in 2005?
> A Not that I'm aware of.
> Q Was MERS in possession of the mortgage in 2005?
> A Not that I'm aware of.

(Dep. of Patrick Gorrien, Grob. Decl. Exh. Q, p. 91; see also Exh. Q, pp. 92-94

(admitting that Wells Fargo – not MERS -- held loan documents for Trust after 2004);

Exh. C, pp. 201-202 (HomEq witness says he doesn't know whether statement that

MERS owned loan in 2005 was accurate)

## ARGUMENT

## POINT I
## WELLS FARGO'S MOTION FOR SUMMARY
## JUDGMENT ON THE BREACH OF CONTRACT CLAIM MUST BE DENIED

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Sadie v. City of Cleveland, 718 F.3d 596, 599 (6th Cir. 2013). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Pittman v. Cuyahoga County Dep't of Children & Family Servs., 640 F.3d 716, 723 (6th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The court must draw all justifiable inferences in favor of the party opposing the motion. Adams v. Hanson, 656 F.3d 397, 401 (6th Cir. 2011).

In this case, Mr. Kline alleges that Wells Fargo breached the contracts between it and Mr. Kline when the following amounts were collected from Mr. Kline on the first and second mortgages:

A. post-acceleration late fees collected from Mr. Kline on the First Mortgage in the 2005 Foreclosure Action;

B. legal fees and expenses collected from Mr. Kline on the First Mortgage in the 2005 Foreclosure Action;

C. legal fees collected from plaintiff on the First Mortgage in the 2007 Foreclosure Action;

D. legal fees and outsourcing fees collected from plaintiff on the Second Mortgage in the 2007 Foreclosure Action; and

11

E.  service of process fees collected from plaintiff relating to the service of process on the Second Mortgage holder by the First Mortgage holder in the 2007 Foreclosure Action; and

F.  The post-acceleration late fee collected from Mr. Kline on the First Mortgage in the 2007 Foreclosure Action.

In its summary judgment motion, Wells Fargo argues that it cannot be liable to Mr. Kline for the assessment of the above-fees and expenses in breach of the loan documents, because its responsibilities as Trustee were purportedly limited by the Pooling & Servicing Agreement between Wells Fargo and the 2004 Trust. (Wells Fargo Brief, pp. 7-9)  Wells Fargo cites no support for this proposition.  Wells Fargo now acknowledges that both of Mr. Kline's loans were sold to the 2004 Trust. (Wells Fargo Brief, p. 2)  As the Trustee, Wells Fargo was the real party in interest, and the proper party to be sued for breaches of the loan documents.  (See Rule 17 of the Federal Rules of Civil Procedure)  It is Mr. Kline's loan documents alone which determine whether Wells Fargo can be found liable for breach of contract.

With regard to attorneys' fees and expenses, the Note on plaintiff's First Mortgage states in relevant part that:

> If the Note Holder has required me to pay in full… the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the *extent not prohibited by applicable law*.  Those expenses include, for example, *reasonable* attorney's fees.  . . . Any amounts disbursed by Lender under this Section . . . shall become additional debt of Borrower…

See Note annexed to Grob. Decl. as Exh. A, Exh. A, at p..3 , ¶7(E).  Paragraph 9 of Mr. Kline's form Mortgage on the first loan states in relevant part that, if the borrower fails to satisfy its obligations under the loan or there is a legal proceeding "that might significantly affect Lender's interest in the Property", then

12

> then Lender may do and *pay for* whatever is ***reasonable*** or
> ***appropriate*** to protect Lender's interest in the Property and
> rights under this Security Instrument . . . Lenders actions
> can include, but are not limited to…. (b) appearing in court;
> and (c) *paying **reasonable** attorney's fees* to protect its
> interest in the property and/or rights under this Security
> Instrument…."

(Grob. Decl. Exh. A, p. 6, ¶ 9 (emphasis added)).

