**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

EUGENE KLINE, et al.,                )
                                      )
            Plaintiffs,               )     CASE NO. 3:08cv408
                                      )
vs.                                   )     JUDGE WALTER HERBERT RICE
                                      )
                                      )
MORTGAGE ELECTRONIC SECURITY          )
SYSTEMS, et al.,                      )
                                      )
            Defendants.               )
                                      )

---

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO REIMER LERNER'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Eugene Kline submits this Memorandum in opposition to the motion for summary judgment filed by Reimer Lorber & Arnovitz ("Reimer"). As shown below, there is ample evidence that Reimer Lorber has charged plaintiff for improper fees and expenses, and thus the motion must be denied.

### STATEMENT OF FACTS

In 2004, Mr. Kline entered into two loan transactions with WMC Mortgage Corporation involving a First Mortgage for $160,000, and a Second Mortgage for $30,000.00. MERS was the nominee on the loan documents for both of the loans. (See loan documents for First Mortgage annexed to Declaration of Paul Grobman ("Grob. Decl.") as Exh. A; Loan documents for Second Mortgage annexed to Grob. Decl. as Exh. B) HomEq was the servicer on both of Mr. Kline's loans.

Unbeknownst to plaintiff, in 2004, both loans were transferred by WMC to a Merrill Lynch entity, which then transferred them to a securitized Trust titled "Merrill Lynch Mortgage Investors, Inc. Mortgage Loan Asset Backed Security Series 2004-WM5" ("the 2004 Trust"). (Deposition of Barclays Rule 30(b)(6) witness Matthew Perry dated Feb. 25, 2015 (hereinafter "Barclays Dep.") annexed to Grob. Decl. as Exh. C, pp. 183-86, 192; Pooling & Servicing Agreement annexed to Grob. Decl. as Exh. D) Wells Fargo was the Trustee which held both of Mr. Kline's loans. (Grob. Decl. Exh. D; Barclays Dep. Grob. Decl. Exh. C, p. 186)

### A. The First Foreclosure Action Against Plaintiff

In early 2005, Mr. Kline fell behind on his payments, and his loan was put in default. In August 2005, Reimer commenced foreclosure proceedings against the plaintiffs and others in state court in Montgomery County, Ohio on behalf of an entity identified as "Mortgage Electronic Registration Systems, Inc. c/o HomEq Servicing Corp", which claimed in the Complaint that it owned and held the loan ("the 2005 Foreclosure Action"). Among the defendants in the 2005 Foreclosure Action was an entity which was also identified as "Mortgage Electronic Registration Systems" with an address in Ocala, Florida. (See 2005 Complaint, Grob. Decl. Exh. E)

On November 18, 2005, judgment for the MERS plaintiff against Kline and the MERS defendant, among others, was entered in the 2005 Foreclosure Action. Thereafter, Kline contacted MERS, Reimer and Barclays about attempting to remove the First and Second Mortgages from foreclosure.

By letter dated December 5, 2005, Reimer, on behalf of MERS, wrote to Kline, advising him of the amount necessary to reinstate the First and Second Mortgages. (Dec.

5, 2005 letter annexed to Grob. Decl. as Exh. F)   In December 2005, Kline paid the amounts demanded in the December 5, 2005 letter by MERS, and the 2005 Foreclosure Action was dismissed

### B.  The Second Foreclosure Action Against Kline

 In late-2006, back problems caused Mr. Kline to miss work, and he again fell behind on his mortgage payments..  On March 16, 2007, a party named "Wells Fargo Bank, N.A., as Trustee" commenced a foreclosure action against Eugene Klein in the Court of Common Pleas for Montgomery County, Ohio (hereinafter "the 2007 Foreclosure Action").  (See 2007 Foreclosure Complaint annexed to Grob. Decl. as Exh. G.)  Wells Fargo was represented in the action by the Reimer firm.  (Id.)

In its Complaint for foreclosure, Wells Fargo represented to the Court that it "is the owner and holder" of the promissory note on the Klein's mortgage, and that it "is the owner and holder of the [] mortgage deed."  (Grob. Exh. G)   However, a document entitled "Assignment of Mortgage" which purportedly assigned the note and mortgage from MERS to Wells Fargo was not executed until March 26, 2007, after the action commenced.  (See Assignment, Grob. Decl. Exh. H;  Grob. Decl. Exh. C (Barclays witness says he does not know why an assignment of mortgage was executed to Wells Fargo if the note and mortgage had already been assigned)

In the Complaint, Wells Fargo also sued "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" as the purported holder of the Second Mortgage on Kline's property (Grob. Decl. Exh. G).   However, the Second Mortgage was not owned by "Mortgage Electronic Registration Systems, Inc. as nominee

for WMC Mortgage Corporation", but rather by the 2004 Trust, the same entity which owned the owned the First Mortgage.

On or about May 17, 2007, "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" filed an Answer in the 2007 Foreclosure Action in which it represented that "it has an interest in the property which is subject of the Complaint", that "there is due from the defendant" Kline $28,858.40 plus interest, court costs and advances, "that it holds a valid mortgage lien upon the real estate described in the plaintiff's Complaint", and requesting "that its interest be protected" and that its lien be paid from the proceeds of the sale." The Answer was signed by Lerner Sampson on behalf of MERS. (See Answer annexed to Grob. Decl. as Exh. I)

By Order dated October 23, 2007, the court granted Wells Fargo's motion for summary judgment against Kline and ordered Kline's home sold. The Court also noted that "Mortgage Electronic Registration Systems, Inc. as nominee for WMC Mortgage Corporation" claimed an interest in the premises arising from the Second Mortgage, and that MERS would have the right to seek to apply that interest to the proceeds of the sale of Kline's property.

