IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EUGENE KLINE, et al.,       :

     Plaintiffs,             Case No. 3:08-cv-408

    v.                    :

MORTGAGE ELECTRONIC         DISTRICT JUDGE WALTER H. RICE
SECURITY SYSTEMS, et al.,

     Defendants.    :

---

DECISION AND ENTRY SUSTAINING THE MOTIONS FOR SUMMARY
JUDGMENT FILED BY ALL DEFENDANTS (DOC. #414, #416, #417,
#418, & #419), OVERRULING AS MOOT DEFENDANTS' MOTIONS IN
LIMINE (DOC. #456, #457, #458, #459, #460, & #461), AND
OVERRULING AS MOOT PLAINTIFF'S MOTION FOR
RECONSIDERATION (DOC. #472); JUDGMENT TO ENTER IN FAVOR
OF DEFENDANTS ON ALL OF PLAINTIFF'S CLAIMS; TERMINATION
ENTRY.

---

In this case, a number of individuals set forth claims against eleven

defendants, seeking monetary damages and injunctive relief based on claims

alleging misconduct in mortgage servicing, misrepresentation in foreclosure filings,

and the charging and collecting of improper and excessive fees from borrowers. At

this time, the only remaining Plaintiff is Eugene Kline ("Kline"), and only his claims

against the following Defendants remain viable: Defendants Mortgage Electronic

Security Systems ("MERS"); Wells Fargo Bank, N.A. ("Wells Fargo"); Reimer,

Arnovitz, Chernek & Jeffrey Co. L.P.A., (f.k.a. Defendant Reimer, Lorber &

Arnovitz Co., L.P.A.) (the "Reimer Firm"); Lerner, Sampson & Rothfuss (the "Lerner

Firm"); and Barclays Capital Real Estate, Inc. ("Barclays"). His claims arise under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692f(1); the Truth in Lending Act ("TILA"), 15 U.S.C. § 1666d; the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Revised Code § 1345.01; and claims for unjust enrichment and breach of contract under the common law of Ohio. The Court's jurisdiction is based on federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

Pending before the Court are Defendants' Motions for Summary Judgment. Doc. #414, #416, #417, #418, & #419. Defendants have moved for summary judgment on all of Plaintiff's remaining claims. For the reasons set forth below, Defendants' motions are SUSTAINED. This ruling moots Defendants' Motions in Limine filed in anticipation of trial, and said motions are therefore OVERRULED. Furthermore, because the Court has determined that Plaintiffs' claims all fail as a matter of law, his Motion for Reconsideration (Doc. #472) of the Court's dismissal of his class claims is moot, and is therefore OVERRULED.

As a preliminary matter, Kline's Memorandum in Opposition to Wells Fargo's Motion for Summary Judgment did not address its arguments directed against his TILA claim. Doc. #466. The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting Sixth Circuit cases affirming grants of summary judgment when non-movant fails to defend a

2

claim in response to summary judgment motion). Kline's failure to address the TILA claim constitutes its abandonment, and it will therefore be dismissed with prejudice.

A second preliminary matter concerns the Court's jurisdiction over Kline's state law claims. As explained more fully below, the Court finds that Defendants are entitled to summary judgment on the remaining federal claims in this action: the two FDCPA claims brought against the Reimer Firm and the Lerner Firm. Under 28 U.S.C. 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over" a state law claim if it has "dismissed all claims over which it has original jurisdiction." Thus, the statute gives the Court the power to, at its discretion, dismiss Kline's state law claims against the Defendants, based on the dismissal of the FDCPA claims over which it had original jurisdiction. However, "[t]hat power need not be exercised in every case in which it is found to exist." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). In the absence of a federal claim, the "justification" for continuing to exercise jurisdiction over a plaintiff's state law claims "lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present[,] a federal court should hesitate to exercise jurisdiction over state claims." *Id.* In this case, such considerations weigh heavily in favor of the Court continuing to exercise jurisdiction over Kline's state law claims. It would ill-serve considerations of judicial economy for a state court, unfamiliar with Kline's claims and the evidence the parties have amassed, to have to take them up at this late date. Furthermore, due to the length and

3

complexity of this litigation, it would be unfair and inconvenient to all parties to dismiss Kline's state law claims without resolving them. For these reasons, the Court will exercise its jurisdiction over Kline's state law claims, even in the absence of the federal claims that gave rise to its original jurisdiction over this action.

## I.   **RELEVANT FACTUAL BACKGROUND**

Unless noted, the following facts are undisputed by the parties.

### A.   **The Loan Transactions**

On June 18, 2004, Kline entered into two loan transactions with WMC Mortgage Corporation ("WMC"). He signed a promissory note with an adjustable interest rate in the amount of $160,000 ("Adjustable Rate Note"), accompanied by a mortgage that placed a primary lien on his home (the "First Mortgage"). The second note, in the amount of $30,000, required payment of any unpaid principal and interest at its maturity ("Balloon Note"), and was secured by a second mortgage on Kline's home ("Second Mortgage"). Wells Fargo Mot. Summ. J. Ex. A, B, C, & D (Docs. #417-2, #417-3, #417-4 & #417-5).[1]

---

[1] These and other documents have been attached to numerous filings in the record. For the sake of clarity, citations to documents in the record are only to the most legible or complete example of a particular document.

4

**B.    Securitization of Kline's Loans**

On an unknown date thereafter, WMC assigned or sold Kline's loans to

Merrill Lynch Mortgage Investors, Inc., an entity that acted as a "depositor" of

notes and mortgages into trusts of residential mortgage-backed securities

("RMBSs").[2] Kline's loans were deposited into an RMBS bearing the name "Merrill

Lynch Investors Trust, Mortgage Loan Asset-Backed Certificates, Series 2004-

WMC5" (hereinafter, "Trust"), which was created pursuant to a Pooling and

Services Agreement ("PSA") dated October 1, 2004.[3] The PSA identified Wells

_____

[2] "A pooling and servicing agreement is an agreement creating a trust that defines
the terms under which promissory notes and their related mortgages are placed
into the trust, describes how the notes and mortgages and related loan documents
are transferred by and between the parties to the trust, and sets forth the various
responsibilities of the parties to the trust. The promissory notes, mortgages or
deeds of trust, and related loan documents are the trust res." *In re Smoak*, 461
B.R. 510, 515 (Bankr. S.D. Ohio 2011). Such trusts are familiar to many as a
factor in the financial crisis of 2008.

[3] There are several gaps in the record concerning these transactions. First, no party
cites to evidence of WMC's assignment or sale of Kline's loans from WMC to the
depositor. Second, although the PSA is evidence of the creation of the Trust, the
parties have only provided select portions of the PSA, none of which reference the
actual deposit of Kline's loans into the Trust. Section 2.02 of the PSA states that
"the Trustee acknowledges receipt of the Mortgage Note for each Mortgage Loan
and delivery of a Mortgage File … with respect to each Mortgage Loan," but this
general acknowledgement is insufficient to demonstrate that Kline's particular
loans were among those deposited. Doc. #417-6 at 6. No party has cited to the
"Mortgage File" that would presumably evidence this transaction. Only the
following deposition statement by Joseph Michael Perry, a representative of
Barclays and former HomEq employee, that is somewhat conclusory and vague,
addresses the issue: "As far as I know, this is the trust that held the Klines' loans."
Doc. #465-3 at 8. The Revathi Jose Deposition cited by MERS addresses this
issue, but no party identifies who this witness is or explains how the witness
would have knowledge of the transaction. Doc. #419-6 at 144. Nevertheless,

5

Fargo as the trustee and HomEq as the servicer of the mortgage loans held in the Trust. Doc. #417-6.

### C. The 2005 Foreclosure

Kline fell behind on the payments on the Adjustable Rate Note. Am. Compl. ¶ 26 (Doc. #157 at 8). On August 17, 2005, the Reimer Firm filed a foreclosure action against Kline. The complaint identified the plaintiff as "Mortgage Electronic Registration Systems, Inc., c/o HomEq Servicing Corporation." Doc. #465-5 at 2. On December 6, 2005, the Reimer Firm sent Kline a letter stating that the total amount required to reinstate his loan would be $10,001.47, with an attachment itemizing the individual fees and costs. Doc. #465-6 at 2-3. These included attorney fees of $1100 and various court costs.[4] *Id.* Kline cured the default and HomEq reinstated the mortgage, leading to the dismissal of the foreclosure action. Compl. ¶ 30 (Doc. #157 at 8).

On November 1, 2006, Wachovia Bank, N.A., sold HomEq to Barclays, which assumed the servicing of Kline's loans after that date. Beck Aff. (Doc. #30-1).

---

based on statements in their briefing, the parties apparently agree that these transactions occurred. The Court will, therefore, consider that Kline's loans were part of the Trust as an undisputed fact for purposes of summary judgment.

[4] The letter attached as an exhibit to Kline's Response is a photocopy of poor quality, and many of the individual amounts it lists are illegible. Doc. #465-6 at 3.

6

### D.    Kline's First Federal Court Action

On March 6, 2007, Kline filed suit against HomEq and the Reimer Firm in

this Court, asserting claims arising under the FDCPA and the OCSPA, as well as

Ohio common law claims for unjust enrichment and breach of contract. Kline

alleged that HomEq and Reimer had illegally and improperly charged him for

"broker price opinions," title reports, post-acceleration late fees, amounts that

were not owed, and "excessive costs for service of process." The allegations

stated that the itemization of fees and costs provided had been inaccurate, but had

nevertheless been paid. Case No. 3:07-cv-84, Doc. #1.

The case was assigned to Judge Rose, who dismissed the case on January

28, 2008. He ruled that the FDCPA claim was barred by the statute of limitations,

and he dismissed the supplemental state law claims without prejudice. Case No.

3:07-cv-84, Doc. #33.

### E.    The 2007 Foreclosure

Kline again fell behind on his payments, and a second foreclosure action was

filed in state court on March 16, 2007. The second foreclosure action was again

filed by the Reimer Firm, and the plaintiff was identified as "Wells Fargo, N.A. as

Trustee c/o HomEq Servicing Corporation." In the complaint, Wells Fargo alleged

that it was "the owner and holder" of the Adjustable Rate Note. Doc. #465-7.

Ten days after the second foreclosure action was filed, on March 26, 2007,

MERS assigned the mortgage on Kline's home and the Adjustable Rate Note to

7

Wells Fargo. The assignment identified MERS as the "nominee for WMC Mortgage Corp." and Wells Fargo as the assignee. The assignment was executed by John Dunnery, who was identified as a Vice President of MERS. Doc. #465-8.

On May 14, 2007, the Lerner Firm filed an answer on behalf of MERS, "as nominee for WMC Mortgage Corporation," asserting an interest in the Balloon Note that was secured by the Second Mortgage. Doc. #465-9. The answer alleged that Kline owed $28,858.40 on the Balloon Note, as well as interest and costs, and identified the specific number of the recorded "valid mortgage lien" held by MERS.

On August 16, 2007, the Reimer Firm sent Kenneth E. Wegner, the attorney representing Kline, a letter that provided "payoff and reinstatement quotes" for both mortgage loans. Doc. #414-9. The letter stated that "the amount to PAYOFF the first mortgage loan through August 30, 2007, is $171,577.27. The amount to PAYOFF the second mortgage through August 30, 2007, is $31,357.17." *Id.*

On October 30, 2007, Kenneth E. Wegner, the attorney representing Kline in the foreclosure action, sent letters to the Reimer Firm and the Lerner Firm requesting payoff amounts for the mortgage loans. Doc. #310-5.

On November 15, 2007, the Reimer Firm responded in a letter that detailed the payoff required to satisfy the Adjustable Rate Note. The letter stated:

> This will confirm that the amount to PAYOFF this loan through December 9, 2007, is $176,332.28. This does not include any attorney fees.
>
> …
>
> The above figure includes an estimate of court costs. When PAYOFF is made, an adjustment will be made and any amounts collected in

8

excess of the actual court costs will be refunded to you. … Also, the present court cost bill may not be accurate since additional costs may be incurred since we do not stop proceedings until funds are actually received.

Doc. #414-11 at 1.

An attachment prepared by HomEq itemized the "Projected Payoff Breakdown" for the Adjustable Rate Note as follows:

| | | |
|---|---|---|
| Unpaid principal balance: | $ | 155,515.98 |
| Interest accrued 10/01/2006-12/09/2007: | $ | 14,821.28 |
| Accrued Late Charges to date: | $ | 178.90 |
| Projected Late Charge(s) : | $ | 0.0 |
| Plus Escrow Advance: | $ | 3,406.12 |
| Less Escrow Balance: | $ | 0.0 |
| … | | |
| Estimated Court Costs: | $ | 2,410.00 |
| … | | |
| Projected Payoff … | $ | 176.332.28 |

*Id.*

In a letter to Kline's attorney dated November 14, 2007, the Lerner Firm detailed that the "amount necessary to pay off" the Balloon Note was $32,946,43, based on the following:

| | | |
|---|---|---|
| Principal Balance Due: | $ | 28,858.40 |
| Interest: | $ | 3,485.03 |
| Recording: | $ | 28.00 |

9

| Previous Service Costs: | $ | 225.00 |
|---|---|---|
| Attorney Costs: | $ | 350.00 |
| Total: | $ | 32,946.43 |

The letter also stated that the court costs were "estimates," subject to further adjustment. Doc. #465-11 at 2.

After deciding to accept a job offer in Texas, Kline sold his home at the end of November, 2007. Kline Dep. at 40 (Doc. #416-3 at 2). The proceeds allowed him to pay off both loans. Am. Compl. ¶ 43 (Doc. #157 at 10).

On December 19, 2007, Mr. Wegner sent a letter to the Lerner Firm requesting a more detailed itemization of the claimed attorneys' fees, "service costs," and interest, as well as "proof of payment" of the recording fee, that had been claimed to satisfy the payoff of the Balloon Note. Doc. #465-12. A similar letter was sent to the Reimer Firm requesting a more detailed breakdown of the costs and fees associated with the payoff of the Adjustable Rate Note. Kline Dep. at 165 (Doc. #414-2 at 21).