The Note and Mortgage governing the second mortgage loan for $30,000.00 is

similar.  The Balloon Note provides that, after default, the Note Holder "will have the

right to be paid back for all of its *reasonable* costs and expenses to *the extent not

prohibited by applicable law*."  (Grob. Decl. Exh. B, ¶4(D) (emphasis added)   See Note

annexed to Grob. Decl. as Exh. A, Exh. B, at p..3 , ¶7(E).   Paragraph 7 of Mr. Kline's

form Mortgage on the Second Mortgage states in relevant part that, if the borrower fails

to satisfy its obligations under the loan or there is a legal proceeding "which materially

affects Lender's interest in the Property", then

> then Lender, at Lender's option, upon notice to Borrower,
> may make such appearances, disburse such sums,
> including *reasonable* attorney's fees, and take such action
> as is *necessary* to protect Lender's interest.   Any amounts
> disbursed by Lender. . . shall become additional
> indebtedness of Borrower…

(Grob. Decl. Exh. B, p. 3, ¶ 7 (emphasis added)).  The Mortgage stated that "as used

herein, 'costs', 'expenses' and 'attorneys' fees' include all sums to the extent not

prohibited by applicable law or limited herein."  Id at ¶13.

With regard to late fees, the Notes on both the First and the Second Mortgage

loans state that:

> If the Note Holder has not received the full amount of any
> ***monthly payment*** by the end of 15 days after the date it is

13

due, I will pay a late charge to the Note Holder.

(Grob. Decl. Exh. A, p. 2, ¶7; Exh. B, p. 1, ¶4)

Wells Fargo contends that it is not in breach the Loan Agreements because "each and every one of the disputed fees and costs" were permitted by the loan documents. (Wells Fargo Brief. pp. 11-12)   As shown below, however, Wells Fargo's argument in this regard is meritless.

As an initial matter, Wells Fargo argues in a footnote that improper fees and expenses collected from Mr. Kline by the defendants in 2005 are barred by res judicata, as they were "raised, or could have been raised" in Mr. Kline's prior lawsuit, <u>Kline v. HomEq Servicing Corp.</u>, 07-cv-0084 (S.D. Ohio 2007) (hereinafter "<u>Kline I</u>")  (Wells Fargo Brief, p. 2-3, fn 2) However, as the decision in <u>Kline I</u> demonstrates, the court dismissed Mr. Kline's FDCPA claim on statute of limitations grounds, and declined to exercised supplemental jurisdiction over any state claims. (See <u>Kline I</u> Docket, #33, p. 3) It is well-settled that a decision in which a federal court declines to exercise supplemental jurisdiction over state claims after dismissing a federal claim does not bar the reinstitution of those claims in a subsequent proceeding.  See, e.g. <u>Meng. v. Schwartz</u>, 305 F.Supp.2d 49, 62 (D.C.D.C. 2004) (finding that res judicata does not apply to bar assertion of state law claims after dismissal of federal claims on the merits in prior action, because "the Court's decision to decline the exercise of supplemental jurisdiction over plaintiffs' state law claims . . . was not a 'decision on the merits,' and, therefore, does not preclude the reinstitution of those claims" in a subsequent action)

14

### A. Post-Acceleration Late Fees Collected From Mr. Kline In 2005 and 2007

As previously stated, at his deposition, Barclays Rule 30(b)(6) witness admitted that Mr. Kline's records showed that he was forced to pay at least four late fees after acceleration in 2005. (Barclays Dep., Grob. Exh. C, pp. 279-280), Plaintiff was also charged at least one post-acceleration late fee in the amount of $69.12 in 2007. (Perry Dep., Grob. Decl. Exh. C, pp. 264-71) Barclays witness stated that the late fee charged in 2007 was in error, and should have been returned to plaintiff by check. (Grob. Exh. C, pp. 268-69) However, there is no record that defendants ever refunded that erroneous late fee charge to Mr. Kline after payoff.

The loan documents at issue only allow the assessment of late fees on overdue *monthly* payments. ((Grob. Decl. Exh. A, p. 2, ¶7; Exh. B, p. 1, ¶4) Because of this, every court which has considered the issue has found that a borrower may not be charged for late fees after his loan has been accelerated. See, e.g., Security Mut. Life Ins. Co. v. Contemporary Real Estate Ass., 979 F.2d 329, 330-331 (3rd Cir. 1993); Wells Fargo Bank v. Guarnieri, 297 B.R. 365, 369 (Bankr. Conn.. 2003), aff'd 308 B.R. 122 (D. Ct. 2004) ("once the borrower is in default and the loan is accelerated, the full amount of the loan becomes due immediately, and there remains no obligation by the borrower to continue making monthly payments. In the absence of an obligation to make monthly payments, payments cannot be 'late.'); RTC Mort. V. JI Sopher & Co., Inc., 1998 WL 132815, at *5 (S.D.N.Y. 1998) ("because acceleration terminated Sopher Inc.'s obligation, as mortgager, to make monthly payments after the date of acceleration, it cannot be liable, as mortgager, for late charges on monthly payments that it was not obligated to make"); In re White, 88 B.R. 498, 505 (D.Mass. 1988) (late charges allowed