In November 2007, Kline's attorney requested figures from the defendants for the amounts necessary to payoff both the First and Second Mortgages. By letter dated November 15, 2007, Reimer advised Kline's attorney of the amount necessary to pay off the First Mortgage on behalf of Wells Fargo. Among other things, the letter demanded $178.00 in late fees and $2,410.00 in "court costs" associated with the 2007 Foreclosure Action, including costs associated with serving process on the Second Mortgage holder. (11/15/2007 letter annexed to Grob. Decl. as Exh. J)

By letter dated November 14, 2007, Lerner Sampson provided a payoff quote to Kline's attorney in the 2007 Foreclosure Action on behalf of the Second Mortgage purportedly owned by MERS.  Among other things, the Payoff Quote demanded $225 in "Previous Service Costs" and $350 in "Attorney Costs."  (11/14/2007 letter annexed to Grob. Decl. as Exh. K)

On or about November 20, 2007, Kline was forced to sell his house to pay off the amounts which were demanded by and allegedly owed to Wells Fargo and MERS on the First and Second Mortgages.   Of the $251,750.00 contract price paid for the home, Wells Fargo and HomEq represented that $176,332.28 was owed to them on the First Mortgage, and MERS and HomEq represented that $32,946.43 was owed on the Second Mortgage. The amounts included (i) legal expenses purportedly incurred by the holder of the First Mortgage in suing the holder of the Second Mortgage in the 2007 Foreclosure Action, including amounts associated with service of process; and (ii) legal fees and expenses purportedly incurred by the holder of the Second Mortgage in defending against the suit brought by the First Mortgage holder.

By letter dated December 19, 2007, Kline requested that the defendants provide an itemization of the attorney's fees and expenses collected from Kline relating to the 2007 Foreclosure involving the First and Second Mortgages.  (Grob. Decl. Exh. L)

By letter dated February 7, 2008, Reimer responded to Kline's request for an itemization of the amounts collected from Kline by Wells Fargo.  (Grob. Decl Exh. M) The letter represented that $803.00 of the amount collected by Wells Fargo was for a "Preliminary Judicial Report", $507.00 was for the Complaint, $450.00 was for "Process Service", $150.00 was for a "Final Judicial Report" and $500.00 was for "Deposit for

5

Order of Sale." An attachment to the letter also indicated that Kline was charged for at least one late fee after his loan was accelerated. The Reimer letter also attached an Escrow Account history which showed that Mr. Kline had an Escrow Balance of zero after Payoff. (Grob. Decl. Exh. O)

By letter dated February 19, 2008, Lerner responded to Kline's request for an itemization of the amounts collected from Kline by MERS listed in the November 14, 2007 payoff. (Grob. Decl. Exh. N) In the February 19, 2008 letter, Lerner said the following with regard to the defendants' right to recover the "attorney costs" of $350.00 from plaintiff Kline:

> With respect to your inquiry on the attorney costs . . . please be advised that these costs were incurred by my client in the protection of its security/mortgage as provided in paragraph 7 of the mortgage. . . . The attorney fees in the amount of $350.00 were incurred by my Client to protect its interest when named as a defendant in the Lawsuit initiated by Wells Fargo Bank, N.A. My office reviewed all pleadings and correspondence (including the complaint, answers, motion for summary judgment and opposition), prepared and filed the answer, and attended the telephone pretrial.

As for the "Previous Service Costs" of $225.00, the Lerner Sampson letter explained them as follows:

> [T]he sum of $225.00 was paid to 3 Arch Trustee Services, Inc. for the servicing of this loan and monitoring of the lawsuit with services that included obtaining local counsel, production of necessary documents and loan information, and billing of invoices. (Grob. Decl. Exh. N)

### C. The Instant Lawsuit

In November 2008, plaintiff brought this putative class action against the defendants on behalf of himself and all other similarly situated individuals, alleging claims under the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et. seq. ("the

FDCPA"), the Truth In Lending Act, 15 U.S.C. §1602 et seq. ("TILA"), breach of contract, unjust enrichment and violation of the Ohio Consumer Sales Practices Act ("the OCSPA"). Despite over a dozen motions seeking dismissal of these claims filed by defendants between 2008 and 2014, each of these causes of actions remain pending against some or all of the defendants.

In 2012, this Court allowed discovery to go forward on both the class and individual claims. Thereafter, plaintiff served document and interrogatory requests on Barclays in June 2012, on MERS in August 2012, and on Wells Fargo on November 4, 2013. MERS served its written responses to plaintiff's discovery requests in March 2014, Barclays in June 2014, and Wells Fargo served its discovery responses in June 2014.

On October 1, 2014, this Court granted plaintiff's Motions to Compel, ordering MERS, Wells Fargo and Barclays to provide plaintiff with additional discovery. (Order, Dock. #377) MERS provided additional discovery ordered by the court on October 22, 2014, Wells Fargo on October 22 and November 10, 2014, and Barclays on January 6, 2015.