The Reimer Firm responded on February 7, 2008, with the following itemization of court costs:

| Preliminary Judicial Report: | $803.00 |
|---|---|
| Complaint: | $507.00 |
| Process Service: | $450.00 |
| Final Judicial Report: | $150.00 |
| Deposit for Order of Sale: | $500.00 |

10

Doc. #465-13.

The letter stated that the itemized costs represented "actual deposits made by" the Reimer Firm, and that the firm was "expecting a refund check for the difference between the actual court costs and deposits and the refund will be forwarded to you upon receipt." *Id*.

Attached to the letter were a number of invoices from vendors that further itemized the costs. The "Preliminary Judicial Report" of $803.00 was comprised of a "Preliminary Judicial Report" for $468.00 and an "Exam Fee" of $335.00. The "Final Judicial Report" was broken down into a "Final Judicial Report Premium" of $50.00 and an "Exam Fee" of $100. The aforementioned fees were paid to the Nova Title Agency, Inc. *Id.* at 5-6. An invoice from Provest, the process server, stated that $100 of the $450.00 fee was for service on MERS, as nominee for WMC. *Id.* at 7.

The Reimer Firm also attached two account statements to the letter. The first account showed transactions to an escrow account for property taxes with a zero balance. The second account listed the late charges and fees associated with the Adjustable Rate Note. The latter account showed a zero balance on December 3, 2007, but two more transactions followed: a charge of $69.12 on December 4, 2007, labeled "Transaction Reversal," and a credit of $69.12 on December 5, 2007, labeled "Late Charge Waiver," bringing it back to a zero balance. *Id.* at 3-4.

The Lerner Firm responded to the Mr. Wegner's request for a fee and costs breakdown in a letter dated February 19, 2008. The letter stated:

11

With respect to your inquiry on the attorney costs and previous service costs, please be advised that these costs were incurred by my client in the protection of its security/mortgage as provided in paragraph 7 of the mortgage, [which] provides:

**Protection of Lender's Security**. If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest.

The attorney fees in the amount of $350.00 were incurred by my client to protect its interest when named as a defendant in the lawsuit initiated by Wells Fargo Bank, N.A. My office reviewed all pleadings and correspondence (including the complaint, answers, motion for summary judgment and opposition), prepared and filed the Answer, and attended the telephone pretrial.

In addition, the sum of $225.00 was paid to 3 Arch Trustee Services, Inc.[,] for the servicing of this loan and monitoring of the lawsuit with services that included obtaining local counsel, production of necessary documents and loan information, and billing of invoices.

Doc. #465-14 at 2-3.

### F. Kline's Second Federal Court Action

Kline and his original co-plaintiffs brought this putative class action on November 10, 2008. Doc. #1. After several of their claims were dismissed, Plaintiffs filed an Amended Complaint on April 14, 2010. Doc. #157.

After the resolution of a number of dispositive motions, Kline remains the only plaintiff, and his set of claims has been substantially winnowed. All of Kline's claims arise from the fees and costs that Defendants charged him in the payoff of his mortgage loans. They will be discussed in more detail below, but the claims

12

against the remaining Defendants are summarized as follows: 1) claims under the

FDCPA, 15 U.S.C. § 1592f(1), and for unjust enrichment against the Reimer Firm;

2) the same two claims against the Lerner Firm; 3) a claim under the TILA, a claim

under the OCSPA, and a claim for breach of contract against MERS;[5] 4) a claim

under the TILA and a claim for breach of contract against Wells Fargo;[6] 5) a claim

under the OCSPA;  and 6) a claim of unjust enrichment against Barclays.[7]

Defendants have separately moved the Court for summary judgment on all

of Kline's remaining claims, and the motions have been fully briefed. After setting

forth the applicable standard of review, the Court will consider each of the

Defendants' motions in turn.

_____

[5] On March 29, 2010, the Court sustained in part and overruled in part MERS' Motion to Dismiss, thereby dismissing Kline's claims under the FDCPA, but allowed Kline's claim under the TILA against MERS to proceed. Doc. #154 at 7 & 15. On March 25, 2011, the Court dismissed Kline's claim against MERS for unjust enrichment. Doc. #239 at 8. Kline's claim under the OCSPA was allowed to proceed, as was his breach of contract claim. *Id*. at 3 n.2 & 10 n.5.

[6] On March 28, 2011, the Court dismissed Kline's OCSPA claim and his claims for unjust enrichment and breach of contract against Wells Fargo. Doc. #240 at 2 n.1 & 9.  In the same Decision, the Court overruled Wells Fargo's Motion for Judgment on the Pleadings (Doc. #180) with respect to Kline's TILA claim. *Id.* at 8. Kline filed a Motion for Reconsideration (Doc. #244), which the Court granted with respect to the breach of contract claim. Doc. #264.

[7] On March 29, 2011, the Court dismissed Kline's TILA and breach of contract claims against Barclays, based on adopting the Report and Recommendations of the Magistrate Judge. Doc. #241

13

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

When a party moves for summary judgment, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The movant "always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has demonstrated that no disputed issue of material

fact exists, the burden shifts to the nonmoving party to present evidence of a

genuine dispute of a material fact that is resolvable only by a jury. *Celotex*, 477

U.S. at 324. The nonmovant must "cit[e] to particular parts of materials in the

record" to demonstrate the existence of a genuine issue of material fact. Fed. R.

Civ. P. 56(c)(1)(A). However, it is not sufficient for the nonmoving party to "simply

show that there is some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the

nonmoving party must "go beyond the pleadings" and present some type of

evidentiary material that demonstrates the existence of a genuine dispute. *Celotex*,

477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 252 (1986). Generalized assertions lacking the support of particularized

14

citation required by Rule 56 do not suffice, as a court has no "obligation to 'wade

through' the record for specific facts" in support of a party's arguments. *United

States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (citing *InterRoyal Corp.

v. Sponseller*, 889 F.2d 108 (6th Cir. 1989)).

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*, 477

U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be

resolved in favor of either party" require denial of summary judgment in order to be

properly resolved by a jury. *Anderson*, 477 U.S. at 250.

When ruling on a motion for summary judgment, a court must assume as

true the evidence of the nonmoving party and draw all reasonable inferences in

that party's favor. *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of

the evidence, and the drawing of legitimate inferences from the facts," as such are

"jury functions" that are inappropriate to employ at the summary judgment stage.

*Anderson*, 477 U.S. at 255.

## III.    THE REIMER FIRM'S MOTION FOR SUMMARY JUDGMENT (DOC. #414)

The Reimer Firm has filed for summary judgment on Kline's two remaining

claims, which are brought under the FDCPA and under a theory of unjust

enrichment under Ohio common law. The Court will consider each in turn.

15

**A.  Kline's FDCPA Claim is not Barred by the Statute of Limitations.**

According to the Reimer Firm, the FDCPA violation that gave rise to Kline's

claim was the August 17, 2007, letter it sent to Kline's attorney that itemized a

number of allegedly improper fees and expenses. Because Kline filed this action on

November 10, 2008, over a year after his attorney received the letter, the Reimer

Firm believes that Kline's claim is barred by the FDCPA's one-year statute of

limitations. Doc. #414-1 at 13-16.

In his Memorandum in Opposition, Kline argues that the language of the

FDCPA provision under which his claim arises expressly states that "collection"

triggers a violation, and the statute of limitations therefore began to run on the

payoff date of November 19, 2007. Doc. #470 at 12-13. He also argues that even

if his claim had been based on the letter being a violation, under *Michalak v. LVNV*

*Funding, LLC*, 604 F. App'x 492, 493 (6th Cir. 2015), the Sixth Circuit has held

that subsequent dunning letters sent by a debt collector may restart the statute of

limitations period under the FDCPA.

The Reimer Firm's Reply Brief did not address Kline's argument or provide

further support for its statute of limitations defense. Doc. #474.

Under the FDCPA, "[a]n action to enforce any liability created by [the

FDCPA] may be brought … within one year from the date on which the violation

occurs." 15 U.S.C. § 1692k(d). The First Claim for Relief of the Amended

Complaint originally presented two theories of FDCPA violations:

16

133. Reimer Lorber, Lerner Sampson and MERS *have attempted to collect* amounts for attorneys' fees, service of process fees, title fees, preliminary judicial reports, final judicial reports and other costs and fees from plaintiffs which were not owed, in violation of §1692e of the FDCPA.

134. Defendants *have collected* amounts for attorneys' fees, service of process fees, title fees, preliminary judicial reports, final judicial reports and other costs and fees from plaintiffs which were not owed in violation of §1692f of the FDCPA.

Doc. #157 at 24-25 (emphasis added).

The Court previously dismissed Kline's FDCPA claim under Section 1692e as time-barred by the one-year statute of limitations, citing the allegation of a false representation made in the complaint of the 2007 Foreclosure action filed on March 16, 2007, some nineteen months before the filing of this lawsuit. Doc. #293 at 15-17. Because of this dismissal, other attempts at collecting the debt alleged in the Amended Complaint that fall outside the statute of limitations – such as the August 17, 2007, letter sent by the Reimer Firm – no longer support Kline's remaining FDCPA claim, which is premised on actual "collection" defined in Section 1692f(1): "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

The Sixth Circuit authority cited by the Reimer Firm, *Goodson v. Bank of America, N.A.*, 600 F. App'x 422 (6th Cir. 2012), discusses the timing of letters sent by the debt collector to the plaintiff that allegedly contained misleading representations about the debt. In that case, because the letters were sent two years before the plaintiff filed suit, they were barred by the statute of limitations.

*Id.* at 429-30. However, the plaintiff's claim alleged a violation under 15 U.S.C.
§ 1692e, the provision of the FDCPA prohibiting "any false, deceptive, or
misleading representation or means in connection with the collection of any debt."
*Id.* at 430. Here, in contrast, the violation concerns the "collection of any amount"
that is not "expressly authorized by the agreement creating the debt or permitted
by law." 15 U.S.C. § 1692f(1). This is a distinct provision of the FDCPA that
specifically defines a violation based on the actual collection of a debt. As
discussed, the August 17, 2007, letter was not the violation that began the
limitations period. The Reimer Firm has not argued or demonstrated that the actual
collection of the payoff amount from Kline occurred outside the one-year statute of
limitations period that would bar his claim. Accordingly, it is not entitled to
dismissal of Kline's FDCPA claim by invoking this defense.

### B. The Undisputed Evidence Demonstrates that the Reimer Firm did not Violate the FDCPA.

The Reimer Firm also argues that Kline cannot demonstrate that it
committed an FDCPA violation because both the Adjustable Rate Note and Ohio
law authorized the specific charges that form the basis for Kline's claim. Doc.
#414-1 at 16-19. It addresses a number of specific charges with the following
arguments. First, the preliminary and final judicial reports that Kline was charged
for were essentially title reports expressly authorized by terms of the Adjustable
Rate Note. *Id.* at 20-21. Second, the service of process fees were authorized by
the Ohio Rules of Civil Procedure to notify lienholders, and MERS was listed as a

18

lienholder of record in the judicial reports. *Id.* at 21-23. Third, the pre-acceleration late fees were expressly contemplated as a remedy under the terms of the Adjustable Rate Note. *Id.* at 23-24. Fourth, both the undisputed evidence and Kline's failure to respond to Requests for Admission on the issue demonstrate that he was not charged for any post-acceleration late fees. *Id.* at 24. Finally, the Reimer Firm also argues that the payoff communication was not an attempt to collect payment from Kline, and therefore could not amount to a violation of the FDCPA. *Id.* at 24-26.

Kline's Memorandum in Opposition responds as follows. First, an attachment to a February 7, 2008, payoff letter sent by the Reimer Firm and the admission of Jacklyn Cartmill, a Barclays representative, demonstrate that he had been charged $69.12 in post-acceleration late fees. Doc. #470 at 14. Second, both the post-payoff adjustments to a Barclays' escrow account and Ms. Cartmill's testimony that those funds were applied to "corporate advances" that included the Reimer Firm's attorneys' fees contradict Mr. Reimer's affidavit statement swearing that the firm collected no attorneys' fees from Kline. *Id.* at 15-17. Third, the language of the Adjustable Rate Note only authorizes fees or charges to protect the lender's interest that are "reasonable" or "appropriate." Citing to a number of cases, Kline argues that charges for a foreclosure plaintiff to serve itself when it holds the first and the second mortgage are neither reasonable nor appropriate. *Id.* at 17-18. Finally, Reimer's argument that its payoff letter was not an inducement of payment

that amounts to an FDCPA violation would only apply to a Section 1692e violation, but Kline's claim arises under Section 1692f(1). *Id.* at 18-20.

In its Reply Brief, the Reimer Firm first notes that because Kline's Response only addresses attorneys' fees, post-acceleration late fees, and service of process fees, he has abandoned any FDCPA claim premised on charges for the judicial reports and the pre-acceleration late fees. Doc. #474 at 1, 12-13. It then points out that Kline never pled a claim based on attorneys' fees, and, even if he had, the undisputed evidence shows that it never collected or attempted to collect any of its fees from him. *Id.* at 3-6. Regarding the post-acceleration late fees, the Reimer Firm points out that Kline failed to identify the attachment that purportedly lists such fees, and further asserts that he has mischaracterized Ms. Cartmill's testimony. *Id.* at 7-9. Finally, the Reimer Firm argues that the service of process fees were reasonable and authorized under Ohio law, and the cases Kline cites concern plaintiffs who sue themselves and, thus, are distinguishable. *Id.* at 9-12.