only before acceleration); <u>Rizzo v. Pierce & Assoc.</u>, 351 F.3d 791 (7th Cir. 2004) ("If, for whatever reason, the Rizzos did not want to pay the late fees, they were free to pay the loan as accelerated. Such a payment would nullify any obligation to pay post-acceleration late fees."); <u>In re Tavern Motor Inn, Inc.</u>, 69 B.R. 138, 141 (Bank. D. Vt. 1987); <u>In re River Valley Fitness One, L.P.</u>, 2004 WL 1171732, *4 (Bank. D.N.H. 2004); <u>Bank National Assoc. v. Shephard Mall Partners LLC</u>, 140 P.3d 559, 562 (Okla. Ct. of Civil Appeals 2005) ("the right to charge late fees ceases upon acceleration because monthly payments are not due after acceleration, so the lender no longer incurs expenses in processing delinquent payments"); <u>TMG Life Ins. Co. v. Ashner</u>, 898 P.2d 1145, 1162 (Kan.App.1995) (late fees compensate lenders "for administration of late payments *prior to* acceleration . . ."); <u>Fowler v. First Federal Savings & Loan Ass.</u>, 643 So.2d 30, 33 (Fla. 1st DCA 1994) ("the bank is only entitled to late charges which accrued up until the day the note was accelerated"); <u>Crest S&L Ass'n v. Mason</u>, 243 N.J. Super. 646, 581 A.2d 120 (N.J. Sup. Ct. 1990). <u>See also</u> Friedman, <u>Contract & Conveyances of Real Property</u>, §6.3, at 813-814 (5th Ed.) ("Provisions for payment of late charges are enforceable prior to acceleration but not thereafter").

Indeed, Barclays Rule 30(b)(6) witness himself admitted that charging post-acceleration late fees was improper. (Perry Dep., Grob. Decl. Exh. C, pp. 264-71) As Mr. Perry stated:

> At the point where you accelerate a loan, you're no longer allowed to collect the late fees. . . . They're no longer collectible from the borrower. (Exh. C, pp. 170-71)[1]

---

[1] Charging post-acceleration late fees in the 2005 foreclosure was improper for another independent reason. As Wells Fargo's Rule 30(b)(6) witness acknowledged at the June 2015 continued deposition of the company – contrary to MERS' representations to the court in the 2005 foreclosure -- MERS did not own or hold the Note for the first

**B. Legal Fees Collected From Mr. Kline In The 2005 And 2007 Foreclosure**.

**(1) Legal Fees Collected In 2005**

The evidence demonstrates that, during the 2005 Foreclosure Action against Mr.

Kline in which MERS was the plaintiff, MERS charged and collected at least $1,100.00

in attorneys fees.  (Grob. Decl. Exh. F, p. 2)   While it was represented in the 2005

foreclosure complaint that MERS was the "owner and holder" of Mr. Kline's first

mortgage, that representation was false.  (Grob. Decl. Exh. E)   The record demonstrates

that the First Mortgage loan had been transferred to the 2004 Trust well before the 2005

foreclosure.  (Grob. Decl. Exh. C, pp. 183-86, 192; Grob. Decl. Exh. D)  Indeed, at the

June 11, 2015 continued deposition of Wells Fargo, the company admitted that MERS

was not in possession of the note for the First Mortgage in 2005, when it claimed to be

the holder and owner:

> Q Was -- was MERS in possession of the note in 2005?
> A Not that I'm aware of.
> Q Was MERS in possession of the mortgage in 2005?
> A Not that I'm aware of.