In February 2015, depositions of each of the parties were taken. During those depositions, there was extensive testimony from the defendants about charges which plaintiff claims are illegal: the post-acceleration late fees and attorneys fees collected from Mr. Kline in the 2005 Foreclosure Action; the service of process fees charged to Mr. Kline relating to the First Mortgage holder serving process on the Second Mortgage holder in the 2007 Foreclosure Action; the attorneys fees charged in representing the holder of the Second Mortgage in the 2007 Foreclosure Action; and the amounts

collected from Mr. Kline relating to the outsourcing services provided by 3-Arch Trustee Services on the Second Mortgage in the 2007 Foreclosure Action.

In addition, Barclays' initial Rule 30(b)(6) witness Matthew Perry acknowledged in his February 2015 deposition that Mr. Kline had been charged at least four late fees after acceleration in 2005,  (Barclays Dep., Grob. Exh. C, pp. 279-280) and one late fee for $69.12 after his loan was accelerated in 2007.  (Exh. C, pp. 264-71), (Perry Dep., Grob. Decl. Exh. C, pp. 264-71)  While Barclays witness stated that the assessment of the 2007 post-acceleration late fee was an error, and should have been returned to Mr. Kline by check, (Grob. Exh. C, pp. 268-69), defendants never refunded that erroneous late fee by sending a check to Mr. Kline after payoff.

After the February 2015 depositions and the March 1, 2015 discovery deadline had passed, each of the corporate defendants produced additional documents.  Among the documents belatedly produced were a new Escrow Activity History which disclosed transactions which had been omitted and misrepresented in the prior Escrow History produced by the defendants in this litigation.  (Grob. Decl. Exh. O).   While the prior Escrow History produced by defendants indicated that Mr. Kline had an Escrow Balance of zero after Payoff, the new history showed that there was in fact a $412.96 Escrow Balance owed to Mr. Kline.  (BC18800, at line 12/3/2007)   Moreover, the new Escrow History also showed two new post-payoff transactions which had been previously concealed by the defendants, in which they made two so-called "Fee Adjustments" (one for $158.00 and one for $324.08) to the Escrow Balance to bring that amount from $412.96 down to zero.  (Id. at line 12/11/2007, 12/24/2007)   The documents also showed that Wells Fargo had added legal fees paid to the Reimer firm to Mr. Kline's account

balance after he paid off his loan, which then appeared to have been taken out of the Escrow Balance.

On June 10-12, 2015, plaintiff's counsel travelled to Baltimore to take additional depositions of Barclays, MERS and Wells Fargo relating to the newly-produced documents. At the further deposition of Barclays' Rule 30(b)(6) witness on June 10, 2015, Barclays' deponent Jacklyn Cartmill admitted that the previous Escrow Activity history omitted the transactions showing that there was an Escrow Balance in Mr. Kline's account after payoff, and that that balance had been reduced by deducting attorneys fees and/or expenses which previously had not been disclosed:

> Q. If the borrower is looking at [the prior Escrow Activity history provided to Mr. Kline], would the borrower have any way of knowing that there was an escrow balance remaining . . . after payoff?
> A. No.
> Q. And would the borrower know that there were two transactions in escrow which took that balance and turned it into zero?
> A They would not.
> Q Do you know whether the borrower was apprised, at any point before [the new Escrow Activity history] was produced on March 26th of 2015, that these transactions that we are talking about, which don't exist on [the prior Escrow Activity history], had been disclosed? . ..
> A. I -- I don't know how the borrower would know.

(See excerpts from the June 10, 2015 Deposition of Jacklin Cartmill annexed to Grob. Decl. as Exh. P, pp. 74-75)

Ms. Cartmill admitted that she had no idea whether charging Mr. Kline for these Corporate Advances through "fee adjustments" to his Escrow Balance after payoff were legal:

> Q And I'm asking you, you don't know whether this was consistent with home HomeEq practice?

> A I do not know.
> Q You don't know whether it was consistent with the loan
> documents?
> MR. POPE: Objection. Go ahead.
> A.  I do not know.
> Q And you don't know whether it was consistent with the
> law?
> MR. POPE: Objection. Go ahead.
>  A I don't know.

(Grob. Decl. Exh. P, pp. 82-83)   She also testified that she had never seen corporate

advances reduced from an Escrow Balance after payoff, and did not know whether this

action was consistent with HomEq's escrow policy.  (See, e.g., Cartmill Deposition,

Grob. Decl. Exh. P, pp. 53,55, 82-83; p. 76 ("why they did that with the escrow account, I

don't know.  I can't answer that.");  p. 80-81  ("I'm not sure why this -- the escrow was

used in this manner. I can't answer that").

Moreover, at the June 11, 2015 continued deposition of Wells Fargo, the

company's Rule 30(b)(6) witness – Patrick Gorrien --  admitted that MERS was not in

possession of the note at the time of the 2005 Foreclosure Action, when MERS claimed

to be the holder and owner:

> Q Was -- was MERS in possession of the note in 2005?
> A Not that I'm aware of.
> Q Was MERS in possession of the mortgage in 2005?
> A Not that I'm aware of.

(Dep. of Patrick Gorrien, Grob. Decl. Exh. Q, p. 91; see also Exh. Q, pp. 92-94

(admitting that Wells Fargo – not MERS -- held loan documents for Trust after 2004);

Exh. C, pp. 201-202 (HomEq witness says he doesn't know whether statement that

MERS owned loan in 2005 was accurate)

**ARGUMENT**

**REIMER LORBER'S MOTION FOR SUMMARY
<u>JUDGMENT MUST BE DENIED</u>**

Summary judgment is appropriate when the record reveals that there are no genuine

issues as to any material fact, and the moving party is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(a); <u>Sadie v. City of Cleveland</u>, 718 F.3d 596, 599 (6th Cir.