As an initial matter, the Court agrees that Kline's failure to respond to the Reimer Firm's arguments concerning the judicial reports and the pre-acceleration late fees amounts to a concession that he cannot prove an FDCPA violation based on these charges. In addition, under the FDCPA, he has the burden of demonstrating that the judicial reports and the pre-acceleration late fees were not "expressly authorized by the agreement creating the debt or permitted by law," but there is no evidence from which a reasonable jury could find a violation under either prong. 15 U.S.C. § 1692f(1). First, the agreements authorize the payment of

20

such remedies to the creditor. The Adjustable Rate Note requires the defaulting debtor to pay the Note Holder late fees, and to pay "for all of [the] costs and expenses in enforcing th[e] Note to the extent not prohibited by applicable law." Doc. #414-3 at 3. In addition, the First Mortgage authorizes the lender to charge the borrower "fees for services performed in connection with the borrower's default." Doc. #414-4 at 9. That agreement also states that "the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee," while also prohibiting fees not authorized by "applicable law." *Id*. Kline has pointed to no provision of Ohio law that prohibits the charging of costs for judicial reports or pre-acceleration late fees. In fact, Ohio law requires a foreclosing plaintiff to file a judicial report containing information about the property, including its legal description, tax information, and all lienholders of record. Ohio Rev. Code § 2329.191. Thus, neither the judicial reports nor the pre-acceleration late fees form the basis for a cognizable FDCPA violation. For the foregoing reasons, even if Kline had not abandoned the judicial reports and pre-acceleration late fees as a basis for this claim, he could not prove a violation of the FDCPA based on same.

This leaves the following three categories of fees and costs, allegedly collected pursuant to the Adjustable Rate Note, which the Court will discuss in turn: attorneys' fees, service of process fees, and post-acceleration late fees.

1. *Attorneys' Fees*

Although the Adjustable Rate Note authorizes the collection of reasonable attorneys' fees, under Ohio law, "a provision in a mortgage or promissory note that awards attorney fees upon the enforcement of a lender's rights when the borrower defaults ... is unenforceable." *Wilborn v. Bank One Corp.*, 906 N.E.2d 396, 401 (Ohio 2009). However, Kline cannot prove an FDCPA violation against the Reimer Firm based on the collection of attorneys' fees from him. He failed to make any factual allegation in the Amended Complaint based on the collection of attorneys' fees by the Reimer Firm. Even if he had pled such a claim, for the following reasons, the undisputed evidence shows that the Reimer Firm did not collect, or attempt to collect, such fees from him.

First, neither of the letters sent from the Reimer Firm to Kline's attorney prior to the payoff listed attorneys' fees among the line items that comprised the payoff amounts. These letters were sent on August 17, 2007, and November 15, 2007. Doc. #414-9 & Doc. #414-11. They each itemized a number of costs and expenses, such as late charges, accrued interest, and court costs, that had been incurred in the filing of the 2007 Foreclosure. Attorneys' fees to the Reimer Firm are listed nowhere in either breakdown. In fact, the November 15, 2007, letter from the Reimer Firm affirmatively states that the payoff amount "does not include any attorney fees." Doc. #414-11. Furthermore, Dennis Reimer, the principal of the Reimer Firm, testified that the firm did not seek such fees in connection with payoffs. Reimer Dep. at 103 (Dep. #414-13 at 3).

22

Second, Kline has admitted that the payoff request did not include attorneys' fees and that the Reimer Firm did not collect any attorneys' fees from him. The Reimer Firm's Requests for Admissions asked him to admit both of these matters, and its attorney has attached an affidavit stating that Kline did not timely respond or object. Doc. #414-7. "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). In his Memorandum in Opposition, Kline has not addressed his failure to timely respond to the Requests for Admission or argued that the matters addressed should not be deemed admitted.

Third, even in the absence of the deemed admissions, the post-payoff adjustments to a Barclays' escrow account and Ms. Cartmill's testimony would not demonstrate a genuine issue of material fact as to whether the Reimer Firm collected attorneys' fees from Kline. There is no evidence that the Reimer Firm had any knowledge of these transactions or even had access to the servicer's escrow account. Furthermore, the relevancy of the transactions is questionable, as they all occurred *after* the payoff date. By that time, any "collection" forming the basis for a Section 1692f(1) violation had already passed.

### 2. *Service of Process Fees*

The Reimer Firm argues that charging Kline for personal service on the defendants in the 2007 Foreclosure did not violate the FDCPA because the

23

Adjustable Rate Note authorized charging him for "costs and expenses in enforcing" it, and Ohio law specifically permits personal service. Doc. #414-1 at 21 (citing Ohio Civ. R. 4.1(B)).

In response, Kline argues that the First Mortgage only allows "reasonable or appropriate" charges to the borrower, but that cannot include service of process fees where a foreclosing party is "actually serving itself" because it is the holder of both the primary and secondary mortgages and their notes. Doc. #470 at 17-18.

For the following reasons, no reasonable jury would conclude that the service of process fees charged to Kline violated the FDCPA. First, the Reimer Firm's Requests for Admissions specifically asked him to admit that the service of process charges were "reasonable." Doc. #414-17 at 16. As discussed previously, the failure to respond to the request functions as an admission on this matter. Therefore, Kline has admitted that the service of process charges were reasonable.

Thus, to prove a violation of the FDCPA, Kline would have to show that the service of process charges were either not "appropriate" or in violation of Ohio law. He argues that it is inappropriate for a foreclosing party to charge such fees for "actually serving itself" when it is the holder of both the primary and secondary mortgages and their notes. Doc. #470 at 17-18. However, the only Ohio case he cites to, *Ohio Department of Human Services. v. Ohio Department of Transportation*, 605 N.E.2d 1007, 1009 (Ohio Ct. App. 1992), involved a subrogation action brought by one Ohio agency against another, in which an Ohio Court of Appeals held that all parties to the action were actually the state and,

24

therefore, the same party. The case did not involve a foreclosing plaintiff with multiple security interests or service of process fees. Kline has cited to no case that demonstrates that such fees violate Ohio law.

Furthermore, the undisputed evidence demonstrates that the Reimer Firm followed the law when it served MERS during the 2007 Foreclosure. Under Ohio law, "[t]he holder of rights or interest in property is a necessary party to a foreclosure action." *Huntington Nat'l. Bank v. Ross* , 720 N.E.2d 1000, 1004 (Ohio Ct. App. 1998). Rule 19 of the Ohio Civil Rules requires the joinder of any necessary party "who is subject to service of process." The undisputed evidence shows that at the time the 2007 Foreclosure was filed, MERS was the lienholder of record on the Second Mortgage. Doc. #414-15 at 3. There was no other party for the Reimer Firm to serve process on, other than MERS. The undisputed evidence also shows that the Reimer Firm was not aware that Wells Fargo held the Balloon Note or the Second Mortgage in the RMBS trust at that time. Even if it had been aware of that fact, however, no reasonable jury could conclude that the Reimer Firm committed a violation of the FDCPA by conducting service of process in accordance with what Ohio law required of it when the firm filed the foreclosure action.

### 3. *Post-Acceleration Late Fees*

The Amended Complaint alleged that Kline was charged post-acceleration late fees in violation of the FDCPA. Am. Compl. ¶¶ 60-61 (Doc. #157 at 13).

However, the Reimer Firm also requested that Kline admit that he was never charged post-acceleration late fees. Request For Admission #24 (Doc. #414-17 at 14). As with the other Requests for Admission, Kline's failure to respond means that this request is deemed admitted.

Even without this admission, Kline has pointed to no evidence to support the allegation that he was ever charged post-acceleration late fees. In his Memorandum in Opposition, when describing the February 7, 2008, letter with a detailed itemization of the payoff that the Reimer Firm sent to his attorney, he states: "An attachment to the letter also indicated that Kline was charged for at least one late fee after his loan was accelerated." Doc. #470 at 6. This is an apparent reference to one of three sets of documents sent with the letter: a summary of transactions to the escrow account held by the servicer, seven pages of transactions to the servicer's "Corporate Advance Account," and eleven pages of transactions to an unnamed account that appears to be the servicer's general account concerning the Adjustable Rate Note. Doc. #465-15 at 3-21. The assertion that somewhere in one of these documents is an indication that Kline was charged post-acceleration late fees is insufficient to fulfill the requirement of Rule 56(c)(1)(A) to cite to "particular parts of materials in the record" that support a factual position. *E.g.*, *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) (stating that a district court does not have the "duty to sift through the record in search of evidence to support a party's opposition to summary judgment"). The Court will not wade through over twenty pages of poorly

26

photocopied documents listing account transactions in tiny, blurred print on a scavenger hunt for the late fee that Kline claims is there.

The only other part of the record that Kline points to as evidence that he was charged post-acceleration late fees is the deposition of Barclays' representative and former HomEq representative, Joseph Perry. Kline claims that Mr. Perry "admitted that Mr. Kline's records showed that he had been charged for at least one post-acceleration late fee in the amount of $69.12, and that this charge was improper." Doc. #470 at 14. This is only a partial description of Mr. Perry's testimony. Mr. Perry did admit that, generally, post-acceleration late fees are not properly charged to a borrower. Perry Dep. at 171 (Doc. #465-3 at 6). He also testified that Kline's account was, in fact, improperly assessed a post-acceleration late fee in the amount of $69.12 on November 16, 2007, and that this charge was an "error." *Id.* at 264-65, 271 (Doc. #465-3 at 22-23, 27). However, Mr. Perry also testified that the error was corrected on December 3, 2007, by a reversal of the $69.12 charge and a refund of the same amount to the escrow account for the purpose of disbursing the refund to Kline. *Id.* at 266, 269-70 (Doc. #465-3 at 24, 27-28).

The records of the servicer's Corporate Advance account and the escrow account corroborate Mr. Perry's description of these transactions. There is a "Late Charge Assessment" that was charged to the account in the amount of $69.12 on November 16, 2007; a deposit of the payoff amount from the sale of Kline's home in the amount of $173,674.26 on December 3, 2007, of which $248.02 was

27

applied to the accumulated late charges; a subsequent "Misapplication Reversal" of $69.12 on December 4, 2007, which reversed the applied payment; and a credit of $69.12 on December 5, 2007, bearing the description "Late Charge Adjustment." Doc. #465-15 at 11-12. Furthermore, a transaction to the escrow account on December 5, 2007, confirms the credit. It was in the amount of $69.12, and is described as "Funds Moved from Suspense [Account]." Finally, it must be noted that the erroneous transaction in question occurred *after* the date of the final payoff letter sent by the Reimer Firm to Kline's attorney, which included no demand for post-acceleration late fees. Thus, the undisputed evidence shows that the Reimer Firm did not demand post-acceleration late fees from Kline, and that the servicer refunded the sole erroneous charge to Kline for such fees. Even in the absence of Kline's deemed admission that he was not charged for such fees, based on the undisputed evidence in the record of the servicer's waiver of such a fee and subsequent refund to Kline, no reasonable jury could conclude that the Reimer Firm violated the FDCPA by charging him for post-acceleration late fees.

In conclusion, there is no evidence to support Kline's remaining FDCPA claim against the Reimer Firm under 15 U.S.C. § 1962f(1). Accordingly, the Reimer Firm is entitled to summary judgment on said claim.

## C.   The Unjust Enrichment Claim against the Reimer Firm

Kline's unjust enrichment claim is stated in the Fourth Claim for Relief of the Amended Complaint, which, in its caption, is brought against "all Defendants."

28

Am. Compl. ¶ 151 (Doc. #157 at 28). The claim alleges that Defendants "charged and received compensation for attorneys' fees and other fees and costs which had not been incurred," that it would be inequitable for them to retain the amounts charged, and that they had been unjustly enriched as a result. *Id.* ¶ ¶ 152-54 (Doc. #157 at 28).

For the following reasons, the Reimer Firm argues that in is entitled to summary judgment on Kline's unjust enrichment claim. First, Kline cannot present any evidence that he conferred a benefit on the firm, as there is no evidence that it retained any funds that he paid to the firm, or that he paid its attorneys' fees. Doc. #414-1 at 28-29. Second, it was not unjust for the Reimer Firm to charge him for the expense of the preliminary and final judicial reports incurred by the Nova Title Agency. *Id.* at 29-31. According to Reimer, such reports are required under Ohio law, and, contrary to Kline's allegations, there is no evidence that the firm and Nova Title Agency are the same entity or that they share fees. *Id.* Finally, Reimer argues that the claim is barred by the doctrine of voluntary payment, which prohibits a person from recovering a payment that he made with knowledge that it was improper for the purpose of suing the payee. *Id.* at 31-32.

In his Memorandum in Opposition, Kline argues that the evidence shows that the Reimer Firm charged him for attorneys' fees in connection with the reinstatement of his loan during the 2005 Foreclosure, citing to a letter sent to him at that time itemizing such fees. Doc. #470 at 21. He also points to evidence that MERS did not hold the loan at the time the 2005 Foreclosure was filed, and did not

have standing to sue him at that time under Ohio law. *Id.* Thus, he believes the recovery of the attorneys' fees was unjust because it was based on a misrepresentation by MERS and the Reimer Firm. *Id.* at 21-22. He incorporates, by reference to his FDCPA claim, the assertion that the Reimer Firm collected attorneys' fees from him during the 2007 Foreclosure. *Id.* at 22-23. Finally, Kline argues that the voluntary payment doctrine does not apply when a party pays to avoid the loss of property, and that he did not have full knowledge of the fact that MERS did not hold the note at the time of the 2005 Foreclosure. *Id.* at 23-24.

In its Reply Brief, the Reimer Firm argues that Kline's unjust enrichment claim cannot be based on the 2005 Foreclosure because there are no factual allegations in the Amended Complaint to support such a theory of the claim, which the Court has observed in a previous ruling. Doc. #474 at 14. The Reimer Firm also argues that an assertion of any such claim at this time would be time-barred, and urges the Court to disregard the improperly authenticated documents attached to the affidavit submitted with Kline's Memorandum in Opposition. *Id.* at 15-17. Furthermore, it points out that Kline failed to demonstrate how he would prove his unjust enrichment claim, and instead has only argued that an exception to the defense of voluntary payment applies. *Id.* at 17.

In the Sur-Reply that the Court granted Kline leave to file, Kline argues that he has the right to present evidence related to the 2005 Foreclosure because the Court previously stated that he could use deposition references to it made by Patrick Gorrien, a Wells Fargo representative, when responding to Defendants'

30

Motions for Summary Judgment. Doc. #487 at 9. He also argues that, under the Sixth Circuit's "course of proceedings" test, Defendants have had "ample notice" that he is challenging the fees and expenses charged to him during the 2005 Foreclosure. *Id.* at 9-10. Furthermore, he claims that the pleadings do not contain specific allegations regarding the attorneys' fees charged to him during the 2005 Foreclosure because "Wells Fargo and MERS concealed critical evidence relating to those claims during discovery." *Id.* at 11.