(Grob. Decl. Exh. Q, p. 91).   Documents produced by Wells Fargo on June 25, 2015 –

four months after the March 1, 2015 discovery deadline – show that plaintiff's loan

documents relating to his First Mortgage loan were held by Wells Fargo at the time of the

---

mortgage at the time it commenced the 2005 Foreclosure, and thus had no right to bring
that action.   (Dep. of Patrick Gorrien, Grob. Decl. Exh. Q, p. 91; see also Exh. Q, pp. 92-
94 (admitting that Wells Fargo – not MERS -- held loan documents for Trust after 2004);
Exh. C, pp. 201-202 (HomEq witness says he doesn't know whether statement that
MERS owned loan in 2005 was accurate)  Since MERS did not in fact possess the Note
at the time the 2005 Foreclosure Action was initiated, it had no right to initiate or
maintain the foreclosure.

2005 Foreclosure Action. (See 6/25/15 email from Russell Pope and accompanying documents annexed to Grob. Decl. as Exh. T)

This misrepresentation in the 2005 Foreclosure Action is significant. Under Ohio law, a holder of a negotiable instrument has standing to sue; however, to be a holder, the named plaintiff must be "in possession of [the] negotiable instrument" that is endorsed in blank. R.C. 1301.201(a) Thus, in order to attain status as a holder, MERS "was required to show that it was in possession of the note." U.S. Bank, N.A. v. Adams, 2012 Ohio 6253, p. 17 (Ohio Ct. App. 2012); R.C. 1301.201(a). If – as the evidence demonstrates -- MERS did not in fact possess the Note at the time the 2005 Foreclosure Action was initiated, then it had no right to initiate or maintain the foreclosure. HSBC Mort. Svces. v. Watson, 2015 Ohio App. Lexis 190 (3rd Dist. 2015) (evidence showing that plaintiff did not possess the note at the commencement of the action precludes summary judgment in plaintiff's favor); Federal Home Loan Mortgage Corp. v. Schwartzwald, 134 Ohio St.3d 13, 2012-Ohio-5017, ¶ 41 (2012) ("It is fundamental that a party commencing litigation must have standing to sue . . . [A] lack of standing at the outset of litigation cannot be cured by receipt of an assignment of the claim or by substitution of the real party in interest").

Thus, had MERS not misrepresented the true holder of Mr. Kline's First Mortgage note at the time of the 2005 foreclosure, that lawsuit could not have been commenced or maintained and MERS and Wells Fargo would not have been entitled to recover attorney's fees from Mr. Kline under the relevant agreements.

**(2) Legal Fees Collected On The First Mortgage Loan In 2007**

Moreover, as shown above, the record contains evidence showing that Mr. Kline was also charged for legal fees by Wells Fargo on the First Mortgage in the 2007 Foreclosure Action. As previously stated, new transaction and escrow histories produced after the March 1, 2015 Discovery Deadline in this litigation reveal the existence of a $412.96 Escrow Balance owed to Mr. Kline by Wells Fargo after Payoff, an amount which was previously misrepresented in a prior Escrow History as zero. (See Grob. Decl. Exh. O, at line 12/3/2007) Moreover, the new Escrow History also shows two new post-payoff transactions which had never been previously disclosed by Wells Fargo or the other defendants, in which the Wells Fargo made two so-called "Fee Adjustments" (one for $158.00 and one for $324.08) to the Escrow Balance owed to Mr. Kline to bring that amount from $412.96 down to zero. (Id. at line 12/11/2007, 12/24/2007) The documents also showed that Wells Fargo had added legal fees paid to the Reimer firm to the amounts purportedly owed by Mr. Kline which appeared have been taken out of the Escrow Balance. (Grob. Decl. Exh. O)

At the further deposition of Barclays' Rule 30(b)(6) witness on June 10, 2015, deponent Jacklin Cartmill admitted that attorney fees were added to the "Corporate Advance balance"[2] on the First Mortgage loan after Mr. Kline had paid off his loan. (Grob. Decl. Exh. P, pp. 65-66, 81) Ms. Cartmill also testified that, through the "Fee Adjustments", the Corporate Advances were apparently deducted from the balance in Mr. Kline's Escrow Account to bring the balance owed to Mr. Kline after payoff down to zero. (Exh. P, pp. 80-83)

---

[2] The Corporate Advance balance represents, among other things, amounts paid to law firms for which defendants sought compensation from the borrower.