2013). The standard for determining whether summary judgment is appropriate is

"whether 'the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Pittman v.

Cuyahoga County Dep't of Children & Family Servs</u>., 640 F.3d 716, 723 (6th Cir. 2011)

(quoting <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 251-52 (1986)). The court must

draw all justifiable inferences in favor of the party opposing the motion. <u>Adams v.

Hanson</u>, 656 F.3d 397, 401 (6th Cir. 2011).

In this case, Mr. Kline alleges that Reimer Lorber collected the following amounts

from Mr. Kline on behalf of its clients which were improper:

     A. post-acceleration late fees collected from Mr. Kline in the 2005
        Foreclosure Action;

     B. legal fees and expenses collected from Mr. Kline on the First Mortgage in
        the 2005 Foreclosure Action;

     C. service of process fees collected from plaintiff relating to the service of
        process on the Second Mortgage holder by the First Mortgage holder in
        the 2007 Foreclosure Action; and

     D. legal fees collected from plaintiff and paid to Reimer Lorber in the 2007
        Foreclosure Action.

     E. The post-acceleration late fee collected from Mr. Kline in the 2007
        Foreclosure Action.

In its summary judgment motion, Reimer Lorber argues that Mr. Kline's claims against it

11

under the FDCPA and unjust enrichment should be dismissed.   Plaintiff addresses each

of these claims below.

## A.  THE FDCPA CLAIM AGAINST REIMER LORBER

Section 1692f(1) of the FDCPA states in relevant part:

> A debt collector may not use unfair or unconscionable
> means to collect or attempt to collect any debt. Without
> limiting the general application of the foregoing, the
> following conduct is a violation of this section:
> **(1)** The ***collection of any amount*** (including any
> interest, fee, charge, or expense incidental to the principal
> obligation) unless such amount is expressly authorized by
> the agreement creating the debt or permitted by law….

15 U.S.C. §1692f(1) (emphasis added).   Plaintiff  contends that Reimer Lorber violated

the FDCPA by collecting the fees and expenses described above (C, D, and E) on behalf

of its clients in the 2007 foreclosure.[1]

### (i) The FDCPA Claim Is Not Barred By The Statute of Limitations

There is a one-year statute of limitations for FDCPA violations.  In its motion,

Reimer Lorber argues that the limitations period began to run under 1692f(1) – not at the

time the allegedly improper amounts were collected from plaintiff on November 19, 2007

– but rather when Reimer Lorber sent its first payoff quote to Mr. Kline in August 2007.

According to  Reimer, since that is when the allegedly improper amounts were first

sought, that is when the statute of limitation begins to run, irrespective of when the

amounts were actually collected from plaintiff.

There are several problems with this argument.  As an initial matter, Reimer

Lorber's position ignores the clear language employed by Congress in §1692f(1). Thus,

as indicated by the plain words of the statute, under §1692f(1), a party's right to bring a

---

[1] In light of the one-year statute of limitations, Plaintiff is not alleging that Rimer violated
the FDCPA based on the fees and expenses collected from him in the 2005 foreclosure.

12

claim does not arise until there has been the *"collection"* of allegedly improper amounts by defendant. Courts have regularly found that – under §1692f(1) -- the statute of limitations is triggered (or is triggered anew) at the time of actual collection which, as Reimer Lorber admits, was within one year of plaintiff's commencement of this lawsuit. Foster v. DBS Collection Agency, 463 F.Supp.2d 783 (S.D. Ohio 2006) (emphasis added) ("defendants actions after the state courts' judgments ... *such as collecting* on the allegedly invalid state court judgments or garnishing class members wages" are actionable events under the FDCPA); Witt v. Westfield Acceptance Corp., 2002 U.S. Dist. Lexis 7821 *2 (S.D. Ind. 2002) (emphasis added) (where the court found that statute of limitations began to run on 1692f(1) claim when defendants "later violated the FDCPA *by actually collecting the judgment* from her"); Purnell v. Arrow Financial Services, 2008 U.S. App. Lexis 25488, *14 (6th Cir. 2008) (unpublished) (under §1692f(1), "the violation occurs with each... collection activity such that each would constitute a discrete violation of the FDCPA")

Second, even if the statute of limitations under 1692f(1) was not triggered by the date of "collection" of the allegedly improper amount, Reimer Lorber acknowledges that it sent a second payoff quote to the attorney for Mr. Kline on November 15, 2007. While Reimer cites to a few district court cases from other circuits to support its argument that a subsequent dunning letter does not re-trigger the statute of limitations, the Sixth Circuit recently came to the opposite conclusion in Michalak v. LVNV Funding, LLC, 2015 U.S. App. Lexis 7982 (6th Cir. 2015) (unpublished). In Michalak, the district court has dismissed an FDCPA claim based on allegedly misleading letters on statute of limitations grounds despite the fact that there were indications that the

defendants had sent additional allegedly improper letters within one year of the commencement of the lawsuit. On appeal, the Sixth Circuit panel reversed, finding that the statute of limitations had not expired because "each dunning letter may constitute a separate violation of the FDCPA." Id. at *3; see also Purnell, 2008 U.S. App. Lexis 25488, *14 (same)

**(ii)    The Amounts At Issue Were Not Permitted To Be Charged Under The FDCPA**

Reimer Lorber also claims that the fees and expenses collected from Mr. Kline at the time he paid off the loan after the 2007 foreclosure did not violate §1692f(1) of the FDCPA, as they were purportedly authorized by plaintiff's Note and Mortgage. Again, Reimer Lorber's argument is meritless.