Unjust enrichment occurs "when a benefit is conferred and it would be inequitable to permit the benefiting party to retain the benefit without compensating the conferring party." *Meyer v. Chieffo,* 950 N.E.2d 1027, 1034 (Ohio Ct.App.2011). According to the Ohio Supreme Court, a plaintiff must demonstrate the following three elements to prove a claim of unjust enrichment: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Johnson v. Microsoft Corp.,* 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hambleton v. R.G. Barry Corp.,* 465 N.E.2d 1298 (Ohio 1984)).

On September 5, 2014, the Court overruled the Reimer Firm's Motion for Judgment on the Pleadings, based on factual allegations in the pleadings that it construed in Kline's favor, finding that Kline had sufficiently pled a claim for unjust enrichment against the firm. Doc. #366. Specifically, the Court pointed to the allegations that the fees Kline paid for the preliminary and final judicial reports were

31

unnecessary and were charged to him through an alleged alter ego of the Reimer Firm, the Nova Title Agency, but were ultimately retained by, and for the benefit of, the Reimer Firm itself. *Id.* at 13-15.

However, the Reimer Firm now presents undisputed evidence that charging Kline for these reports was a necessary expense, and it did not retain any benefit from their collection. First, as noted when discussing the FDCPA claim, such reports are required by Ohio law when a plaintiff files a foreclosure action. Ohio Rev. Code § 2329.191. Second, the affidavit of Dennis Reimer, a principal of the Reimer Firm, states the following:

> The Reimer Firm did not retain any portion of the expenses paid by Mr. Kline when he paid off the first and second mortgage on the property in November, 2007. Specifically, the firm did not receive or retain any portion of the costs Mr. Kline paid for the preliminary judicial report, final judicial report, service of process charge, court costs or late charges. The Reimer Firm did not receive any benefit with respect to the costs and expenses paid by Mr. Kline.

Reimer Aff. ¶ 4 (Doc. #414-18 at 1-2).

Mr. Reimer also provided testimony that undermines Kline's allegation that Nova Title Agency, Inc., was an alter ego collecting fees on behalf of his firm:

> Nova Title Agency Inc. ("Nova Title") and Reimer, Lorber & Arnovitz Co., L.P.A. and Reimer Arnovitz, Chernek & Jeffrey are, and have always been separate and distinct entities. Nova Title was not and has never been owned or controlled by Reimer Arnovitz, Chernek & Jeffrey f/k/a/ Reimer, Lorber & Arnovitz Co., L.P.A. None of the costs paid by Eugene Kline for services provided by Nova Title was shared with, passed on to or retained by Reimer, Lorber & Arnovitz Co., L.P.A.

*Id.* ¶ 5 (Doc. #414-18 at 2).

Kline has pointed to no evidence that creates a genuine issue of fact regarding Mr. Reimer's statements, which are all material to his unjust enrichment claim. Moreover, he has not addressed the fees associated with the Nova Title Agency expenses with his unjust enrichment claim, and has apparently abandoned them as a basis for it.

Instead, his arguments concentrate on the attorneys' fees he paid to the Reimer Firm for the reinstatement of his loan during the 2005 Foreclosure and his allegation that the firm collected attorneys' fees from him during the 2007 Foreclosure. However, as the Court previously observed when ruling on the Reimer Firm's Motion for Judgment on the Pleadings, the Amended Complaint is devoid of any allegations to support a claim of unjust enrichment arising out of the 2005 Foreclosure. The sole mention of the foreclosure proceeding itself is in the following sentences:

> 28. After the plaintiffs' default, HomEq contacted the Reimer law firm, and requested that they commence foreclosure proceedings against the plaintiffs on behalf of HomEq and WMC Mortgage Company.
>
> 29. In August, 2005, Reimer commenced foreclosure proceedings against the plaintiffs.
>
> 30. Those foreclosure proceedings were later dismissed as a result of a reinstatement of mortgage.

Am. Comp. ¶¶ 29-30. (Doc. #157 at 8).

The attorneys' fees he paid as a portion of the reinstatement costs of his mortgage loan in 2005 were clearly within his knowledge when he filed this action on November 10, 2008, and when the Amended Complaint was filed on April 14,

2010. Furthermore, as explained in the Court's analysis of the FDCPA claim, Kline never alleged that the Reimer Firm collected attorneys' fees from him in connection with the 2007 Foreclosure. Even if he had made the allegation, his deemed admissions on the matter and the undisputed evidence previously discussed demonstrate that no such fees were collected.

Third, citing *Carter v. Ford Motor Co.*, 561 F.3d 562 (6th Cir. 2009), Kline argues in his Sur-Reply that the Sixth Circuit uses a "course of proceedings" test to determine the scope of a plaintiff's claims "despite the failure to specifically allege such claims in the Complaint." Doc. #487 at 9. This statement is not representative of the test, which is not an incantatory device that allows a litigant to conjure a new claim from whole cloth. In *Carter*, the Sixth Circuit defined it as follows: "*where language in a complaint is ambiguous*, this Court has used a 'course of the proceedings test' to determine whether defendants have received notice of the plaintiff's claims." *Id.* at 566 (emphasis added). Kline's factual allegations were not ambiguous. Rather, they were silent as to *any* allegations of wrongdoing arising out of the 2005 Foreclosure, and *any* allegation that the Reimer Firm charged him attorneys' fees during the 2007 Foreclosure. Moreover, over a year ago, the Court clearly stated that "the 2005 Foreclosure . . . is not the subject of this action," and that "[t]he allegations of the Amended Complaint and the record before the Court demonstrate that Kline's viable unjust enrichment claim arises from the fees Reimer collected in the 2007 foreclosure case." Doc. #366 at 15. Faced with a statement that contradicts his own understanding of the scope of

34

a claim he is in the process of litigating, it is incumbent on a party not to passively

assume that the "course of proceedings" will provide notice to the Court and

opposing counsel of the factual basis for his claim.

Finally, Kline claims that discovery documents belatedly produced by Wells

Fargo in June, 2015, "demonstrate that MERS did not 'own' or 'hold' plaintiff's

first mortgage . . . at the time of the 2005 foreclosure action, and thus neither

Reimer nor MERS had the right to bring or maintain that action." Doc. #487 at 11.

This statement is followed by no citation to any document in the record to support

these assertions, and is therefore accorded no weight.

In conclusion, there is no evidence in the record to support Kline's unjust

enrichment claim against the Reimer Firm. The undisputed evidence shows that the

firm did not benefit from any of the fees that it charged to him, which were

collected on behalf of expenses properly accrued to prosecute the foreclosure

action. Because Kline cannot prove such a claim, it is unnecessary for the Court to

consider the parties' arguments regarding the defense of voluntary payment. For

the reasons discussed above, the Court sustains the Reimer Firm's Motion for

Summary Judgment in its entirety, and dismisses both the FDCPA claim and the

unjust enrichment claim against said Defendant with prejudice.

## IV.     THE LERNER FIRM'S MOTION FOR SUMMARY JUDGMENT (DOC. #416).

Kline's remaining claims against the Lerner Firm, a claim under the FDCPA

and an Ohio common law claim of unjust enrichment, are based on the firm's

collection of attorneys' fees and other costs in connection with the Balloon Note and the Second Mortgage. Am. Comp. ¶¶ 62-76 (Doc. #157 at 13-16). The Amended Complaint alleges that the Balloon Note and the Second Mortgage were held by MERS, as nominee for the original lender, WMC Mortgage, and that Kline contacted the Lerner Firm to obtain a "formal payoff quote" for this debt.[8] *Id.* ¶ 62 (Doc. #157 at 14). In addition to the payoff amount, the Lerner Firm collected $225 in "Previous Service Costs" it had paid to 3 Arch Trustee Services for "monitoring of the lawsuit" and $350 in attorneys' fees from Kline. *Id.* at 64 (Doc. #157 at 14). These charges were prohibited by Ohio law, according to Kline, and therefore violated the FDCPA. *Id.* ¶¶69-71, 73-76, 134 (Doc. #157 at 15-16, 25). He further alleges that the Lerner Firm was unjustly enriched by the collection of these amounts. *Id.* ¶¶ 151-153 (Doc. #157 at 28).

The Lerner Firm has filed for summary judgment on both the FDCPA claim and the unjust enrichment claim. The Court will address each in turn.

## A. Kline's FDCPA Claim under 15 U.S.C. § 1692f(1) against the Lerner Firm

The Lerner Firm attacks Kline's FDCPA claim on several fronts. First, it argues that the conduct in question, which it describes as merely "participating in the 2007 Foreclosure in protection of the position of junior mortgagee" and

---

[8] Although not specifically alleged in the Amended Complaint, the Lerner Firm represented the junior lienholder of record, MERS, in the 2007 Foreclosure. Petersmann Aff. ¶ 8 (Doc. #311 at 3).

"responding to an inquiry from Kline's counsel" with a payoff quote, do not
amount to actionable activity under the FDCPA. Doc. #416 at 11-13. Second, the
Lerner Firm argues that because the actions on which Kline's dismissed FDCPA
claim under Section 1692e and his still-viable claim under Section 1692f(1) are
"identical," as a matter of law, a freestanding Section 1692f(1) claim is not
cognizable. *Id.* at 13-14. Finally, even if considered on its merits, the Lerner Firm
argues that Kline's Section 1692f(1) claim fails because he has admitted that the
attorneys' fees were reasonable by not responding to its Requests for Admission,
the undisputed evidence shows that the attorneys' fees and costs were
reasonable, and none of them was prohibited by applicable law. *Id.* at 14-18.

        In Kline's Memorandum in Opposition, he counters the Lerner Firm's
arguments with the following points. First, Ohio law clearly prohibits the attorneys'
fees collected from Kline. Doc. #468 at 7-8. Second, the collection of attorneys'
fees was also improper because Wells Fargo actually held the Balloon Note and the
Second Mortgage, not MERS, and the attorneys' fees were therefore collected for
the defense of a party "in a lawsuit brought by itself." *Id.* at 8-9. Third, for the
same reason, neither the attorneys' fees nor the costs paid to 3 Arch Trustee
Services were "reasonable" or "necessary," as authorized by the Balloon Note. *Id.*
at 9. Fourth, the Lerner Firm's representative testified that 3 Arch Trustee Services
referred the matter to the firm, and referral fees are prohibited by the Fannie Mae
Guidelines and the Ohio Rules of Professional Conduct. *Id.* at 10.

The Lerner Firm replies as follows. First, the declaration that Kline's attorney submitted with the Memorandum in Opposition does not fulfill the requirement of Fed. R. Civ. P. 56(c)(4) that it must be based on personal knowledge, or otherwise demonstrate his competency to testify on the matters stated therein, and should therefore be disregarded. Doc. #473. Second, the Lerner Firm elaborates on its argument that the Section 1692f(1) claim is not cognizable because its factual predicate is identical to the dismissed Section 1692e claim, and points out that Kline has not responded to this argument. Third, the Lerner Firm's belief that the law is unsettled in Ohio regarding the propriety of a junior lienholder charging attorneys' fees to a debtor undercuts Kline's argument that the fees and costs were improper. Fourth, the fact that Kline's loans were all part of the same trust does not mean that the charges were improper, because MERS was the holder of record and was therefore a proper party. Fifth, Kline has pointed to no evidence that the Balloon Note was subject to Fannie Mae Guidelines or that a servicer's failure to follow them is in any way actionable. Finally, the Lerner Firm's representative, Sara M. Petersmann, stated in an affidavit that the firm paid no referral fees to 3 Arch Trustee Services, and Kline has pointed to no evidence to the contrary. Thus, there is no evidence to support his claim that the Ohio Rules of Professional Conduct were violated.

As an initial matter, the Court agrees with the Lerner Firm that the declaration of Kline's attorney does not conform to the standard required by Rule 56(c)(4) of the Federal Rules of Civil Procedure. The rule states: "An affidavit or

declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the

affiant or declarant is competent to testify on the matters stated." The Declaration

of Paul Grobman merely states that he "says under penalty of perjury" that he

represents Kline, and "submit[s] this Declaration in opposition to the motions for

summary judgment filed by each of the defendants in this action." Doc. #465 at 1.

The remainder of the Declaration simply lists the attached exhibits cited in the

Memorandum in Opposition. However, the Court declines to disregard the

Declaration or the attached exhibits because the Lerner Firm has not pointed to a

single exhibit that does not exist somewhere else in the record of this case. The

exhibits are records of the state court proceedings, the correspondence between

the parties' attorneys' at that time, and copies of the loan agreements, all of which

have been presented to the Court on multiple occasions. The remaining exhibits are

deposition transcripts of Defendants' representatives. Although the Declaration

lacks the specific language of Rule 56(c)(4), it would prioritize form over substance

to disregard the attached evidence on that basis.

Several of the Lerner Firm's legal arguments create a sense of déjà vu. The

Court has previously ruled – repeatedly – that Kline's remaining FDCPA claim

arises under Section 1692f(1), and is premised on that provision's prohibition on

the "collection of any amount" that is not "expressly authorized by the agreement

creating the debt or permitted by law."[9] 15 U.S.C. § 1692f(1). The Court has also

previously discussed the inapplicability the Sixth Circuit's holding in *Grden v.

Leiken Ingber & Winters PC*, 643 F.3d 169 (6th Cir. 2011), to Kline's Section

1692f(1)claim, yet the Lerner Firm again argues that it controls, in spite of the fact

that *Grden* was a Section 1692e case based not on actual collection of a debt, but

upon a false or misleading representation. However, it is unnecessary to reengage

with *Grden* or the other legal arguments presented by the Lerner Firm. Even

assuming the viability of Kline's theory of FDCPA liability, based on the undisputed

facts before the Court, the claim fails as a matter of law.

As stated previously, under 15 U.S.C. § 1692f(1), the FDCPA defines a

specific violation based on "[t]he collection of any amount (including any interest,

fee, charge, or expense incidental to the principal obligation) unless such amount is

expressly authorized by the agreement creating the debt or permitted by law."