As this Court has previously found, it is well-settled that under Ohio law that a borrower may not be charged attorney's fees incurred in a foreclosure action that has proceeded to judgment. Kline v. MERS, 2013 U.S. Dist. Lexis 133765 (S.D. Ohio 2013) Here, the belatedly-produced disclosures provide probative evidence that (i) Wells Fargo did in fact collect attorney's fees which were charged to Mr. Kline on the First Mortgage in the 2007 Foreclosure Action; and (ii) that the defendants concealed these illegal transactions from Mr. Kline until the new documents were belatedly produced after the completion of discovery.

**(3) Legal Fees Collected On The Second Mortgage Loan In 2007**

MERS also collected $350.00 in legal fees from Mr. Kline in November 2007 by misrepresenting that it was the owner and holder of the Second Mortgage loan, when in fact was it was owned by the Trust in which Wells Fargo was Trustee.   With regard to those fees, this court has twice before ruled that they were not permitted under Ohio law. See  Kline v. MERS, 2013 U.S. Dist. Lexis 27042, *39 (S.D. Ohio Feb. 27, 2013) ("The Court concludes, based on the controlling law of Wilborn, Miller, and Leavens, that Ohio law does not permit the attorney fees that Kline alleges LS&R charged to him");  Kline v. MERS, 2013 U.S. Dist. Lexis 133765 (S.D. Ohio Sept. 18. 2013) (denying Lerner Sampson's Motion to Reconsider ruling that the legal fees charged to Mr. Kline were not permitted by law under §1692f(1))   Because the relevant form Mortgage provides that legal fees could not be charged if they were "prohibited by applicable law", the collection of these fees was absolutely prohibited by Mr. Kline's contract.

Moreover, even if it were not prohibited to pass on legal fees to borrowers in these circumstances under Ohio law, the legal fees collected from Mr. Kline pertaining to

20

the Second Mortgage would still be improper. The legal fees were associated with the defense of an action brought against MERS brought by "Wells Fargo Bank N.A. as Trustee." (Grob. Decl. Exh. G) However, contrary to the representations in the court documents, however, MERS did not own the Second Mortgage, and in fact, both the First and Second mortgages were owned by the same Trust. (Grob. Exh. C, pp. 183-86; Grob. Exh. D; Excerpts from Deposition of Revathi Jose, Grob. Decl. Exh. S, p. 194). Thus, when MERS or Wells Fargo hired Lerner Sampson to defend it in the 2007 foreclosure action, it was defending *itself* in a lawsuit brought by *itself*.

Plaintiff is unaware of a single reported decision in which a party was allowed to recover legal fees for defending against a lawsuit brought by itself.[3] The same reasoning applies to the $275.00 paid to 3Arch Trustee Services for monitoring the 2007 foreclosure on behalf of the second mortgage holder.

---

[3] See generally  Ohio Dept. of Human Resources v. Ohio Dept. of Trans., 78 Ohio App.3d 658, 661 (10th App. Dist. 1992) ("It is axiomatic that a party cannot sue itself"); 59 Am. Jur. 2d Parties, § 4 (One person cannot be both plaintiff and defendant in the same action). Globe & Rutgers Fire Ins. Co. v. Hines, 273 F. 774, 777 (2d Cir.1921) ("It is elementary that the same person cannot be both plaintiff and defendant in the same action."); Trs. of the First Society of the Methodist Episcopal Church v. Stewart, 27 Barb. 553 (N.Y.Sup.Ct.1858) ("No party can be both plaintiff and defendant in the same action."); Carbon County School Dist. No. 2 v. Wyoming State Hosp., 680 P. 2d 773, 775 (Wyo. 1984) (One cannot sue oneself); United States v. Interstate Commerce Comm., 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949) (Courts do not engage in academic past time of rendering judgment in favor of persons against self; generally, no case or controversy exists for court to adjudicate.); Allen v. Evans, 7 Ariz. 354, 357 (1901) ("One may not sue himself any more than he may contract with himself."); Chadd v. Delavan Industries, Inc., No. 86-74241, 1987 U.S. Dist. LEXIS 15758, *5 (E.D. Mich. May 19, 1987) ("one may not sue himself."); Cruden v. Bank of N.Y., 957 F.2d 961, 968 (2d Cir. 1992) ("it would be absurd to require the debenture holders to ask the Trustee to sue itself")