**Post-Acceleration Late Fees**. As previously stated, at his deposition, Barclays Rule 30(b)(6) witness admitted that Mr. Kline's records showed that he had been charged for at least one post-acceleration late fee in the amount of $69.12, and that this charge was improper. (Perry Dep., Grob. Decl. Exh. C, pp. 264-71) As Mr. Perry stated:

> At the point where you accelerate a loan, you're no longer allowed to collect the late fees. . . . They're no longer collectible from the borrower.

(Exh. C, pp. 170-71) Moreover, every court which has considered the issue has also found that a borrower may not be charged for late fees after his loan has been accelerated.[2]

---

[2] See, e.g., Security Mut. Life Ins. Co. v. Contemporary Real Estate Ass., 979 F.2d 329, 330-331 (3rd Cir. 1993); Wells Fargo Bank v. Guarnieri, 297 B.R. 365, 369 (Bankr. Conn.. 2003), aff'd 308 B.R. 122 (D. Ct. 2004) ("once the borrower is in default and the loan is accelerated, the full amount of the loan becomes due immediately, and there remains no obligation by the borrower to continue making monthly payments. In the absence of an obligation to make monthly payments, payments cannot be 'late.'); RTC

14

**Legal Fees**.  In its brief, Reimer admits that "attorneys' fees may not be charged" to borrowers who are paying off their loan. (Riemer Mem. p. 13)  In support of Reimer Lorber's motion for summary judgment, the firm submits an affidavit from Dennis Reimer, a principal of the firm, which stated that

> The Reimer firm did not seek to collect, nor did it collect attorney's fees from plaintiff Kline with respect to the payoff of the first mortgage on his property. Nor were any of the Reimer firm's attorney's fees passed on to Mr. Kline with respect to the payoff of the first mortgage on his property.

(Affidavit of Dennis Reimer submitted in support of Reimer Motion for Summary Judgment, Dock. #414, Exh. 18, ¶3).  Mr. Reimer's sworn assertion that none of its legal fees were "passed on to Mr. Kline" turns out not to be true.

Thus, as previously stated, transaction and escrow histories produced by Barclays after the March 1, 2015 Discovery Deadline in this litigation reveal the existence of a

---

Mort. V. JI Sopher & Co., Inc., 1998 WL 132815, at *5 (S.D.N.Y. 1998) ("because acceleration terminated Sopher Inc.'s obligation, as mortgager, to make monthly payments after the date of acceleration, it cannot be liable, as mortgager, for late charges on monthly payments that it was not obligated to make"); In re White, 88 B.R. 498, 505 (D.Mass. 1988) (late charges allowed only before acceleration);  Rizzo v. Pierce & Assoc., 351 F.3d 791 (7th Cir. 2004) ("If, for whatever reason, the Rizzos did not want to pay the late fees, they were free to pay the loan as accelerated.  Such a payment would nullify any obligation to pay post-acceleration late fees.");  In re Tavern Motor Inn, Inc., 69 B.R. 138, 141 (Bank. D. Vt. 1987); In re River Valley Fitness One, L.P., 2004 WL 1171732, *4 (Bank. D.N.H. 2004); Bank National Assoc. v. Shephard Mall Partners LLC, 140 P.3d 559, 562 (Okla. Ct. of Civil Appeals 2005) ("the right to charge late fees ceases upon acceleration because monthly payments are not due after acceleration, so the lender no longer incurs expenses in processing delinquent payments"); TMG Life Ins. Co. v. Ashner, 898 P.2d 1145, 1162 (Kan.App.1995) (late fees compensate lenders "for administration of late payments *prior to* acceleration . . ."); Fowler v. First Federal Savings & Loan Ass., 643 So.2d 30, 33 (Fla. 1st DCA 1994) ("the bank is only entitled to late charges which accrued up until the day the note was accelerated"); Crest S&L Ass'n v. Mason, 243 N.J. Super. 646, 581 A.2d 120 (N.J. Sup. Ct. 1990).  See also Friedman, Contract & Conveyances of Real Property, §6.3, at 813-814 (5th Ed.) ("Provisions for payment of late charges are enforceable prior to acceleration but not thereafter").

$412.96 Escrow Balance owed to Mr. Kline after Payoff, an amount which was previously misrepresented in a prior Escrow History as zero. (See Grob. Decl. Exh. O, at line 12/3/2007)  Moreover, the new Escrow History also shows two new post-payoff transactions which had never been previously disclosed by the defendants, in which the defendants made two so-called "Fee Adjustments" (one for $158.00 and one for $324.08) to the Escrow Balance owed to Mr. Kline to bring that amount from $412.96 down to zero. (Id. at line 12/11/2007, 12/24/2007)  The documents also showed that the defendants had added legal fees paid to the Reimer firm to the amounts purportedly owed by Mr. Kline which appeared have been taken out of the Escrow Balance. (Grob. Decl. Exh. O)