Thus, the first prong asks whether the agreement expressly authorized the amount

collected. Paragraph 7 of the Second Mortgage states:

**Protection of Lender's Security.** If Borrower fails to perform the
covenants and agreements contained in this Mortgage, or if any action
or proceeding is commenced which materially affects Lender's interest
in the Property, then Lender, at Lender's option, upon notice to
Borrower, may make such appearances, disburse such sums, including

---

[9] These arguments were addressed at length in the Court's Decision and Entry
Overruling the Lerner Firm's Motion for Judgment on the Pleadings, and in the
Court's Decision and Entry Overruling the Lerner Firm's Motion to Reconsider, or,
in the Alternative, to Certify a Question of Law to the Ohio Supreme Court. Doc.
#294 & Doc. #305.

reasonable attorney's fees, and take such action as is necessary to protect Lender's interest.

In a previous ruling, the Court stated that this "the language … clearly authorizes charging sums to the borrower, including attorney's fees, in order to protect the lender's interest in the event of foreclosure." Doc. #294 at 16-17. When the Lerner Firm moved the Court for judgment on the pleadings, arguing that the $350 in attorneys' fees was "reasonable," the Court could not grant the motion because "the issue of reasonableness" was an evidentiary issue that could not be resolved "based on the pleadings, the record … and the simple fact of the parties' disagreement." *Id.* at 22. However, Kline has conceded the reasonableness of the attorneys' fees by failing to respond to the following Requests for Admissions propounded upon him by the Reimer Firm:

Request for Admission No. 1. Admit that $100 per hour was a reasonable hourly rate for an attorneys' services in the area of Dayton, Ohio, during 2007 and 2008, for the representation of a client in a civil matter pending on a court's docket, including the evaluation of a complaint consultation with the client, filing of pleadings, and communication with other case counsel.

Request for Admission No. 2. Admit that a total attorney fee of $350 was a reasonable fee during the years 2007 and 2008, for an attorney's services consisting of review of pleadings, orders, and memoranda filed in a civil case pending in Dayton Ohio, conferring with other case counsel, responding to correspondence from opposing counsel, and consulting with the client.

Fischer Aff., Ex 1 ¶¶ 3-4 (Doc. #416-2 at 4).

Kline's Memorandum in Opposition did not address his failure to respond to the Requests for Admission. As with the Requests for Admission propounded by the Reimer Firm, they are deemed admitted. Fed. R. Civ. P. 36(a)(3). Because the

41

Second Mortgage authorized reasonable attorneys' fees and Kline admits that the Lerner Firm's attorneys' fees were reasonable, no reasonable jury could conclude that an FDCPA violation premised upon the collection of an amount not "expressly authorized by the agreement creating the debt" occurred.

This leaves the question of whether the Lerner Firm's attorneys' fees were "authorized by law." This issue has been extensively litigated by the parties and the Court has ruled on more than one occasion that Ohio law prohibits the enforcement of a provision of a promissory note that authorizes the collection of the lender's attorneys' fees for its enforcement. Doc. #249 & #Doc. #305. Nevertheless, evidence has been presented to the Court that demonstrates that, within weeks of the collection of the attorneys' fees, HomEq refunded the attorneys' fees to Kline. The affidavit of Jacklyn Cartmill, a Barclay's representative whose position involves "locating and analyzing historical archival records," states that she "discovered that a reimbursement check was mailed to the Plaintiff on or about December 21, 2007, in the amount of $422.32. That sum included the $350.00 which had been assessed to and collected from the Plaintiff in the payoff of the second mortgage loan." Cartmill Aff. ¶ 9 (Doc. #477-2 at 4). The check itself is attached as an exhibit to the affidavit, is payable to the order of Eugene D. Kline, and conforms to Ms. Cartmill's representation.

In a Sur-Reply Brief addressing the refund of the attorneys' fees, Kline makes several arguments. None of them has merit. First, he argues that, under Federal Rule of Civil Procedure 8(c)(1), the Lerner Firm had the burden of pleading

the affirmative defense of payment, and because it did not, has waived such a

defense. However, payment is an affirmative defense to a claim arising from an

agreement creating a monetary obligation, such as a debt. *See Desjardins v.*

*Desjardins*, 308 F.2d 111, 116, 91 Ohio Law Abs. 111 (6th Cir. 1962) (applying

state law and not enforcing provisions of divorce decree requiring payment to

divorced spouse). Kline's FDCPA claim was not based on an allegation that the

Lerner Firm owed him money, and he has not demonstrated that this affirmative

defense applies to a Section 1692f(1) FDCPA claim.

Second, Kline claims that "both Ms. Cartmill and the Defendants who filed

her affidavit are lying" and have made "fraudulent statements" to the Court. *Id.* at

8. These heated accusations are based on the following observations. The payoff

quote from Lerner Sampson stated that, as of December 6, 2007, Kline owed

$3,485.02 in accrued interest on the Balloon Note. However, the transaction

history of the "Corporate Advance Account" produced earlier this year in discovery

shows that on November 29, 2007, when the payoff was applied, only $3,379.81

went to interest, and $422.32 was placed into the escrow account. Based on the

$105.82 difference in the interest amounts, he states the following:

> Thus, even if the $422.32 of Escrow Overpayments refunded to Mr.
> Kline could somehow be attributed to a refund of the $350.00 legal
> fee as Cartmill's Affidavit claims, that would still mean that MERS,
> HomEq and Lerner Sampson collected a portion of the $350 fee from
> Mr. Kline, since MERS and HomEq never paid back the $105.82 in
> interest owed to plaintiff.

Doc. #488.

This argument is contradictory. If, as Kline asserts, the $105.82 in interest was never repaid to him, the $422.32 refund check in question more than covered the $350.00 in legal fees, just as Ms. Cartmill describes in her affidavit.

The undisputed facts before the Court show that Kline received a refund check from HomEq that refunded to him the amount of attorneys' fees collected from him by the Lerner Firm, and that he received it just several weeks after paying off the Balloon Note. Even though the collection of the attorneys' fees was not authorized by Ohio law, it was immediately remedied by its return to Kline. Kline does not dispute that he received the check. Nor does he allege that he suffered a compensable injury, such as emotional distress, before the $350.00 was refunded to him. Based on these facts, no reasonable jury could conclude that Kline suffered a violation under the statute based on the collection of attorneys' fees. *E.g., Parker v. Shermeta, Adams & Von Allmen, P.C.*, No. 13-15067, 2014 WL 5473074 (E.D. Mich. Oct. 27, 2014) (holding that no genuine issue of material fact existed on plaintiff's claim under 15 U.S.C. § 1692f(1), and observing that a defendant's refund of an amount collected demonstrated its "affirmative steps" to comply with controlling state law "and, by extension, its obligations under the FDCPA").

The only remaining component to Kline's FDCPA claim is the collection of $225 in expenses to 3 Arch Trustee Services. At the time of the payoff, the Lerner Firm described this fee as an expense "for the servicing of [the Balloon Note] and monitoring of the lawsuit with services that included obtaining local counsel, production of necessary documents and loan information, and billing of invoices."

44

Doc. #465-14 at 2-3. Subsequent testimony from Joseph Perry, a former HomEq employee, has revealed that the servicer hired 3 Arch Trustee Services to monitor the amount of equity that existed in the Second Mortgage and to track changes in that amount, so that the servicer could decide whether to bid on the property at a foreclosure sale. Perry Dep. at 41, 47, 51-57 (Doc. #417-12).

For the following reasons, no reasonable jury could conclude that the fees that the Lerner Firm collected on behalf of the servicer for 3 Arch Trustee Services amounted to an FDCPA violation. First, unlike the attorneys' fees issue, Kline has pointed to no provision of Ohio law prohibiting the collection of such fees. Thus, no reasonable jury could conclude that they fulfill the Section 1692f(1) prong defining a violation based on the "collection of any amount ... not permitted by law."

Second, no reasonable jury could conclude that fees in question violated the other prong of Section 1692f(1), because they were "expressly authorized by the agreement creating the debt." It is undisputed that the 3 Arch Trustee Services fees were collected pursuant to Paragraph 7 of the Second Mortgage, which authorizes the lender to "disburse such sums ... and take such action as is necessary to protect Lender's interest." Kline does not dispute Mr. Perry's description of the role of 3 Arch Trustee Services, which monitored the amount of equity so that the holder of the Second Mortgage could make a reasoned decision about bidding for the secured property at any sale subsequent to a foreclosure action brought by the primary lienholder. This function appears reasonably

45

necessary to protect the lender's interest, and a charge for it is therefore authorized by the agreement creating the debt.

Kline claims that the Lerner Firm has "acknowledged" the referral of the case to the Lerner Firm by 3 Arch Trustee Services, citing the deposition of the firm's representative, Sara Petersmann. Doc. #468 at 10. Ms. Petersmann did state that the Lerner Firm received a "referral" from 3 Arch Trustee Services. Petersmann Dep. at 99 (Doc. #465-21). However, the nature of the "referral" was a request "to file an answer *on behalf of* the second mortgage holder." *Id* (emphasis added)*.* Mr. Perry's testimony revealed that 3 Arch Trustee Services performed its services at HomEq's request, and that it was "through" 3 Arch Trustee Services that HomEq would refer cases to local counsel. Perry Dep. at 54 (Doc. #417-12). Moreover, Ms. Petersmann testified that the Lerner Firm paid no fees to 3 Arch Trustees Services. Petersmann Dep. at 146 (Doc. #416-5 at 4). Kline has pointed to no evidence in the record that contradicts any of the foregoing facts and they are, therefore, undisputed. None of these facts supports the argument that the "referral" was anything other than 3 Arch Trustee Services acting on behalf of the servicer, HomEq.

Furthermore, Ms. Petersmann's testimony demonstrates that the Lerner Firm did not violate Rule 7.2 of the Ohio Rules of Professional Conduct, which states that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services." Finally, Kline has pointed to no evidence demonstrating that the Balloon Note or the Second Mortgage was governed by the Fannie Mae Guidelines

46

that he claims the Lerner Firm violated, which would be a necessary factual predicate to claiming an FDCPA violation.

In conclusion, the undisputed evidence before the Court demonstrates that the Lerner Firm did not commit a violation under Section 1692f(1) of the FDCPA. Accordingly, the Lerner Firm's Motion for Summary Judgment on said claim is sustained, and same is dismissed with prejudice.

### B. The Unjust Enrichment Claim against the Lerner Firm

The Amended Complaint alleges that the Lerner Firm benefitted from improper attorneys' fees and expenses charged on behalf 3 Arch Trustee Services. Am. Compl. ¶¶ 62-76 (Doc. #157 at 14-17). In pleading the unjust enrichment claim, the Fourth Claim for Relief states that these fees and costs "had not been incurred by Defendants," and that it would be inequitable and amount to unjust enrichment if they were retained. *Id.* ¶ 151-54 (Doc. #157 at 28).

The Lerner Firm argues that it is entitled to summary judgment on Kline's unjust enrichment claim for the following reasons. First, Kline conferred no benefit on the Lerner Firm because its client paid its attorneys' fees, which were not contingent upon Kline paying off the Balloon Note and Second Mortgage. Doc. #416 at 8-9. Second, it was not unjust for the Lerner Firm to retain $350.00 in attorneys' fees from for five hours of work on the case, in accordance with the agreement it had with its client. *Id.* at 9-10. Third, because Kline voluntarily sold

his home to pay off his debts, the voluntary payment doctrine bars any claim of unjust enrichment. *Id.* at 10-11.

Kline makes the following points in his Memorandum in Opposition in response. First, the Court has already determined that Ohio law did not permit the benefit in question, the attorneys' fees collected by the Lerner Firm, which he paid directly to the firm. Doc. #468 at 12. Second, under Ohio law, a benefit may be conferred directly or indirectly upon the beneficiary to prove an unjust enrichment claim, and he paid "money directly" to the Lerner Firm through his attorney. *Id.* at 12-13. Finally, Kline counters that the voluntary payment doctrine does not apply when the plaintiff pays money to avoid the loss of property, and that he did not have full knowledge of the facts regarding the actual holder of the Balloon Note until after this case was filed. *Id.*

In its Reply, the Lerner Firm argues that Kline fails to point to any part of the record to support his claim that he was forced to sell his house, and quotes portions of his deposition in which he described the decision to pay off his loans as voluntary. Doc. #473 at 2. The Lerner Firm also states that Kline presents no facts that support his claim that he conferred a benefit on it, and fails to cite to the record to support his assertion that he paid money directly to the firm.[10] *Id.* at 3.

_____

[10] Kline's Sur-Reply does not specifically address the unjust enrichment claim, but his arguments attacking the assertions of Ms. Cartmill's affidavit are relevant to that claim. These arguments have been addressed in the Court's previous discussion of his FDCPA claim against the Lerner Firm. *See supra* Part IV.A.

48

As stated previously, the three elements of an unjust enrichment claim are: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Johnson v. Microsoft Corp.,* 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hambleton v. R.G. Barry Corp.,* 465 N.E.2d 1298 (Ohio 1984)). Ohio courts have described unjust enrichment as "a claim under quasi-contract law against a person in receipt of benefits that he is not justly and equitably entitled to retain." *Crawford v. Hawes*, 2013-Ohio-3173, ¶ 34, 995 N.E.2d 966, 975 (Ohio Ct. App.) (citing *Hummel v. Hummel*, 14 N.E.2d 923, 923 (Ohio 1938)).

As a preliminary observation, the Court notes that Kline has failed to address the fees paid to 3 Arch Trustee Services in his responsive arguments. Thus, he has abandoned any factual basis for his unjust enrichment claim against the Lerner Firm, other than the attorneys' fees collected in connection with the payoff of the Balloon Note and the Second Mortgage.