**(4)  Illegal Outsourcing Fees Collected From Mr. Kline In The
2007 Foreclosure Action**

Moreover, the amount paid to 3 Arch is improper for another reason.  In its Rule

30(b)(6) deposition, Lerner Sampson acknowledged that 3 Arch referred the defense of

the second mortgage foreclosure to the firm. (Sara Petersmann Dep., Grob. Decl. Exh. U,

p. 99),   Moreover, the February 2008 letter from Lerner Sampson to plaintiff  said that

the fee paid to  3 Arch was compensating them "for the servicing of this loan and

monitoring of the lawsuit with services that included obtaining local counsel, production

of necessary documents and loan information, and billing of invoices."  (Grob. Decl. Exh.

N)

At its Rule 30(b)(6) deposition, Lerner Sampson acknowledged that it followed

the fee guidelines set by both Fannie Mae and Freddie Mac.  (Petersmann, Grob. Decl.

Exh. U, pp. 32-33)  Barclays also acknowledged that Fannie Mae Guidelines set forth the

industry standard.  (Grob. Decl. Exh. C, pp.  24-25)  Fannie Mae Guidelines demonstrate

that passing on such outsourcer type-fees is prohibited.  Thus, as far back as 1996, the

Fannie Mae Guidelines stated:

> Servicers, their agents, or any outsourcing firms they
> employ must not charge (either directly or indirectly) -- and
> the Fannie Mae-retained trustees will not pay (to the
> servicer or any other person or entity) -- any "outsourcing"
> referral fee or a similar fee in connection with any Fannie
> Mae-owned or -securitized mortgage…

Fannie Mae Announcement 96-12.  Similarly, in another section published in January

2003, the Fannie Mae guidelines stated that:

> We will not reimburse a servicer for legal fees and
> expenses related to actions that are essentially servicing
> functions or for expenses that are properly allocated to the
> attorneys' or trustee's overhead expenses (since such

22

> expenses are taken into consideration when we establish our fee schedule).

In August 2003, Fannie Mae published the following guideline:

> If the servicer elects to use the services of a national law firm, outsourcing, or other agency or company that coordinates or refers legal work to others, the servicer is responsible for making certain that Fannie Mae is not asked to reimburse a servicer for services, legal fees, or expenses that are duplicative or allocated to the servicer's, attorneys or trustees overhead expenses (since such services are taken into consideration when we establish our fee schedules).(Exh. V hereto)

Finally, in an August 2008 Guideline, Fannie Mae stated that: the engagement agreement must "specify the attorneys' fees, impose limits on costs, and prohibit the payment of outsourcing or referral fees."

The payments to 3 Arch violate these Fannie Mae Guidelines. The collection of such amounts also violates Rule 7.2 of the Ohio Rules of Professional Conduct, which prohibits a lawyer from "giving anything of value to a person for recommending the lawyer's services", and Rule 5.4, which prohibits fee-sharing between attorneys and non-lawyers.[4] Should the jury find that the arrangement between Lerner Sampson and 3 Arch violated one of these provisions, then the fees paid to 3 Arch and collected from plaintiff would be prohibited by "applicable law." Dragelevich v. Kohn, Milstein, Cohen & Hausfeld, 755 F. Supp. 189, 193 (N.D. Ohio 1990) ("Ohio courts would accept what appears to be the majority view, that DR 2-107(A) precludes enforcement of the agreement alleged in this case."); Krischbaum v. Dillon, 567 N.E.2d 1291, 1300 (Ohio

---

[4] Lerner Sampson has claimed that there was no written agreement between it and 3 Arch, and the other defendants have also stated that they can find no agreement between Barclays or Wells Fargo and 3 Arch in their possession, custody or control.

1991) (affirming that the Ohio Code of Professional Responsibility "has the force of law").

## **<u>CONCLUSION</u>**

Wherefore, for each of these reasons, plaintiff Eugene Kline respectfully submits that that Wells Fargo's motion for summary judgment should be denied in all respects.

Date: October 15, 2015

/s/ Paul Grobman _____
Paul Grobman (Pro Hac Vice)
555 Fifth Avenue, 17th floor
New York, New York 10017
T. 212-983-5880
F. 212-682-7060
  *Counsel for Plaintiffs*