At the further deposition of Barclays' Rule 30(b)(6) witness on June 10, 2015, deponent Jacklin Cartmill admitted that Reimer Lorber's attorney fees were added to the "Corporate Advance balance"[3] after Mr. Kline had paid off his loan. (Grob. Decl. Exh. P, pp. 65-66, 81)  Ms. Cartmill also testified that, through the "Fee Adjustments", the Corporate Advances were apparently deducted from the balance in Mr. Kline's Escrow Account to bring the balance owed to Mr. Kline after payoff down to zero. (Exh. P, pp. 80-83)

As this Court has previously found, it is well-settled that under Ohio law that a borrower may not be charged attorney's fees incurred in a foreclosure action that has proceeded to judgment.  Kline v. MERS, 2013 U.S. Dist. Lexis 133765 (S.D. Ohio 2013) Here, the belatedly-produced disclosures provide probative evidence that (i) the Reimer firm did in fact collect attorney's fees which were charged to Mr. Kline in the second

---

[3] The Corporate Advance balance represents, among other things, amounts paid to law firms for which defendants sought compensation from the borrower.

foreclosure action brought against him; and (ii) that the defendants concealed these illegal transactions from Mr. Kline until the new documents were belatedly produced after the completion of discovery on March 26, 2015.

      **Service of Process Fees.** Mr. Kline was charged for a service of process fee associated with the plaintiff in the foreclosure action (denominated in the Complaint as "Wells Fargo Bank N.A. as Trustee" serving "Mortgage Electronic Registration Systems, Inc., as nominee for WMC Mortgage Corp." (Grob. Decl. Exh. M) Contrary to the representations by Wells Fargo and its counsel Reimer Lorber, however, MERS did not own the second mortgage, and in fact, both the first and the second mortgages were owned by the same Trust. (Grob. Exh. C, pp. 183-86; Grob. Exh. D; Excerpts from Deposition of Revathi Jose, Grob. Decl. Exh. S, p. 194). Thus, when the first mortgage holder served the second mortgage holder in the 2007 action, it was actually serving itself.

      Paragraph 9 of Mr. Kline's form Mortgage states that, if the borrower fails to satisfy its obligations under the loan or there is a legal proceeding that might significantly affect Lender's rights in the Property, then

> the Lender may do and *pay for* whatever is ***reasonable*** or ***appropriate*** to protect Lender's interest in the Property and rights under this Security Instrument . . . Lenders actions can include, but are not limited to…. (b) appearing in court; and (c) *paying **reasonable** attorney's fees* to protect its interest in the property and/or rights under this Security Instrument…."

(Reimer Mem., Exh. A, p. 6, ¶ 9 (emphasis added)) Thus, the form note signed by Mr. Kline limits the recovery of fees to those that are reasonable and appropriate, and plaintiff

is unaware of a single reported or unreported decision in which a party was allowed to recover legal fees or expenses for suing itself. [4]

### (iii) Reimer's Claim That It's Letter Was Not Designed To Induce Payment Is Not Only Meritless, And Irrelevant

Citing to the Sixth Circuit's unpublished decision in Goodson v. Bank of America, 2015 U.S. App. Lexis 1565 (6th Cir. 2015) (unpublished), Reimer also argues that its collection of allegedly improper fees and expenses is outside the confines of §1692f because the firm's November 15, 2007 Payoff Letter to plaintiff was not sent "in order to induce payment." (Reimer Mem. pp. 19-20) As Reimer admits, it previously made the identical when it sought dismissal of plaintiffs' FDCPA claim against it based on Grden v. Leikin Ingber & Winters PC, 643 F.3d 169 (6th Cir. 2011) At that time, the court correctly found that Grden applies only to conduct alleged under §1692e of the FDCPA, not §1692f. (See Doc. 294, p. 15, Doc. 305, pp. 23-26) Nothing in the interim has changed the soundness of the court's reasoning.

---

[4] See generally Ohio Dept. of Human Resources v. Ohio Dept. of Trans., 78 Ohio App.3d 658, 661 (10th App. Dist. 1992) ("It is axiomatic that a party cannot sue itself"); 59 Am. Jur. 2d Parties, § 4 (One person cannot be both plaintiff and defendant in the same action). Globe & Rutgers Fire Ins. Co. v. Hines, 273 F. 774, 777 (2d Cir.1921) ("It is elementary that the same person cannot be both plaintiff and defendant in the same action."); Trs. of the First Society of the Methodist Episcopal Church v. Stewart, 27 Barb. 553 (N.Y.Sup.Ct.1858) ("No party can be both plaintiff and defendant in the same action."); Carbon County School Dist. No. 2 v. Wyoming State Hosp., 680 P. 2d 773, 775 (Wyo. 1984) (One cannot sue oneself; United States v. Interstate Commerce Comm., 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949) (Courts do not engage in academic past time of rendering judgment in favor of persons against self; generally, no case or controversy exists for court to adjudicate.); Allen v. Evans, 7 Ariz. 354, 357 (1901) ("One may not sue himself any more than he may contract with himself."); Chadd v. Delavan Industries, Inc., No. 86-74241, 1987 U.S. Dist. LEXIS 15758, *5 (E.D. Mich. May 19, 1987) ("one may not sue himself."); Cruden v. Bank of N.Y., 957 F.2d 961, 968 (2d Cir. 1992) ("it would be absurd to require the debenture holders to ask the Trustee to sue itself")

In Grden, the plaintiff claimed that the defendant's response to plaintiff's request for a written verification of an account balance which turned out to be incorrect violated 15 U.S.C. §1692e, prohibiting "a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." The district court granted summary judgment to defendant, finding that the communication was not "in connection with the collection of any debt" as required by §1692e, because providing the "balance statement" was neither "an attempt to collect a debt", nor could a reasonable jury find that "an animating purpose of the statements was to induce payment by Grden." Grden, 643 F.3d at 173. In Goodson, the court faced the same question, finding that the letters at issue were sent by defendant for "informational" purposes, and thus that no "reasonable jury could not find that its animating purpose was to induce payment" as required to state a violation of §1692e.