Here, there is some basis for a reasonable jury to find that Kline satisfies the first two elements of an unjust enrichment claim. The undisputed evidence shows that Kline's payoff included $350 for attorneys' fees, which a reasonable jury could conclude amounted to a benefit that he conferred upon the firm. However, for a number of reasons, such a finding would be tenuous at best. The Lerner Firm's records show that the payoff check it received from Kline was made payable to the servicer, HomEq, not to the Lerner Firm. Petersmann Aff. Ex. 10

49

(Doc. 311-10 at 1). Under Ohio Rule of Professional Conduct 1.15(a), a lawyer must hold its clients' property "separate from the lawyer's own property," in an interest-bearing trust account apart from the lawyer's operating account. The Lerner Firm may have held the payoff funds in trust before disbursing them to its client, but there is no evidence to suggest that it retained them or deposited them into its own account. However, because it is undisputed that the Lerner Firm included the attorneys' fees in the payoff quote and subsequently collected the payoff from Kline, the Court would be inclined to let a jury determine whether this evidence demonstrates that Kline conferred a benefit on the Lerner Firm. With regard to the second element, there appears to be no dispute that the Lerner Firm was aware of that it collected the attorneys' fees in the payoff amount from Kline. As noted, it included that specific charge in in the payoff quote it submitted to Kline's attorney and received the entire amount of the payoff after the sale of his house.

However, even if Kline could convince a jury that the evidence supports the third element, his unjust enrichment claim fails as a matter of law, because he has already received the entire remedy that the claim provides. "Restitution is the remedy provided upon proof of unjust enrichment 'to prevent one from retaining property to which he is not justly entitled.'" *San Allen, Inc. v. Buehrer*, 2014-Ohio-2071, ¶ 114, 11 N.E.3d 739, 781 (Ohio Ct. App. 2014) (citing *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 141 N.E.2d 465 (Ohio 1957)). "Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he

has conferred upon another, not to compensate him for a loss suffered." *Jones v.*

*Jones*, 2008-Ohio-6069, ¶ 33, 903 N.E.2d 329, 337 (Ohio Ct. App. 2008). Here,

the benefit Kline allegedly conferred is the $350.00 in attorneys' fees that were

charged as part of the payoff of the Balloon Note and Second Mortgage. As

discussed when dismissing Kline's FDCPA claim against the Lerner Firm, the

undisputed evidence shows that several weeks after making the payoff, he

received a refund check from HomEq for the attorneys' fees that the Lerner Firm

charged him. Cartmill Aff. ¶ 9 (Doc. #477-2 at 4). Kline has not alleged or argued

that he suffered some additional loss during the weeks between the payoff and the

refund from having paid the $350.00, but even if he had, restitution would be

limited to the amount he actually conferred. "Unjust enrichment entitles a party

only to restitution of the reasonable value of the benefit conferred."*Crawford v.*

*Hawes*, 2013-Ohio-3173, ¶ 34, 995 N.E.2d 966, 975 (Ohio Ct. App. 2013).

Because Kline received payment for the benefit he alleges that he conferred, his

unjust enrichment claim fails as a matter of law. Accordingly, the Lerner Firm is

entitled to summary judgment on his unjust enrichment claim, and same is

dismissed with prejudice.

## V.  WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT (DOC. #417)

In the Amended Complaint, Kline alleges that Wells Fargo falsely asserted

that it was the "owner and holder" of the Adjustable Rate Note when it

commenced the 2007 Foreclosure proceeding against him, because the

Assignment of Mortgage from MERS to Wells Fargo did not occur until after the suit was filed. Doc. #157 at 9. He also alleges that he was improperly and unnecessarily charged for service of process fees, the preliminary and final judicial reports, and late fees added after the acceleration of the loan. *Id.* at 10-13. By "demanding and collecting more" than it was entitled to, "and then failing to return Kline's overpayment within six months," Wells Fargo allegedly violated the TILA, 15 U.S.C. § 1666d. *Id.* at 25. In his breach of contract claim, Kline asserts that his loan agreements were breached by the collection of "fees, expenses, and costs of collection in excess of that allowed" by the agreements. *Id.* at 30.

As noted previously, *supra* at page 2, Kline has abandoned the TILA claim. This leaves the breach of contract claim, which Wells Fargo attacks on a number of grounds. The Court will first address Wells Fargo's purely legal argument that its liability is limited by the PSA, and will then turn to its factual arguments for summary judgment in its favor.

### A. Whether Wells Fargo's Liability is Limited by the Terms of the PSA

Wells Fargo argues that it cannot be held liable for a breach of Kline's loan agreements because its duties and obligations were solely determined by the terms of the PSA that created the RMBS, the trust in which the loans were held. Doc. #417-1 at 7. According to Wells Fargo, the PSA supersedes "concepts of common law," and Kline has not identified a provision of the PSA that was breached. *Id.* at 7-9. The bank quotes a number of provisions of the PSA that purportedly limit its

liability to "the performance of such duties and obligations as are specifically set forth in the [PSA]," and disclaim any liability of the trustee for "any action or failure to act by the Servicer" of the loans held in the RMBS. *Id.*

In response to Wells Fargo's argument that its duties are defined solely by the PSA and not by his loan agreements, Kline simply asserts that "Wells Fargo cites no support for this proposition." Doc. #466 at 12. His only other argument is that, under Rule 17 of the Federal Rules of Civil Procedure, Wells Fargo is the "proper party" to be sued for a breach of the loan documents because it is the "real party in interest." *Id.*

Kline's first assertion is incorrect. In its briefing, Wells Fargo supports its argument that the PSA is the sole source of its duties and obligations with an extensive quotation from *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 180 (S.D.N.Y. 2011). In *Ellington Credit Fund*, two hedge funds that had invested in RMBSs brought a number of common law claims, including breach of contract and breach of fiduciary duty claims, against the trustee and the servicer of the pooled loans. *Id.* at 178-79. Like the present case, the trust was the creation of a PSA. *Id.* at 178. Applying New York law, the district court scrutinized the terms of the PSA and concluded that the plaintiffs had only plausibly alleged a breach of the duty to warn beneficiaries of the servicer's breach of the PSA, but dismissed the claim insofar as it alleged a breach of a general duty to monitor the servicer. *Id.* at 190-91. The district court also dismissed the plaintiffs' breach of fiduciary duty claim. *Id.* at 193. The court

53

reasoned that a "securitization trustee" that is subject to a PSA is similar to a commercial trust, which, unlike ordinary trustees, owes only limited extra-contractual fiduciary duties to trust beneficiaries under New York law. *Id.* at 192. Because the PSA did not expressly impose a fiduciary duty on the trustee comparable to that imposed by common law on an ordinary trustee, the court declined to recognize that such a duty was owed, and dismissed the breach of fiduciary duty claim as well. *Id.* at 192-93.

In spite of Kline's failure to discuss this authority, the Court nevertheless concludes that Wells Fargo's reliance on *Ellington Credit Fund* is misplaced. The case applies New York law to the plaintiffs' breach of contract and breach of fiduciary duty claims, but there is no explanation of how, or if, the Ohio law governing Kline's breach of contract claim is analogous. Furthermore, Wells Fargo selectively quotes language from the court's discussion of the breach of fiduciary duty claim, such as "much of the common law of trusts, and its corresponding fiduciary obligations, are not applicable to commercial trusts," to suggest that the very existence of a PSA somehow immunizes a trustee from *any* common law claim. Doc. #417-1 at 7 (quoting *Ellington Credit Fund*, 837 F. Supp. 2d at 191). The use of this quotation is misleading. The discussion in which it appeared did not concern the breach of contract claims, which were fully analyzed by the court. Rather, the discussion containing the language quoted by Wells Fargo concerned the scope of the fiduciary duty that the trustee owed to the plaintiffs, which was

limited by the terms of the PSA, to determine the viability of the breach of fiduciary duty claim. 837 F. Supp. 2d at 191-92.

    An important distinction is that, unlike the present case, the plaintiffs in *Ellington Credit Fund* were hedge funds that were certificate holders and beneficiaries of the RMBSs, and their breach of contract claims expressly alleged breaches of the PSAs that created the securities. In contrast, Kline's allegations of breach arise under his loan and mortgage agreements, based on the theory that Wells Fargo can now be held liable for their breach when it attempted to enforce them. Wells Fargo appears to believe that, under *Ellington Credit Fund*, the PSA somehow insulates the trustee of an RMBS from *any* breach of contract claim arising from an individual securitized loan held in the trust. Doc. #417-1 at 7. However, the plaintiffs in that case only alleged a breach of the PSA, not any individual loan or agreement in the trust. They were certificate-holding investors in the trust, not mortgagors whose loans had been pooled and securitized. Thus, the case provides no support for the contention that Wells Fargo can only be held liable for its duties and obligations under the PSA. That might be the case if the certificate holders and investors in the Trust sued Wells Fargo, but they are not the plaintiffs in this litigation. Whatever duties and obligations Wells Fargo has under the PSA are owed to the trust beneficiaries, the investors in the RMBS, and Kline has no standing to enforce the terms of that agreement. *See*, *e.g., Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 87 (2d Cir. 2014) (holding that original mortgagors had no standing to bring breach of contract claims alleging the

breach of a PSA that created the trust holding their loans, as mortgagors "were not parties to the assignment agreements" or intended third-party beneficiaries). In short, *Ellington Credit Fund* does not demonstrate that the PSA immunizes Wells Fargo from liability for breach of Kline's loan documents, which are separate agreements entirely. Accordingly, it is not entitled to summary judgment on Kline's breach of contract claim on the grounds that its liability is limited to the terms of the PSA.

The parties have not discussed or briefed the real issue this argument presents: whether the contractual duties and obligations of the agreements controlling the securitized loans held in an RMBS might be imputed to its trustee, who may then be sued by the debtor for breach of those agreements. As discussed, Wells Fargo argues that it can only be liable under the terms of the PSA, but the Court considers that argument as a "red herring." The PSA is not the agreement under which Kline's breach of contract claim arises. On the other hand, Kline's rebuttal is limited to the following statement, accompanied by a citation to Rule 17 of the Federal Rules of Civil Procedure: "As the Trustee, Wells Fargo was the real party in interest, and the proper party to be sued for breaches of the loan documents." Doc. #466 at 12. His assertion may refer to the inclusion of "a trustee of an express trust" in Rule 17's enumerated list of possible real parties in interest. Fed. R. Civ. P. 17(a)(1)(E). However, the plain language of the rule demonstrates that a real party in interest can only be a *claimant*: "An action must be prosecuted by the real party in interest." *See* Charles Alan Wright & Arthur R.

Miller, 6A Fed. Prac. & Proc. Civ. § 1542 (3d ed.) (observing that because "the real-party-in-interest principle is a means to identify *the person who possesses the right sought to be enforced* . . . the term [real party in interest] directs attention to whether [a] plaintiff has a significant interest in the particular action [it] has instituted, and Rule 17(a) is *limited to plaintiffs*") (emphasis added). Wells Fargo is not the plaintiff, nor is it prosecuting a claim in this action. Kline, not Wells Fargo, is the "real party in interest" under Rule 17(a) for the purposes of this action. Thus, Kline's argument does not answer the question of whether Wells Fargo may be held liable as a defendant for a breach of his loan agreements.

The law of assignment provides the answer. It is undisputed that MERS effected an assignment of Kline's Adjustable Rate Note and First Mortgage to Wells Fargo on March 26, 2007. Doc. #465-8. Under Ohio law, "the assignee of a contract takes that contract with all rights of the assignor and subject to all defenses that the obligor may have had against the assignor." *Citizens Fed. Bank, F.S.B. v. Brickler,* 683 N.E.2d 358, 364 (Ohio Ct. App. 1996) (holding that the assignee of a loan agreement could not declare a default under terms that the mortgagor and the assignor had agreed to modify prior to assignment); *see also CitiMortgage, Inc. v. Hoge*, 2011-Ohio-3839, ¶ 19, 962 N.E.2d 327, 332 (Ohio Ct. App. 2011) ("The default rule for consumer and commercial mortgages alike is that a mortgage lender's assignee takes subject to the claims and defenses that the borrower might assert against the original lender") (quoting Christoper L. Peterson, *Predatory Structured Finance*, 28 Cardozo L. Rev. 2185, 2233 (2007)).

57

When it filed the 2007 Foreclosure in state court against Kline, Wells Fargo
asserted that it was the "owner and holder" of the note, and that it was entitled to
all the rights and remedies that the note and mortgage afforded to an assignee
attempting to enforce their terms. Wells Fargo certainly did not take the position
that the only the terms of the PSA controlled when it filed the state court
foreclosure proceedings against Kline. It is contradictory for Wells Fargo to argue
that it was entitled to invoke the loan agreements to enforce its rights under them,
but, at the same time, cannot be held liable for any breach of the same agreements
due to the purported ability of the PSA to limit its liability, an agreement to which
Kline is not even a party. For the foregoing reasons, Wells Fargo has failed to
demonstrate that it is not subject to the basic black letter law of assignment
adhered to by Ohio courts, or that a breach of contract claim against it by an
obligor to a loan agreement that it prosecuted as a foreclosing plaintiff may not be
pursued.

**B.  Whether Wells Fargo Breached the Terms of the Loan Agreements**

Wells Fargo also argues that, even if it could be held legally responsible for a
breach of Kline's loan agreements, it is entitled to summary judgment because their
terms have not been breached. Doc. #417-1 at 9. Before reaching the individual
points that Wells Fargo makes to support this argument, it is necessary to
determine the precise scope of Kline's breach of contract claims. In the Response
in Opposition, he provides the following description of his breach of contract claim:

58

Case: 3:08-cv-00408-WHR Doc #: 492 Filed: 12/23/15 Page: 59 of 80 PAGEID #: 8917

In this case, Mr. Kline alleges that Wells Fargo breached the contracts between it and Mr. Kline when the following amounts were collected from Mr. Kline on the first and second mortgages:

A. post-acceleration late fees collected from Mr. Kline on the First Mortgage in the 2005 Foreclosure Action;

B. legal fees and expenses collected from Mr. Kline on the First Mortgage in the 2005 Foreclosure Action;

C. legal fees collected from plaintiff on the First Mortgage in the 2007 Foreclosure Action;

D. legal fees and outsourcing fees collected from plaintiff on the Second Mortgage in the 2007 Foreclosure Action;

E. service of process fees collected from plaintiff relating to the service of process on the Second Mortgage holder by the First Mortgage holder in the 2007 Foreclosure Action; and

F. The post-acceleration late fee collected from Mr. Kline on the First Mortgage in the 2007 Foreclosure Action.

Doc. #466 at 11-12.