There are fundamental differences between the circumstances in Grden and Goodson and the situation here. As opposed to this case, the plaintiffs in Grden and Goodson *never paid* the allegedly improper amounts demanded, and thus there was no claim of "*the collection*" of improper amounts under 15 U.S.C. *§1692f*. As opposed to §1692e, "the focus of §1692f is on the *conduct* of the debt collector." Allen v. LaSalle Bank, N.A., 629 F.3d 364, 368, n.8 (3rd Cir. 2011) (emphasis added). In fact, "unlike other provisions of the FDCPA, §1692f does not require a 'communication." Brief for The United States as *Amicus Curiae* in *Allen*, annexed and made Exhibit B hereto, p. 9, fn. 4.)[5] Muir v. Navy Fed. Credit Union, 529 F.3d 1100, 1106-1107 (D.C. Cir. 2008).

_____

[5] As this Court has recognized (Doc. #271), positions taken by agencies in *amicus* briefs are entitled to deference. See Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871 (2011),Id. at 880-81 (finding that position of the Board of Governors of the Federal

Rather, all that is required under §1692f (1) is that the defendant have engaged in "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation)" which is allegedly not "expressly authorized by the agreement creating the debt or permitted by law."  Allen v. Lasalle Bank, N.A., 629 F.3d 364, 368-69 (3rd Cir. 2011) ("The only inquiry under§1692f(1)is whether the amount collected was expressly authorized by the agreement creating the debt or permitted by law");  Turner v. J.V.D.B. & Assocs., Inc., 330 F.3d 991, 996 (7th Cir. 2003) (emphasis added) ("Whether the collection of a debt violates § 1692f(1) depends **solely** on two factors: (1) whether the debt agreement explicitly authorizes the charge; or (2) whether the charge is permitted by law.").  Since Reimer does not and cannot deny that it has "collected" the challenged fees from plaintiff, §1692f(1) applies, and the discussion in Grden and Goodson relating to §1692e is wholly inapplicable.[6]

---

Reserve System on interpretation of administrative regulation as stated in *amicus* brief was entitled to deference unless plainly erroneous or inconsistent with the regulation). Thus, while not conclusive, the position taken by the FTC and the CFPB in the amicus brief is entitled to deference and "due weight."   See Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1327 (7th Cir. 1997) (Seventh Circuit held that the FTC's interpretation of a provision of the FDCPA in an *amicus* brief must be given "due weight" in the interpretation of the statute).

[6] Even if there was no "collection" of allegedly improper amounts here triggering a cause of action under §1692f(1), the letters sent here by Reimer – the attorneys representing Wells Fargo in the foreclosure action -- are a far cry from the "balance statement" provided by the defendant in Grden, and were clearly "in connection with the collection of a debt." The letter makes several statements imploring payment, including: "The funds MUST be in the form of Certified check, money order or Official Check…and MUST BE received in OUR office no later than 3:00 p.m. on December 5, 2007. (Grob. Decl. Exh. J (emphasis in original))

### B.  PLAINTIFF HAS A VALID CLAIM FOR UNJUST ENRICHMENT AGAINST REIMER LORBER

Reimer Lorber also alleges that Mr. Kline cannot bring a claim against the firm for unjust enrichment because there is purportedly "no evidence" that any of the amounts paid to the Reimer firm were "passed on" to plaintiff or paid "directly or indirectly" by him.  (Reimer Mem., p. 23)   Again, the record demonstrates that this is untrue.

 The evidence demonstrates that, during the 2005 foreclosure against plaintiff, the Reimer firm charged and collected at least $1,100.00 in attorneys fees from plaintiff in suing on behalf of MERS.  (Grob. Decl. Exh. F, p. 2)   While Reimer represented in the 2005 foreclosure complaint that MERS was the "owner and holder" of Mr. Kline's first mortgage, that representation was false.  (Grob. Decl. Exh. E)  The record demonstrates that first mortgage had been transferred to the 2004 Trust well before the 2005 foreclosure.  (Grob. Decl. Exh. C, pp. 183-86, 192; Grob. Decl. Exh. D)  Indeed, at the June 11, 2015 continued deposition of Wells Fargo, the company admitted that MERS was not in possession of the note in 2005, when it claimed to be the holder and owner:

> Q Was -- was MERS in possession of the note in 2005?
> A Not that I'm aware of.
> Q Was MERS in possession of the mortgage in 2005?
> A Not that I'm aware of.