1. *The 2005 Foreclosure*

Regarding the first two points, the Amended Complaint provides no support for Kline's assertion that his breach of contract claim encompasses any fee or expense recovered during the 2005 Foreclosure. The pleading is devoid of any allegation that Kline was charged for fees or expenses by any Defendant during that proceeding. Paragraphs 25-30 of the Amended Complaint contain the only allegations concerning the events before and during the 2005 Foreclosure, and they state:

25. In or about June 2004, plaintiffs Eugene and Constance Kline entered into two loan transactions with WMC Mortgage Corporation under which plaintiffs were loaned the principal sum of $160,000.00.

26. At some point thereafter, plaintiffs fell behind on their payments, and their loan was put in default.

27. The loan was serviced by HomEq.

28. After the plaintiffs' default, HomEq contacted the Reimer law firm, and requested that they commence foreclosure proceedings against the plaintiffs on behalf of HomEq and WMC Mortgage Company.

29. In August 2005, Reimer commenced foreclosure proceedings against the plaintiffs.

30. Those foreclosure proceedings were later dismissed as a result of a reinstatement of mortgage.

Doc. #157 at 8.

The foregoing paragraphs present a background to the allegations concerning the 2007 Foreclosure, and all factual allegations in the pleading of improper fees and expenses concern that later proceeding. Doc. #157 ¶¶ 45-76. The Fifth Claim for Relief, the section of the Amended Complaint expressly devoted to the breach of contract claim, alleges that by charging "fees, expenses and costs of collection in excess of that allowed under" the loan agreements, Defendants "breached th[o]se agreements to the detriment of" Kline and his former co-plaintiffs. *Id.* ¶ 163 (Doc. #157 at 30). Because the allegations regarding the 2005 Foreclosure make no mention of fees or expenses, Defendants would have no reason to believe that anything other than the fees and expenses charged in the wake of the 2007 Foreclosure formed the basis of his breach of contract claim. A

60

plaintiff may not advance a new claim or theory in response to a motion for summary judgment. *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 787-78 (6th Cir. 2005); *see also Lally v. BP Prods N. Am., Inc.*, 615 F. Supp. 2d 654, 659 (N.D. Ohio 2009) (citing *Tucker* and observing that "Plaintiffs may not expand the scope of their claims in an opposition to a summary judgment motion"). Furthermore, as discussed previously in its analysis of the Reimer Firm's Motion for Summary Judgment, the Court communicated its understanding over a year ago to the parties that Kline's claims of wrongdoing only concern the 2007 Foreclosure. Kline may not now assert that the fees and expenses charged during the 2005 Foreclosure are the basis for his breach of contract claim. Accordingly, the scope of the breach of contract claim is limited to the fees and expenses collected from Kline as a result of the 2007 Foreclosure.

This leaves the various fees and expenses charged during the 2007 Foreclosure, which, for the sake of clarity, must be separately discussed.

2. *Allegations of Attorneys' Fees Collected under the Adjustable Rate Note during the 2007 Foreclosure*

Section 7 of the Adjustable Rate Note governs default and the remedies available to a Note Holder. Doc. #465-1 at 16. Upon default, the Note Holder may demand the "full amount" of any principal and interest owed. *Id.* Section 7(E) states:

Payment of Note Holder's Costs and Expenses

> If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

*Id.*

Citing this provision, Wells Fargo argues that the collection of attorney fees could not have breached this term of the Adjustable Rate Note because it expressly authorized such collection. Doc. #417-1 at 9-10. This argument pointedly ignores the settled rule under Ohio law that "contracts for the payment of attorney fees upon the default of a debt obligation are void and unenforceable." *Wilborn v. Bank One Corp.*, 906 N.E.2d 396, 401 (Ohio 2009) (citing *Leavans v. Ohio Nat. Bank*, 34 N.E. 1089 (Ohio 1893)). "In other words, a provision in a mortgage or promissory note that awards attorney fees upon the enforcement of the lender's rights when the borrower defaults, such as a foreclosure action that has proceeded to judgment, is unenforceable." *Wilborn*, 906 N.E.2d at 401. The Court addressed this point of law at length in its Decision and Entry of February 27, 2013, which overruled the Lerner Firm's Motion for Judgment on the Pleadings, and in its Decision and Entry of September 18, 2013, which overruled the Lerner Firm's Motion for Reconsideration. Doc. #294 at 23-28 & Doc. #305. Applying this principle of Ohio law, the collection of attorneys' fees would breach the term of the Adjustable Rate Note that says such fees may only be collected to the "extent not prohibited by applicable law."

Apart from this legal argument, Wells Fargo points out that the only allegations of illegally charged attorneys' fees in the Amended Complaint concern the Lerner Firm's handling of the Second Mortgage, not the Reimer Firm's representation of Wells Fargo in connection with the First Mortgage. Doc. #417-1 at 12. As the Court has previously concluded, a careful reading of the Amended Complaint confirms this assertion. The allegations of improper fees and expenses charged in connection with the Adjustable Rate Note and the primary mortgage do not include attorneys' fees. Am. Compl. ¶¶ 45-61 (Doc. #157 at 10-13).

However, Kline believes that recently uncovered evidence demonstrates that Wells Fargo charged him for the legal fees it paid to the Reimer Firm. Doc. #466 at 19. On March 26, 2015, Barclays produced a record of transactions to an escrow account that the servicer maintained during the foreclosure. Doc. #465-15 at 2. Kline points to a previously undisclosed positive balance in the escrow account of $412.96, that remained after the proceeds from his payoff had been applied, and two subsequent transactions that brought the escrow account balance to zero. Doc. #466 at 19. Those transactions occurred on December 11, 2007, and December 24, 2007. Doc. #465-15 at 3. According to Kline, these transactions and the testimony of Jacklyn Cartmill, Barclays' representative, demonstrate that the positive balance in the escrow account was applied to attorneys' fees owed to the Reimer Firm. *Id.* After reviewing transactions labeled "Corporate Advance Activity" in the servicer's account particular to the Kline foreclosure, Ms. Cartmill testified that the servicer's records showed that it paid the Reimer Firm $510.00 in

attorneys' fees on December 10, 2007. Doc. #465-16 at 5. She also testified that the surplus funds from the escrow account "were applied to outstanding balances" in this account. *Id.* at 12.

In its Reply Brief, Wells Fargo denies that any of the foregoing evidence demonstrates that attorneys' fees were assessed to or collected from Kline, asserting as follows. First, the loan payoff quote for the Adjustable Rate Note and the First Mortgage did not mention or itemize attorneys' fees, so no such fees were assessed. Doc. #477 at 8. Second, according to Ms. Cartmill, accrued interest on the principal owed, as "specified in the loan payoff quote," was the specific source of the $412.96 surplus in the escrow account. *Id.* Wells Fargo states that it "readily acknowledges that Barclays later applied a portion of the accrued and collected interest to satisfy some of the numerous advances that Barclays had previously paid to various vendors," but that "Kline himself was never assessed those fees as part of the payoff quote, nor did he ever pay any of those fees." *Id.* at 9 n.3. Third, Wells Fargo characterizes the argument in Kline's Response as "mere supposition and conjecture," because Ms. Cartmill was actually "unable to tell whether *any* of the $482.00 reallocation was applied to the specific invoice from Reimer Lorber because the debits and credits to the recoverable advance balance are undertaken on a gross basis with no allocation by transaction." *Id.*

For the sake of this analysis, the Court makes the hypothetical assumption that the timing of the production of the escrow account records and Ms. Cartmill's

subsequent deposition statements might justify amending the breach of contract claim to allegations of breach based on Wells Fargo's collection of the Reimer Firm's attorneys' fees. Nevertheless, for the following reasons, there is no evidence from which a reasonable jury might conclude that such collection occurred. First, it is undisputed that the itemized payoff quote presented to Kline in connection with the Adjustable Rate Note never included any amount of attorneys' fees that Wells Fargo owed to the Reimer Firm. The payoff consisted of the following line items: unpaid principal balance of $155,515.98; accrued interest of $14,821.28; late charges of $178.90; reimbursement for $3,406.12 in advances to the escrow account; and estimated court costs of $2,410.00. Doc. #465-10. Without any mention of attorneys' fees, no reasonable jury would view the payoff quote as an attempt to collect them.

Second, Wells Fargo has presented undisputed evidence that the specific funds deposited into the escrow account on December 3, 2007, came from 1) the $3,406.12 that the payoff indicated were owed to the account, and 2) an additional $412.96 that was taken from the $14,821.28 in accrued interest itemized in the payoff. There is no evidence in the record to indicate that Kline was not charged the proper amount for the balance due to the escrow account or the accrued interest on the Adjustable Rate Note. Kline has not pointed to any evidence that would suggest that either amount was inaccurately computed or artificially inflated to conceal the inclusion of attorneys' fees. Nor has he demonstrated that these charges, accrued interest and reimbursement for property

taxes paid by the holder of the Adjustable Rate Note, do not qualify as remedies provided under its terms. The undisputed evidence shows that the actual amount collected from Kline was in accordance with the terms of the Adjustable Rate Note, which contemplated the payment of accrued interest and accrued "costs and expenses" to enforce its terms. Doc. #465-1 at 17.

Kline places a great deal of emphasis on the $412.96 surplus to the escrow account generated from the payoff proceeds, the two subsequent "adjustments" that brought the escrow account to a zero balance, and Ms. Cartmill's testimony that the surplus funds were applied to "outstanding balances" on the "Corporate Advance Account," which included $510.00 in attorneys' fees paid to the Reimer Firm. There is no question that the transactions to the escrow account, described in its ledger as "Fee Adjustments," are somewhat opaque in nature. However, these transactions occurred *after* the payoff. At that point in time, Kline's business with Defendants had ended, and Kline has not explained why HomEq, the servicer at that time, was not free to do what it wished with the proceeds generated from the payoff. Wells Fargo and Barclays readily concede that the $412.96 surplus to the escrow account was reversed and subsequently applied to "the outstanding corporate expense advances," and the undisputed evidence shows that the Reimer Firm was then paid $510.00 in attorneys' fees. However, no reasonable jury could conclude that these post-payoff transactions could constitute a breach of the terms of the Adjustable Rate Note when the transactions occurred *after* all parties' rights and duties under it had been extinguished. The transactions to the escrow

account demonstrate only that HomEq moved funds from one account to another after Kline had satisfied its obligation to the servicer. This does not demonstrate an intent to charge or an actual charge to Kline for the Reimer Firm's attorneys' fees. Due to the post-payoff timing of the transactions, they do not demonstrate the existence of a genuine dispute of material fact on the question of a breach of the Adjustable Rate Note.

### 3. *The Attorneys' Fees Collected under the Balloon Note and Second Mortgage in the 2007 Foreclosure*

The Amended Complaint alleges that the Lerner Firm collected $350.00 in attorneys' fees from Kline for its representation of MERS during the 2007 Foreclosure, which was one of the itemized charges in the payoff of the Balloon Note and Second Mortgage. Doc. #157 at 13-15. The collection of these fees by MERS, Barclays, and the Lerner Firm were alleged to be in violation of Ohio law, and, by extension, the terms of the Balloon Note, which prohibited fees charged to a debtor that violated applicable law. *Id.* at 15.

Wells Fargo argues that it cannot be held liable for the $350 in attorneys' fees collected from Kline for the payoff of the Balloon Note, because it was not one of the Defendants named in the allegations concerning the collection of those fees. Doc. #417-1 at 12. Even if it had been named in the allegations, Wells Fargo also argues the fees were paid to the Lerner Firm, which did not represent it in the foreclosure action, but represented "the investor's interests" in the Balloon Note and the second mortgage. *Id.*

In his Response, Kline argues that the collection of the fees was clearly illegal under Ohio law. Doc. #466 at 20. He further argues that Wells Fargo can be held liable for collecting the fees because it, and not MERS, was the actual holder of the Balloon Note and Second Mortgage, in addition to being the holder the Adjustable Rate Note and the First Mortgage. *Id.* at 21. Thus, Kline asserts, the fees collected from him were paid to the Lerner Firm for representation in a lawsuit in which Wells Fargo had sued "itself." *Id.*

In its Reply Brief, Wells Fargo concedes that the evidence demonstrates that Lerner Firm collected $350.00 in attorneys' fees from Kline when it represented the junior lienholder in the 2007 Foreclosure. Doc. #477 at 9. Nevertheless, it argues that Kline can "claim no [legally compensable] harm as a result of the collection," because a statement in an affidavit by Ms. Cartmill and a check attached thereto as an exhibit shows that Kline received a refund for the attorneys' fees on December 21, 2007. *Id.* at 9-10.

Wells Fargo does not address Kline's assertion that it sued itself in the 2007 Foreclosure case, but this point is unnecessary to address in order to resolve the question of its liability for the attorneys' fees that the Lerner Firm recovered from Kline under a breach of contract theory. Under Ohio law, "a plaintiff must present evidence on several elements to successfully prosecute a breach of contract claim. Those elements include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994). No party disputes the validity of the Balloon

68

Note or an act of performance thereunder. Furthermore, based on the undisputed fact that the Lerner Firm collected $350.00 in attorneys' fees from Kline and the impermissibility of such fees under Ohio law, a reasonable jury could conclude the provision of the Balloon Note that made Kline liable only for the Note Holder's "reasonable costs and expenses to the extent not prohibited by applicable law" was breached.

However, it is unnecessary to discuss whether Wells Fargo can be held liable for breach of contract under Kline's theory of imputed liability, based on its actual possession of the Balloon Note during the 2007 Foreclosure, because there is no evidence to support the element of damages. No reasonable jury could conclude that Kline suffered damage or loss because the undisputed evidence shows that he received a refund for the attorneys' fees within several weeks of its collection, as demonstrated by the affidavit of Ms. Cartmill and the check submitted as an exhibit thereto. "Under Ohio law, there can generally be no viable action for breach of a contract where the plaintiff cannot show that it has suffered damages flowing from the alleged breach." *W.D.I.A. Corp. v. McGraw-Hill, Inc.*, 34 F. Supp. 2d 612, 627 (S.D. Ohio 1998). Furthermore, "the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach." *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187 (Ohio1993). Because the undisputed evidence shows that Kline was compensated for the $350 in attorneys' fees that he alleges constituted a breach, he was made whole for the damages he alleges. Thus, the attorneys' fees paid to the Lerner Firm cannot form the basis for

his breach of contract claim against Wells Fargo or, as previously discussed, any other Defendant in this action.