(Grob. Decl. Exh. Q, p. 91).   Documents produced by Wells Fargo on June 25, 2015 – four months after the March 1, 2015 discovery deadline – show that plaintiff's loan documents relating to his first loan were held by Wells Fargo at the time of the first foreclosure action.  (See documents annexed to Grob. Decl. as Exh. T)

The misrepresentation made by Reimer and MERS in the 2005 foreclosure action is significant.   Under Ohio law, a holder of a negotiable instrument has standing to sue;

however, to be a holder, the named plaintiff must be "in possession of [the] negotiable instrument" that is endorsed in blank.  R.C. 1301.201(a)  Thus, in order to attain status as a holder, MERS "was required to show that it was in possession of the note."  U.S. Bank, N.A. v. Adams, 2012 Ohio 6253, p. 17 (Ohio Ct. App. 2012); See R.C. 1301.201(a).  If – as the evidence demonstrates -- MERS did not in fact possess the Note at the time the 2005 foreclosure action was initiated, then it had no right to initiate or maintain the foreclosure.  HSBC Mort. Svces. v. Watson, 2015 Ohio App. Lexis 190 (3rd Dist. 2015) (evidence showing that plaintiff did not possess the note at the commencement of the action precludes summary judgment in plaintiff's favor); Federal Home Loan Mortgage Corp. v. Schwartzwald, 134 Ohio St.3d 13, 2012-Ohio-5017, ¶ 41 (2012) ("It is fundamental that a party commencing litigation must have standing to sue . . . [A] lack of standing at the outset of litigation cannot be cured by receipt of an assignment of the claim or by substitution of the real party in interest").

Thus, had Reimer and MERS not misrepresented the true holder of Mr. Kline's first mortgage note at the time of the 2005 foreclosure, that lawsuit could not have been commenced or maintained and neither Reimer nor MERS would have been entitled to recover attorneys fees from plaintiff.   Thus, under these circumstances, the record contains evidence establishing each of the elements of an unjust enrichment claim for the attorneys fees charged in the 2005 foreclosure --  Mr. Kline conferred a benefit upon Reimer Lorber, and because of Reimer's misrepresentations in the foreclosure, "it would be unjust" for Reimer Lorber to retain those fees.

Moreover, as shown above, the record contains evidence showing that Mr. Kline was also charged for Reimer's legal fees in the 2007 foreclosure.   As Reimer itself

22

acknowledges, any such fees charged to Mr. Kline were improper.  (Reimer Mem., p. 13 ("In payoff situations, under Ohio law, attorneys' fees may not be charged to the debtor") With regard to these legal fees as well, then, it was improper to charge these fees, and it would be inequitable to allow Reimer to retain them.

       **(i)**      **The Unjust Enrichment Claim Is Not Barred By The Voluntary Payment Doctrine**

Finally, Reimer Lorber contends that plaintiff's unjust enrichment claim against it is barred by the voluntary payment doctrine.   However, as Reimer acknowledges, the voluntary payment doctrine only applies "in the absence of fraud, duress, compulsion or mistake of fact," and only if the party "voluntarily pays another with full knowledge of the facts."  (Reimer Mem., pp. 26-27)  Here, none of these prerequisites to application of the voluntary payment doctrine are present.

For instance, it has repeatedly been held that the voluntary payment doctrine does not apply where – as here -- a party pays an amount in order to avoid the loss of possession of its property.  Rocky Knoll Estates MHC, LLC v. CW Cap. Mgmt. LLC, 2015 U.S. Dist. Lexis 48311, *6 (W.D.N.Y. 2015)  ("Courts have held that the voluntary payment doctrine does not apply when a party makes payments under economic duress or compulsion, *e.g*., when a party must make payment or face the loss of possession of its property.");  Rickenbach v. Wells Fargo Bank, N.A., 635 F.Supp.2d 389, 395 (D.N.J. 2009)  ("In the present action, the Court cannot decide at this juncture whether Plaintiffs knew that mortgage fees were invalid but paid them in order to avoid foreclosure and eviction, thereby making the payments involuntary.");  Nevada Ass. Services Inc. v. Tate County of Clark, 338 P.3d 1250, 1256 (Nev. Sup. Ct. 2014)(recognizing that the voluntary payment doctrine does not apply where a party makes a payment "to save his

interest in his property", such as where the payor is subject "to ongoing or imminent foreclosure proceedings"). For this reason alone, then, the voluntary payment doctrine is inapplicable to plaintiff's claims.

Moreover, as shown above, Reimer also fails to satisfy the requirement that the payment have been made with "full knowledge of the facts" and without fraud. It was not until June of 2015 that Wells Fargo produced documents and provided testimony showing that MERS was not the holder of the first mortgage at the time of the 2005 foreclosure, and thus had no right to initiate foreclosure proceedings which resulted in the legal fees that Mr. Kline was forced to pay in 2005.

In the same respect, it was not until March and June of 2015 that Barclays produced an accurate Escrow History which disclosed the fact that plaintiff was charged for attorney's fees after his loan was fully paid off, and that these amounts were apparently deducted from an Escrow Balance which was also concealed by defendants, and which should have been refunded to Mr. Kline. Patterson v. Dean Morris, 2011 U.S. Dist. Lexis 34097, *28 (E.D. La. 2011) ( "If there were in fact misrepresentations about the fees and costs, then the voluntary payment could not have been made with full knowledge of the facts")

## **CONCLUSION**

Wherefore, for each of these reasons, plaintiff Eugene Kline respectfully submits that that Reimer Lorber's motion for summary judgment should be denied in all respects.

Date: October 16, 2015

/s/ Paul Grobman _____
Paul Grobman (Pro Hac Vice)
555 Fifth Avenue, 17th floor
New York, New York 10017
T. 212-983-5880
F. 212-682-7060
  *Counsel for Plaintiffs*