### 4. *Service of Process Fees, Title Report Fees, and Purported "Outsourcing Fees"*

The Amended Complaint alleges "illegal" service of process fees were collected from Kline during the 2007 Foreclosure. Doc. #157 at 10-12. According to Kline, he was charged more than the actual process fees that were incurred, and costs were passed on to him after unnecessarily serving process on MERS and other parties to that action. *Id.*

Wells Fargo points to specific language in multiple provisions of the Adjustable Rate Note and the Balloon Note that authorized the collection of court costs, including title reports, incurred to enforce both notes. Doc. #417-1 at 10-11. According to Wells Fargo, the necessity of serving process on all parties to a foreclosure action, and the specific mention of title reports in the agreements, demonstrate that charging Kline for such costs did not breach the terms of either agreement. *Id.* Furthermore, Wells Fargo points out that because Kline failed to respond to Requests for Admissions asking him to admit to the reasonableness of such fees, the matter is deemed admitted under Rule 36(a)(3) of the Federal Rules of Civil Procedure.

In the legal arguments presented in his Memorandum in Opposition, Kline does not directly address the service of process fees as the basis for his breach of contract claim or Wells Fargo's arguments challenging them. In the version of the

70

facts of his case that he presents, he mentions the allegation in the Amended Complaint that he was charged such fees, and, in the preliminary description of the breach of contract claim, he describes one of its bases as "service of process fees collected from plaintiff relating to the service of process on the Second Mortgage holder by the first Mortgage holder in the 2007 Foreclosure Action." Doc. #466 at 5 & 12. However, the section of his legal argument addressing the 2007 Foreclosure does not mention the service of process fees or address Wells' Fargo's argument that he has admitted to their reasonableness. Accordingly, the Court concludes that he has abandoned the service of process fees as a basis of his breach of contract claim.

Kline argues that the fees paid to 3 Arch Trustee Services were "improper" and amounted to an "illegal outsourcing" to a third party. Doc. #466 at 22. His arguments regarding these fees are identical to those he stated when challenging them in his claim against the Lerner Firm under the FDCPA. *See supra* Part IV.A. The Court's analysis of those arguments applies to his breach of contract claim as well. To summarize that analysis, because the fees collected by 3 Arch Trustee Services were collected pursuant to Paragraph 7 of the Second Mortgage, which authorizes the lender to "disburse such sums ... and take such action as is necessary to protect Lender's interest," no reasonable jury could conclude that such actions or such sums breached the agreement, as the lender incurred them to monitor the amount of its equity in the note. Kline also argues, once again, that that the fees violated Fannie Mae Guidelines and the prohibition in the Ohio Rules

71

of Professional Conduct against fee sharing. However, as the Court previously stated, he points to no evidence that the guidelines are applicable to his loan agreements or evidence of fee-sharing in the record. *See supra* Part IV.A.

5. *Post-acceleration Late Fees*

The last part of Kline's breakdown of his breach of contract claim asserts that it is based on the post-acceleration late fees allegedly collected from him during the 2007 Foreclosure action, pursuant to the Adjustable Rate Note and the First Mortgage. Doc. #466. However, as Wells Fargo points out, he did not object to or timely answer following Request for Admission propounded upon him:

> Admission No. 6: You have no affirmative evidence to establish that the particular late charges which were assessed as part of the payoff of your first and second mortgages were accrued and applied after your mortgage loans were accelerated and demanded.

Doc. #417-1

Accordingly, under Fed. R. Civ. P. 36, Kline is deemed to have admitted that he was not charged for post-acceleration late fees. Kline has not addressed the deemed admission in his Memorandum in Opposition, which the Court interprets as a tacit acknowledgement of its legal effect. In addition, as the Court concluded in its discussion of Kline's FDCPA claim against the Reimer Firm, there is no evidence to support his claim that he was charged post-acceleration late fees. *See supra* Part III.B.3.

For the foregoing reasons, the Court concludes that Wells Fargo is entitled to summary judgment on Kline's breach of contract claim. Because he has

72

abandoned the only other claim against Wells Fargo, his claim under the TILA,

Wells Fargo is entitled to summary judgment on all of Kline's claims against it.

Accordingly, its Motion for Summary Judgment (Doc. #417) is sustained, and all of

Kline's claims against it are dismissed with prejudice.

## VI.    BARCLAY'S MOTION FOR SUMMARY JUDGMENT (DOC. #418)

Kline's only remaining claim against Barclays is for unjust enrichment.

Barclays presents a number of arguments in support of granting summary judgment

in its favor on this claim. First, it argues that the Amended Complaint fails to allege

that any benefit was conferred upon it, as required to state a claim of unjust

enrichment under Ohio law. Doc. #418-1 at 7. It notes that Kline was given leave

to amend his unjust enrichment claim against it after the Court previously found

the claim insufficiently pled, but that the following two statements were the extent

of the "rebolstered allegations" in the Amended Complaint:

> Upon information and belief, [Barclays] was the direct recipient of
> some of the fees and expenses passed on to Kline by the defendants
> in this action.

> Upon information and belief, [Barclays] was compensated for the
> services it provided in connection with the purported debts owed by
> Kline.

*Id.* (quoting Am. Compl. ¶¶ 159-160 (Doc. #157 at 29)).

Barclays argues that these allegations against it are vague and factually

inadequate, and therefore insufficient as a matter of law. *Id.* at 8-9.

73

Second, Barclays points to the following Request for Admission to which

Kline did not provide a timely response:

> ADMISSION NO. 15: You have no affirmative evidence to establish
> that any of the disputed fees and expenses itemized in your Amended
> Complaint remain in the possession of Barclays.

*Id.* at 9.

Because Kline did not respond or seek an extension of time to respond to its

Requests for Admission, Barclays argues that this admission bars the unjust

enrichment claim. *Id.* Restitution is the only remedy for unjust enrichment, and

Kline was been made whole by the restitution he received.

Third, Barclays cites to Kline's own deposition testimony, in which he could

not identify an expense or fee retained by Barclays. *Id.* Fourth, Barclays points to

evidence in the record that shows that a number of fees and expenses were

ultimately paid to other entities, such a process server in Florida, the Nova Title

Agency, and the Law Firm Defendants, and therefore there is no evidence to show

that it retained any of them. *Id.* at 10-11. Finally, incorporating the argument of

other Defendants, Barclays argues that Kline's unjust enrichment claim is barred by

the voluntary payment doctrine. *Id.* at 13.

In his Memorandum in Opposition, Kline states the following. First, in

response to Barclays' assertion that he cannot show that it retained any of the

fees, he makes the contradictory argument that, "under the PSA, Barclays had the

right to collect and retain late fees."[11] Doc. #467 at 13. Second, he cites to the deposition of Matthew Perry, Barclays' representative, and states that Mr. Perry admitted that Kline was charged a post-acceleration late fee. *Id.* Third, he claims that, according to established case law and Mr. Perry's own statements, post-acceleration late fees are improper. *Id.* at 13-14.

After reviewing Kline's arguments, the Court notes that he fails to address Barclays' argument that his Request for Admission is deemed to have been admitted. This is a tacit acknowledgement of the legal effect of having failed to respond, deny, or move for an extension of time to respond to the Request for Admission, which is that the matter therein is deemed admitted under Rule 36. Thus, as a matter of law, Kline has admitted that he has no evidence to show that Barclays retained any of the fees or expenses described in the Amended Complaint, as is required to prove a claim of unjust enrichment. *See, e.g. Johnson v. Microsoft Corp.,* 834 N.E.2d 791, 799 (Ohio 2005) (describing elements of an unjust enrichment claim, including "retention of the benefit by the defendant"). For this reason alone, his claim fails.

Even in the absence of this deemed admission, based on Kline's response, he appears to have winnowed the scope of his unjust enrichment claim against Barclays to include only the allegations that he was charged post-acceleration late

_____

[11] This argument contradicts the allegation that forms the basis for all Kline's claims: that Defendants did not have the right to collect the fees and expenses from him that form the basis for his claim.

fees. However, when analyzing his FDCPA claim against the Reimer Firm, the Court discussed and rejected his arguments that he was charged such fees. Moreover, by virtue of his deemed admission to the Request for Admission of the Reimer Firm, Kline admitted that he was never charged post-acceleration late fees. Doc. #414-17 at 14. Accordingly, the Court sustains Barclays' Motion for Summary Judgment (Doc. #418), and dismisses Kline's sole remaining claim against said Defendant with prejudice.

## VII.   MERS'S MOTION FOR SUMMARY JUDGMENT (DOC. #419)

Kline has two remaining claims against MERS: a violation of the OCSPA, as pled in the Third Claim for Relief in the Amended Complaint, and for breach of contract, as pled in the Fifth Claim for Relief of the Amended Complaint. Doc. #157 at 26-28, 30-32. The Court will first discuss the breach of contract claim, before turning to the OCSPA claim.

### A.   Kline's Breach of Contract Claim against MERS (Fifth Claim for Relief)

The breach of contract claim against MERS is based on the same allegations of improper fees and expenses that formed the basis for his claim against Wells Fargo, alleging that Wells Fargo was the actual holder of the Balloon Note and Second Mortgage during the 2007 Foreclosure. Am Compl. ¶¶ 62-76 (Doc. #157 at 13-16).

MERS' arguments for granting summary judgment in its favor on the breach of contract claim mirror those of Wells Fargo. It cites to the provisions of the

76

Balloon Note that authorized the holder to recoup its costs and expenses in enforcing the note in the event of a default, and argues that all the charges and fees Kline complains of were authorized by those terms. Doc. #419-1 at 8-10.

Kline's Memorandum in Opposition describes a breach of contract claim premised on exactly the same allegations that formed his claim against Wells Fargo, and his arguments are verbatim to those he directed against that claim. Doc. #469 at 11-22. Accordingly, there is no independent basis for analyzing his breach of contract claim against MERS, and, for the reasons stated when discussing the claim against Wells Fargo, MERS is also entitled to summary judgment on said claim.

### B. Kline's Claim under the OCSPA against MERS (Third Claim for Relief)

Kline's OCSPA claim alleges that he was injured by "materially misleading and/or deceptive acts and practices because [he] was required to pay fees, charges, and/or attorneys' fees which were in excess of those permitted by the loan documents or applicable statutes." Am. Compl. ¶ 143 (Doc. #157 at 26).

MERS argues that it is entitled to summary judgment on the OCSPA claim because it is "derivative" of the breach of contract claim. Doc. #419-1 at 11. Because the fees in question were not "improperly assessed or collected by MERS," it argues that "there can be no misleading or deceptive act" as a matter of law. *Id.*

In response, Kline asserts that MERS cites no case to support the derivative nature of an OCSPA claim, and cites to *Hudson-Wobbecke Ents., Inc. v. Burwell,* No, 06-CA-58, 2007-Ohio-1728, ¶ 38, 2007 WL 1096956 (Ohio Ct. App. 2007), for the proposition that "[a] violation of the [O]CSPA does not depend on any contractual or quasi-contractual claims; rather, it is a separate cause of action and legal claim." Doc. #469 at 23.

The Court is inclined to agree with Kline that MERS has not demonstrated that, as a matter of law, an OCSPA claim is derivative of a common law claim with which it is pled. The cases cited by MERS involve loss of consortium and punitive damages claims. Doc. #419-1 at 11-12 (citing *Roberts v. Luneau-Gordon*, No. 15212, 1995 WL 703898 (Ohio Ct. App. Nov. 29, 1995) and *Kill v. CSX Transp*. 923 N.E.2d 1199 (Ohio Ct. App. 2009)). The OCSPA presents a comprehensive statutory scheme for remedying injuries to consumers. *See, e.g.*, *Fletcher v. Don Foss of Cleveland, Inc.*, 628 N.E.2d 60, 63 (1993) (stating that the purpose of the OCSPA as "is to protect consumers and eradicate deceptive trade practices, which necessarily entails a liberal interpretation of the Act to effectuate [its] legislative intent"). If those remedies were somehow derivative of non-OCSPA claims, such as a common law claim of breach of contract, the Ohio legislature would presumably have made that requirement clear in the text of the statute. There is no basis for reading such a requirement into the OCSPA, based merely upon MERS's loose analogy to derivative claims for punitive damages and loss of consortium.

Nevertheless, Kline's only defense of his OCSPA claim is to equate it with his breach of contract claims, asserting that there is "substantial evidence demonstrating" that MERS breached the agreements. Doc. #469. However, he does not point to anything in the record to show what evidence he would use at trial to support his allegation that MERS committed "materially misleading and/or deceptive acts and practices," other than the evidence of breach that the Court has already considered and rejected. With no other indication of what constitutes the basis for his OCSPA claim, the Court concludes that MERS has discharged its burden under Rule 56 to demonstrate the absence of any admissible evidence to support that claim.

Accordingly, MERS' Motion for Summary Judgment (Doc. #419) is sustained in its entirety. Kline's OCSPA and breach of contract claims against MERS are, therefore, dismissed with prejudice.

## VIII.  CONCLUSION

For the reasons set forth above, the Court SUSTAINS all of Defendants' Motions for Summary Judgment. Doc. #414, #416, #417, #418, & #419. Defendants' Motions in Limine, which were filed in anticipation of trial, are OVERRULED as moot. Doc. #456, #457, #458, #459, & #460.

Kline's Motion for Reconsideration (Doc. #472), which moved the Court to reinstate the class allegations that it had stricken from the Amended Complaint, is also mooted by the Court's ruling, and is accordingly overruled.

Judgment will be entered in favor of Defendant and against Plaintiff on all claims in the Amended Complaint (Doc. #157).

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.


Date:  December 23, 2015        _____

WALTER H. RICE
UNITED STATES DISTRICT JUDGE